IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Cheryl A. Munday and Margaret Devine, on behalf of themselves and others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 9:20-cv-02144-DCN-MHC |
| v | ) ) ) | |
| Beaufort County, Philip Foot, Quandara Grant, John Does 1-5 and Jane Does 1-5, | ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

AND NOW COME Defendants Beaufort County ("County"), Philip Foot ("Foot"), Quandara Grant ("Grant"), John Does 1-5 and Jane Does 1-5[1] (all of the above are referred to herein as "Defendants"), by and through their undersigned counsel, and file the following Memorandum in Support of Motion for Summary Judgment:

## INTRODUCTION

Plaintiffs Cheryl A. Munday ("Munday") and Margaret Devine ("Devine"), on behalf of themselves and others similarly situated, allege that this lawsuit "concerns the manner in which inmates are searched at the Beaufort County Detention Center [("Detention Center")] . . . and . . . violations of the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution." (*See* Docket Entry # 12 ¶ 1). Plaintiffs further allege that "[a] specific concern is that female inmates at the Beaufort County Detention Center are subjected to degrading and unnecessary strip and body cavity searches under circumstances and conditions when male inmates are not." (*See* Docket Entry # 12 ¶ 3). As discussed below, the strip searches involved no physical contact between Detention Center staff and the Plaintiffs. For the reasons set forth herein, Plaintiffs cannot

---

[1]    While Plaintiffs reference "John Doe" and/or "Jane Doe" Defendants, they have never moved to amend their Complaint to join any of them as named defendants.

{01162984.DOCX.2 }

- 1 -

create a genuine issue of material fact in support of their claims against Defendants.

A.    **Undisputed Facts**

    1.    **The Detention Center's Strip Search Policies and Practices**

The Detention Center uses various terms to describe the status of inmates. For example, "[p]re-classification is when an inmate is arrested and they are placed in an area prior to going to bond hearing." (*See* Response in Opposition to Motion to Certify Class, Docket Entry # 34-1, at 20:12-14). Intake refers to booking, which occurs at the beginning of the pre-classification process. (*See id.,* at 20:19-23). Inmates are "classified" into areas of the Detention Center:

> Classification is once they go to a bond hearing and they receive a cash bond or cannot produce bond, then they are classified to a different area. . . .

Q:    And when -- what different areas might an inmate be classified to once he or she is classified?

A:    General population -Okay. -- or depending on that inmate's behavior, we have other classification units. . . . We have maximum security and we have super max.

(*See* Docket Entry # 34-3, at 21:3-18).

Prior to February 27, 2015, women in pre-classification holding were not strip searched unless reasonable suspicion existed, as set forth in the Detention Center Policy No. 5.14 Searches/Contraband And Preservation/Disposition of Evidence, at subsection (3) Arrestee Strip Searches at Intake. (*See* Response in Opposition to Motion to Certify Class, Docket Entry # 40-1 ¶ 5). Moreover, at that time, male and female inmates were *not* strip searched upon going into the Detention Center's general population, in the absence of a specific reason. (*See* Ex. A (Grant Depo.), at 52:7-53:9). This resulted in the problematic passing of contraband pre-classification inmates to general population. (*See id*).

As a result of this and certain legal developments,[2] on February 27, 2015, the Detention

---

[2]    In 2012, the United States Supreme Court decided *Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 333-34 (2012), which held that a policy of strip searching all inmates going into general population did not violate the Fourth Amendment.

{01162984.DOCX.2 }

Center adopted a policy set forth in a memo of Deputy Director C.E. Allen that *all* inmates being moved from pre-classification to other areas of the Detention Center (including general population) will be strip searched:

Sub:    **Strip Search of all Inmates leaving Pre-Class**

1. Effective this date all inmates being moved from Pre-Class to other areas of the facility will be strip searched as a matter of policy.

2. The Pre-Class officer assisted by other members of the shift will strip search all inmates that are being moved by Classifications to other areas of the facility, as part of the process of changing uniforms.

3. Inmates being assigned to Maximum Security or Super Max Security will be strip searched in the B-Wing as part of them changing uniforms.

4. Officers will ensure that all the linen, and personal property are also searched as part of this process.

5. Questions or clarification contact me ASAP.

(*See* Docket Entry # 40-1 ¶ 6).  Under this policy, all pre-classification females would be subjected to a strip search, because the holding area for pre-classification females was — and still is — located in the Bravo Unit, a general population area designated for females.  (*See* Docket Entry # 40-1 ¶ 6).  Because the female pre-classification area was located in female general population, contraband could be conveyed to general population by being passed through openings or being left behind in the cell after the inmate leaves.  (*See id.* & Ex. A (Grant Depo.), at 32:4-23).

On the other hand, pre-classified male inmates are housed in a 16-bed open bay area where multiple inmates are located.  (*See* Docket Entry # 34-2, at 29:3-19).  This male pre-classification area was in an entirely separate building from general population.  (*See* Ex. A (Grant Depo.), at 35:5-36:24).  As a result, under the February 27, 2015 memorandum, male inmates would only be strip searched based on reasonable suspicion.  Although strip searches were not mandatory for pre-classification male inmates at that time, many male inmates were, in fact, strip searched:

Specifically, these searches were made based [upon] reasonable suspicion premised on their current charge, present or past behaviors as set forth in the policy, or based on the request of the arresting officer for reasonable suspicion.  For instance, as a matter of application of the above policy, all men coming into the Beaufort County Detention Center with felony drug charges or a history of having contraband violations with previous detentions would have been strip searched upon being booked into the facility.

{01162984.DOCX.2 }

(*See* Docket Entry # 40-1 ¶ 9). Moreover, during the 2015-2020 time period, *all* male inmates who left the male pre-classification area and went into general population were strip searched. (*See* Docket Entry # 40-1 ¶ 10).

Beginning on May 5, 2020, as a result of COVID-19 protocols, the area that the Detention Center had previously used for male pre-classification holding — in a separate building from general population — was required as a quarantine space. (*See* Docket Entry # 40-1 ¶ 7). Because of this, the Detention Center's male pre-classification holding area was moved into general population, which had the effect of requiring *all* pre-classification males to be strip searched. (*See id.*). From February 27, 2015 until May 5, 2020, male inmates were subject to strip search only upon reasonable suspicion, as set forth in the Detention Center Policy No. 5.14 Searches/Contraband And Preservation/Disposition of Evidence, at subsection (3) Arrestee Strip-Searches at Intake. (*See* Docket Entry # 40-1 ¶ 8).

2.    **The Facts of the Named Plaintiffs' Cases**

a.    **Plaintiff Munday**

Unlike Plaintiff Devine (and other putative class members), Plaintiff Munday's claims involve her strip search, as well as alleged misconduct during a *clothed* booking pat down search.[3]

Plaintiff Munday alleges that she was arrested on March 9, 2018 and charged with driving under the influence. (*See* Docket Entry # 12 ¶ 15). She was taken to the Detention Center to begin the booking process. (*See id.*). At the onset of the booking process, a Detention Center officer allegedly reviewed Munday's personal information and commented, "you look great." (*See* Docket Entry # 12 ¶ 15). Plaintiff Munday asserts that the officer made the comment just before informing her that she was subjected to a full body "pat down." (*See id.*).

The officer then allegedly initiated a full body pat down, while Munday was clothed. (*See*

---

[3]    It is worthwhile to note that Plaintiff Munday's physical description of the "Jane Doe" who booked her does not match anyone who worked that evening or her listed booking officers. Additionally, her description of the room where she claims the strip search occurred is not the room where such searches actually occur.

{01162984.DOCX.2 }

Docket Entry # 12 ¶ 17). Plaintiff Munday alleges that the officer placed her hands on her ankles and worked her way up the legs; she claims that the officer grabbed her crotch and ran a finger along her vaginal area. (*See id.*). Plaintiff Munday alleges that the officer inserted a finger into her vagina until clothing prevented it from going further inside. (*See id.*). Munday claims that the pat down continued to her upper body where the officer attempted to insert her hands under her bra. (*See id.*). Plaintiff Munday claims that the officer's intentional contact with her genitalia "served no penological purpose and was undertaken with the intent to gratify the officer's sexual desire and/or to humiliate Munday." (*See* Docket Entry # 12 ¶ 18).

Following the pat-down, Munday was allegedly taken to a small area known as the "strip-search room" and required to remove her clothing. (*See id.*). While nude, she was allegedly required several times to bend over, spread her buttocks and cough. (*See id.*). She claims that the officer conducting the strip search became angry and started shouting. (*See id.*). She claims that the door remained open during the strip search so that passersby could see her naked body. (*See id.*).

Munday alleges that she was led back to the lobby, where she witnessed a male arrestee being booked. (*See* Docket Entry # 12 ¶ 19). She claims that the male arrestee was only patted from the knees down only and that the man's groin or buttocks were not searched. (*See id.*). The male inmate was not strip-searched. (*See id.*). He was allegedly handed jail clothing and directed to change in an adjacent room. (*See id.*).

### b.    Plaintiff Devine

Plaintiff Devine was arrested on January 17, 2019 and accused of driving under the influence. (*See* Docket Entry # 12 ¶ 20). She was transported to the Detention Center for booking. (*See id.*). Devine alleges that her personal belongings were confiscated and a Detention Center officer initiated a clothed, full body pat down. (*See* Docket Entry # 12 ¶ 21).

Plaintiff Devine alleges that she was led to a shower stall and required to remove her clothes. (*See* Docket Entry # 12 ¶ 22). She claims that the shower stall was open so that passersby

{01162984.DOCX.2 }

were able to see in.  (*See id.*).  After Devine removed her clothes, two guards allegedly instructed her to turn around, face a wall, bend over from the waist so that her backside and genitalia were exposed and cough.  (*See id.*).  Plaintiff Devine claims that, despite her compliance, the officers ordered her to "cough harder and louder." (*See* Docket Entry # 12 ¶ 23).  The guards then allegedly ordered her to take a shower while they watched.  (*See id.*).  She claims that the guards required her to shower again, making sure to wet her hair completely.  (*See* Docket Entry # 12 ¶ 24).

**B.**    **Procedural Background**

**1.**    **Class Allegations**

Plaintiffs Munday and Devine ("Named Plaintiffs") assert claims not only in their own right, but also as representatives of a putative plaintiff class.  Specifically, Named Plaintiffs seek to represent a putative class comprising women who have been admitted to the Detention Center while awaiting bail or for an initial court appearance, women who have been arrested on default warrants and held in the Detention Center, and women who have been held in protective custody in the Detention Center.  (*See* Docket Entry # 12 ¶ 4).  On December 1, 2021, Plaintiffs moved for certification of the following class:

> All female pre-classification detainees in the custody of BCDC [Beaufort County Detention Center] who, upon their admission or return to BCDC from outside of BCDC, were strip/visual body cavity searched, while pre-classification males were not, from February 27, 2015, until the class period closes.

(*See* Docket Entry # 31, at 1).  Plaintiffs asserted that — although they assert different constitutional theories (Fourth Amendment and Equal Protection), the class would be the same for both and would encompass all claims.[4]  (*See id.*).  The parties have fully briefed Plaintiffs' motion for class certification, which awaits the Court's disposition.

---

[4]    Alternatively, Plaintiffs asked the Court to "certify a liability issue class pursuant to Fed. R. Civ. P. 23(c)(4), defined the same as the Rule 23(b)(3) class, applicable to the claim that the Defendants' uniform strip/vbc search practices violate Section 1983, and/or as to such claims and issues as the Court may deem appropriate."  (*See id.*).

{01162984.DOCX.2 }

2.    **Plaintiffs' Causes of Action**

Plaintiffs filed this lawsuit on March 6, 2020 in the Court of Common Pleas of Beaufort County, South Carolina against the County, Foot, Grant, and a number of "Doe" Defendants. On June 5, 2020, Defendants removed this action under this Court's federal question jurisdiction. In their Amended Complaint, Plaintiffs allege the following causes of action:

- *__Count 1__*: 42 U.S.C. § 1983 for violations of the Fourth Amendment (Against all Defendants);

- *__Count 2__*: 42 U.S.C. § 1983 for violations of the Equal Protection clause (Against all Defendants);

- *__Count 3__*: Article I, Section 10 of the South Carolina Constitution regarding privacy (Fourth Amendment analogue) (Against all Defendants);

- *__Count 4__*: Article I, Section 3 of the South Carolina Constitution regarding equal protection (Against all Defendants);

- *__Count 5__*: Negligent Deprivation of Statutory Rights under South Carolina Tort Claims Act (Against Defendant County);

- *__Count 6__*: Reckless Infliction of Emotional Distress (Against Defendant County);

- *__Count 7__*: Assault (Against all Defendants);

- *__Count 8__*: Battery (Against BCSD Officer Defendants and the County);

- *__Count 9__*: Negligence (Against all Defendants); and

- *__Count 10__*: Attorneys' Fees Under 42 U.S.C. § 1988(b)

For the following reasons, the Court should grant Defendants summary judgment as to all claims asserted against them and should dismiss Plaintiffs' Amended Complaint with prejudice.

## ARGUMENTS

"[T]he nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). That proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen.*

{01162984.DOCX.2 }

*Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

A.    **The Court Should Grant Summary Judgment as to the "Doe Defendants."**

As set forth above, Plaintiffs filed this lawsuit against not only the County, Foot, and Grant, but also a number of unidentified "Doe" defendants:

> 10.    Defendants John Does 1-5 (collectively, "BCDC Supervisory Defendants") were and are now responsible for the training, supervision, control, assignment, and discipline of both sworn and civilian personnel of the County who work in, operate, administer, and manage BCDC, and for the formulation, promulgation, adoption, application, administration, and enforcement of the policies, rules, regulations, and practices of BCDC. At this time, Plaintiffs do not know the identities and capacities of the BCDC Supervisory Defendants and therefore sue these Defendants by fictitious names. Plaintiffs will seek to amend this Complaint to include one of more of the BCDC Supervisory Defendants' true names and capacities when ascertained.

> 11.    Defendants Jane Does 1-5 (collectively, "BCDC Officer Defendants") were at all times relevant herein employees of the County who worked as correctional officers at BCDC. At this time, Plaintiffs do not know the identities of the BCDC Officer Defendants and therefore sue these Defendants by fictitious names. Plaintiffs will seek to amend this Complaint to include one of more of the BCDC Officer Defendants' true names when ascertained.

(*See* Docket Entry # 12 ¶¶ 10-11).

Plaintiff Munday alleges that her strip search occurred on or about March 9, 2018, while Plaintiff Devine's alleged strip search took place on January 17, 2019. (*See* Docket Entry # 12 ¶¶ 15 & 20). Plaintiffs commenced this action in the Court of Common Pleas of Beaufort County, South Carolina on March 6, 2020. (*See* Docket Entry # 1-1). They filed their Amended Complaint on August 5, 2020. (*See* Docket Entry # 12). Plaintiffs had a full and complete opportunity to conduct depositions and engage in other discovery. On November 2, 2020, Defendants served discovery responses upon Plaintiffs that identified the officers involved in the searches of Plaintiffs. (*See* Ex. B). Under the Third Amended Scheduling Order, discovery closed on February 27, 2022. (*See* Docket Entry # 26). Although this case has been pending for two years,

{01162984.DOCX.2 }

- 8 -

discovery has closed, and the time to amend the pleadings expired long ago, Plaintiffs never moved to amend their complaint to name (and properly serve) any particular BCDC Supervisory or Officer Defendants.

"[A]lthough designation of a 'John Doe' defendant is not favored in the federal courts, it is permissible when the identity of the alleged defendant is not known at the time the complaint is filed and plaintiff could identify the defendant through discovery." *Treece v. South Carolina Dep't of Mental Health*, 2010 U.S. Dist. LEXIS 27989, at *4 (D.S.C. Mar. 24, 2010) (Ex. C) (*citing Schiff v. Kennedy*, 691 F.2d 196, 197-98 (4th Cir. 1982)). Such actions are only permissible against "real, but unidentified, defendants." *See Schiff*, 691 F.2d at 197. "However, once filed, it is incumbent upon a plaintiff to amend his pleadings to correctly identify the specific individuals involved so that the matter may proceed to judgment." *See Anderson v. Davies*, 2012 U.S. Dist. LEXIS 42562, at *16 (D.S.C. Mar. 28, 2012) (Ex. D). Plaintiffs have not moved to formally name and join any of the "Doe Defendants." As a result, the Court should enter summary judgment as to them, leaving only the County, Foot and Grant as Defendants.

If the court does not grant summary judgment as to the "Doe Defendants," it should, in the alternative, dismiss any claims against the Doe Defendants without prejudice. Under Federal Rule of Civil Procedure 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time." The "Doe Defendants" have never been named in this action or served with process. Under such circumstances, the Court should — at the very least — dismiss any claims against "Doe Defendants" without prejudice. *See Williams v. Perdue Farms, Inc.*, 2020 U.S. Dist. LEXIS 19003, at *12 n.10 (D.S.C. Feb. 5, 2020) (Ex. E) ("The Court dismisses John Doe Contractor, LLC without prejudice because discovery ended in December and Plaintiff never sought leave to amend her complaint to substitute a named defendant in place of this John Doe defendant.").

For the foregoing reasons, the Court should grant summary judgment against Plaintiffs and

dismiss any claims they assert against the "Doe Defendants" with prejudice. In the alternative, the Court should dismiss Plaintiffs' claims against the Doe Defendants without prejudice.

**B.**    **The Court Should Grant All Defendants Summary Judgment as to Plaintiffs' Section 1983[5] Claims Under the Fourth Amendment (Count 1).**

Plaintiffs assert Count 1 pursuant to 42 U.S.C. § 1983 and allege that the Detention Center's strip search policies and practices "violated [their] clearly established rights to be secure in their persons against unreasonable searches and seizures as guaranteed by the Fourth [Amendment]." (*See* Docket Entry # 12 ¶ 48). For the reasons that follow, under clear Supreme Court precedent, the strip searching of female pre-classification inmates — who would be among the Detention Center's general population — did not violate the Fourth Amendment.

"A body cavity search does not violate an inmate's Fourth Amendment rights if the search is reasonable and not motivated by punitive intent." *Frazier v. Kimbrell*, 2021 U.S. Dist. LEXIS 86712, at *5 (D.S.C. Apr. 12, 2021) (Ex. F). The Fourth Circuit has set forth standards to govern the analysis of strip searches of inmates:

> [I]n *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), the Supreme Court "developed a flexible test to determine the reasonableness of a broad range of sexually invasive searches . . . ." *United States v. Edwards*, 666 F.3d 877, 883 (4th Cir. 2011) (citation and internal quotation marks omitted). Under Wolfish, a court is to consider the following factors to determine the reasonableness of the search: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559.

*See King v. Rubenstein*, 825 F.3d 206, 214-15 (4th Cir. 2016); *accord Wolfish*, 441 U.S. at 558 ("[Although p]retrial detainees [] retain some Fourth Amendment rights upon commitment to a corrections facility, we nonetheless conclude that these [strip] searches do not violate that Amendment. The Fourth Amendment prohibits only unreasonable searches, and under the circumstances, we do not believe that these searches are unreasonable.") (internal citations

---

[5]    Count 10 of Plaintiffs' Amended Complaint seeks attorneys' fees under 42 U.S.C. § 1988. However, because (as set forth in this Memorandum) Plaintiffs' Section 1983 claims must fail, they are not entitled to attorneys' fees under Section 1988, as they will not be "prevailing" parties. Defendants reserve the right to request attorneys' fees under Section 1988 if appropriate.

{01162984.DOCX.2 }

omitted).

In 2012, the United States Supreme Court held that the Fourth Amendment does *not* prohibit a policy requiring the strip searching of all detainees who will be in a jail's general population:

> The admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself. . . . Detecting contraband concealed by new detainees, furthermore, is a most serious responsibility. Weapons, drugs, and alcohol all disrupt the safe operation of a jail. . . . Something as simple as an overlooked pen can pose a significant danger. Inmates commit more than 10,000 assaults on correctional staff every year and many more among themselves. . . . There is a substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk when he is admitted to the general population. . . .

*See Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 333-34 (2012); *accord id.*, 566 U.S. at 340 ("The Court holds that jail administrators may require all arrestees who are committed to the general population of a jail to undergo visual strip searches not involving physical contact by corrections officers.") (Alito, J., concurring).

The Detention Center's strip search policy — which required visual strip searches of all inmates who would be in contact with general population — is consistent with the Fourth Amendment and the Supreme Court's *Florence* opinion.

**C.     The Court Should Grant All Defendants Summary Judgment as to Plaintiffs' Section 1983 Claims Under the Equal Protection Clause (Count 2).**

**1.     Plaintiffs Can Present No Evidence of Discriminatory Intent.**

Count 2 of Plaintiffs' Amended Complaint asserts a Section 1983 claim based on an alleged violation of Plaintiffs' equal protection rights.   "To succeed on an equal protection claim, [Plaintiffs] must first demonstrate that [they have] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Veney v. Wyche*, 293 F.3d 726, 730-31 (4th Cir. 2002) (*quoting Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)); *accord United States v. Charleston*

{01162984.DOCX.2 }

*Cty.*, 316 F. Supp. 2d 268, 305 (D.S.C. 2003) ("In order to establish a violation of the Equal Protection Clause of the 14th Amendment, the burden is upon the private Plaintiffs to show discriminatory purpose and effect.").

"'Discriminatory' purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects." *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (*quoting Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)); *accord City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) ("We have made clear that '[p]roof of racially discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause.") (citations omitted).  "If disparate treatment alone were sufficient to warrant a constitutional remedy, then every blunder by a local authority, in which the authority erroneously or mistakenly treats an individual differently than it treats another who is similarly situated, would rise to the level of a federal constitutional claim." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 825 (4th Cir. 1995).

Plaintiffs can proffer no evidence that Defendants acted with discriminatory intent against female inmates.  The strip search policy is, itself, facially gender-neutral.  The policy does not single out women for separate treatment.[6]  Instead, it requires searches of all prisoners who move into contact with general population.  Plaintiffs present no evidence that the Detention Center created the strip search to search Plaintiffs specifically *because of their sex* (rather than because they were in general population).  Plaintiffs proffer no evidence of any sexual animus or ill-will toward women.  Any inmate, male or female, who will be coming into contact with general

---

[6]    That is not to say that a Detention Center policy that treats women differently would necessarily be improper.  In fact, South Carolina law recognizes that female and male inmates must be separated and treated differently: "[i]n all prisons and local detention facilities in the State, a separation of the sexes must be observed at all times."  *See* S.C. Code § 24-13-10.  Additionally, "[c]orrectional facilities, local detention facilities, and prison or work camps must limit, when practical, bodily inspections of a female inmate by male officers when the female inmate is naked or only partially clothed."  *See* S.C. Code § 24-13-35(M).  South Carolina law often *requires* facially different treatment of male and female inmates.

{01162984.DOCX.2 }

- 12 -

population must be strip searched, for everyone's safety. The strip search of female inmates is a byproduct of the logistical fact that women pre-classification prisoners must be placed in general population, whereas there exists a separate pre-classification holding area for male prisoners. There is no evidence, or even reason to speculate, that Defendants put this arrangement in place for the purpose of subjecting women to discriminatory strip searches.

Plaintiffs' argument that the policy has had a disparate impact on women because the female pre-classification holding area happens to be in general population does not constitute evidence of a constitutional violation. As set forth above, evidence of disparate impact (if it exists), without more, does not show discriminatory intent. Plaintiffs' *only* evidence offered in support of discriminatory intent the policy's impacts on women as compared to men.

Therefore, because Plaintiffs cannot create a genuine issue of material fact as to discriminatory intent, the Court should grant Defendants' Motion for Summary Judgment.

### 2.    <u>Even if Plaintiffs Can Present Evidence of Discriminatory Intent, the Strip Search Policy Withstands Constitutional Scrutiny.</u>

Even if Plaintiffs could show discriminatory purpose or intent, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *See id.* The Fourth Circuit and the United States Supreme Court have applied intermediate scrutiny to classifications based on sex:

> Sex is somewhere in the middle, constituting a quasi-suspect class. Sex is only quasi-suspect because, although it frequently bears no relation to the ability to perform or contribute to society, the Supreme Court has recognized inherent differences between the biological sexes that might provide appropriate justification for distinctions.

> Because sex-based classifications are quasi-suspect, they are subject to a form of heightened scrutiny. Specifically, they are subject to intermediate scrutiny, meaning that they fail unless they are substantially related to a sufficiently important governmental interest. To survive intermediate scrutiny, the state must provide an exceedingly persuasive justification for its classification.

*See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607-08 (4th Cir. 2020) (citations and internal quotation marks omitted). As discussed above, the Supreme Court has recognized that strip

{01162984.DOCX.2 }

- 13 -

searches of inmates who contact general population is reasonable under the Fourth Amendment. As the Court recognized in *Florence*, general population dramatically magnifies the dangers posed by weapons and other contraband.  A minor offender could provide a weapon or contraband to a violent criminal in general population, creating great risks for personnel and inmates..

As Defendant Grant testified, the logistics of the Detention Center creates a risk that a female pre-classification inmate could pass contraband to an inmate in the general population; that risk also mandates that male inmates be strip searched before contacting general population:

Q·   So in a hypothetical circumstance, a female inmate goes into pre-class, she's concealed or attempted to conceal contraband on her person or in her person.

A·   Right.

Q:   If she's not properly searched, she could then pass that contraband to a member of the general population from the pre-class unit?

A· ·   Correct.· Yes, sir.

Q·   Okay.· Now, is that different when you place a male into pre-class?

A    Well, a male in pre-class, if something is missed, he is in the pre-class area.· He would go to court to have a bond hearing.· If, in fact, he is staying with us, then we would do a strip search on him and he is escorted up the hall to a general population area.

Q·   Okay.· At which point, he would be strip searched, right?

A·   He would be strip searched prior to, correct.

Q    Okay.· But while he's still in the pre-class unit, and in a hypothetical situation has not been strip searched, if he has, in fact, concealed contraband, he could pass that contraband to other members of the pre-class unit but not to general population; is that --

A·   Yes, sir.

Q    Why is that not a risk that the detention center wants to address with respect to passing contraband to other members of the pre-class unit?

A    Well, if they do pass contraband to a member of the pre-class unit, they get strip searched prior to entering the general population area anyway, so we

{01162984.DOCX.2 }

- 14 -

would again have an opportunity to catch the contraband.

(*See* Ex. A (Grant Depo.), at 32:15-34:1).  The policy at issue is neutrally designed to minimize a very specific risk of harm: contraband entering the Detention Center's general population.  The facially gender-neutral classification at issue — between those who are and are not in a position to give contraband to general population inmates — is substantially related to an important government interest in maintaining the safety of general population, for both the inmates and staff.

In their class certification briefing, Plaintiffs cited *Mary Beth G. v. Chicago*, 723 F.2d 1263 (7th Cir. 1983), for the proposition that "strip searching women but not men violates Equal Protection Clause."  (*See* Docket Entry # 31-1, at 3).  However, *Mary Beth G.*, a case decided nearly forty years ago, is factually inapposite.  In that case, the defendant city stated that its "decision to search men and women differently was not arbitrary but based on the documented ability of women arrestees to secrete weapons and contraband in the vaginal cavity."  *Mary Beth G.*, 723 F.2d at 1274.  This ignored evidence that men can (and do) also secrete weapons and contraband in body cavities; moreover, the city did not present evidence that the vaginal smuggling of contraband was such a widespread problem that it warranted subjecting only women to mandatory strip searches.  The reason for the Detention Center's policy was the location of the female pre-classification holding area in general population.  Plaintiffs present no evidence that the Detention Center based this policy on the characteristics of gender or for the purpose of discriminatorily strip searching women.  The Supreme Court has held that detention centers have a strong interest in strip searching anyone going to general population.

For the foregoing reasons, the Court should grant all Defendants summary judgment as to Plaintiffs' equal protection claim.

**D.    The Court Should Grant Defendants Foot and Grant Summary Judgment as to Plaintiffs' Section 1983 Claims (Counts 1 and 2).**

**1.    The Court Should Grant the Individual Defendants Summary Judgment as to Plaintiffs' Section 1983 Claims (Counts 1 and 2) Because Plaintiffs Proffer No Evidence That They Participated in a Constitutional Violation.**

Plaintiffs' Section 1983 claims against Foot and Grant fail because Plaintiffs can present no evidence that Foot and Grant directly deprived Plaintiffs of constitutional rights.  "Because vicarious liability is inapplicable to . . . §1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  "[L]iability is personal, based upon *each defendant's own* constitutional violations."  *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (emphasis added).  "Personal participation of a defendant is a necessary element of a § 1983 claim against a government official."  *See Herrera v. Finan*, 176 F. Supp. 3d 549, 568–69 (D.S.C. 2016), *aff'd*, 709 F. App'x 741 (4th Cir. 2017); *accord Foley v. Graham*, 2020 U.S. Dist. LEXIS 23925, at *7-8 (D. Nev. Feb. 11, 2020) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation.") (quotation marks and citation omitted) (Ex. G); *Wiltz v. Shah*, 2016 U.S. Dist. LEXIS 103420, at *9 (S.D. Ill. Aug. 4, 2016) ("[A]s to Defendants Baldwin, Lashbrook, Funk, Godinez, and Shicker, the official liability claims will only be allowed to the extent it is alleged that each one personally participated in or caused the deprivation at hand.") (Ex. H).  Plaintiffs can present no evidence that Defendants Foot and Grant participated in any way in conducting strip searches on them. Therefore, the Court should grant them summary judgment as to the Section 1983 claims against them.

**2.    The Doctrine of Qualified Immunity Bars Plaintiffs' Section 1983 Claims (Counts 1 and 2) Against the Individual Defendants.**

Moreover, Plaintiffs' Section 1983 claims fail because Defendants Foot and Grant are entitled to qualified immunity.  The United States Supreme Court set forth the standard for qualified immunity in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), where it held that "government

{01162984.DOCX.2 }

officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*, 457 U.S. at 818. "If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages." *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011). In addressing qualified immunity, the Supreme Court has recommended that the lower courts follow a two-step sequence to aid in the elaboration of constitutional rights: (1) determine whether a right exists and (2) determine if the right was clearly established. *See id.* at 2031-32; *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). However, courts "may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand." *Id.* at 235.

The Supreme Court has said that qualified immunity seeks to ensure that defendants "reasonably can anticipate when their conduct may give rise to liability," *Davis v. Scherer*, 468 U.S. 183, 195 (1984), by attaching liability only if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Fourth Circuit has expounded upon the Supreme Court's test:

> Qualified immunity shields a government official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly established] right applies to the actions of the official must be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

*Wiley v. Doory*, 14 F.3d 993 (4th Cir. 1994) (internal citations omitted). "If the right was not clearly established in the specific context of the case – that is, if it was not clear to a reasonable [official] that the conduct in which he allegedly engaged was unlawful in the situation he confronted – then

{01162984.DOCX.2 }

the law affords immunity from suit." *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004). The court must determine "whether a reasonable [official] could have believed the [challenged conduct] to be lawful, in light of clearly established law" at the time of the abuse. *Anderson v. Creighton*, 483 U.S. at 641.

A constitutional law "is clearly established for qualified immunity purposes when 'pre-existing law' makes the 'unlawfulness' of the act 'apparent.'" *Meeker v. Edmundson*, 415 F.3d 317, 323 (4th Cir. 2005) (*quoting Anderson*, 483 U.S. at 640). "[A] court in this district generally must look *only* to the case law from the United States Supreme Court, the Court of Appeals for the Fourth Circuit, and the South Carolina Supreme Court." *Ferrera v. Hunt*, 2012 U.S. Dist. LEXIS 45444 (D.S.C. March 19, 2012) (emphasis added) (Ex. I), *report and recommendation adopted in part*, 2012 U.S. Dist. Lexis (March 28, 2012).

When determining whether a right is clearly established at the time of an alleged violation, the court must first define the right, doing so "in light of the specific context of the case, not as a broad general proposition." *McKinney v. Richland Cnty. Sheriff's Dep't*, 431 F.3d 415, 417 (4th Cir. 2005). "To determine whether a federal right was clearly established at the time of the defendants' alleged conduct, [the court] focus[es] not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Jackson v. Long*, 102 F.3d 722, 728 (4th Cir. 1996). In *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011), the Supreme Court warned against defining the claimed constitutional right too generally:

> A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." [Citation omitted.] We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. [Citation omitted.] The constitutional question in this case falls far short of that threshold. . . . The Court of Appeals also found clearly established law lurking in the broad "history and purposes of the Fourth Amendment." 580 F.3d, at 971. We have repeatedly told courts—and the Ninth Circuit in particular [citation omitted], not to define clearly established law at a high level of generality. [Citations omitted.] The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the

{01162984.DOCX.2 }

- 18 -

violative nature of particular conduct is clearly established.

Subsequently, the Supreme Court has further discussed how narrowly the constitutional right should be defined:

> Howards contends that our cases have 'settled' the rule that, "'as a general matter[,] the First Amendment prohibits government officials from subjecting an individual to retaliatory actions'" for his speech.  [Citation omitted.]  But we have previously explained that the right allegedly violated must be established, "'not as a broad general proposition,'" *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) *(per curiam),* but in a "particularized" sense so that the 'contours' of the right are clear to a reasonable official, *Anderson, supra,* at 640, 107 S. Ct. 3034.  Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause.   This Court has never held that there is such a right.

*Reichle v. Howards,* 132 S. Ct. 2088 (2012).

Defendants Foot and Grant are entitled to qualified immunity under these standards.  Most importantly, Plaintiffs can cite no Supreme Court (United States or South Carolina) or Fourth Circuit authority clearly establishing (prior to the alleged conduct) that a gender-neutral policy such as this is plainly unconstitutional if it disparately impacts female inmates because of the logistics of the particular facility.  To the contrary, prior to the February, 2015 strip search policy, the United States Supreme Court expressly ruled that the visual strip searches before entering general population were constitutional.  As Defendant Grant testified, "[o]nce the case law came out saying that we could do the strip search prior to them entering general population, then we changed."  (*See* Ex. A (Grant Depo.), at 41:17-20).  If anything, Defendants Foot and Grant had ample reason to believe that the Detention Center's policy and practice were consistent with Supreme Court precedent.

Thus, because *binding law* prior to the alleged violations did not clearly establish the rights at issue, Defendants Foot and Grant are entitled to qualified immunity.

**E.**    **The Court Should Grant All Defendants Summary Judgment as to Plaintiffs' Claims for Violations of the South Carolina Constitution (Counts 3 and 4).**

Plaintiffs also allege that Defendants violated their rights under Article I, § 10 (Count 3 —

privacy) and Article I, § 3 (Count 4 — equal protection) of the South Carolina Constitution. In those causes of action, Plaintiffs request only money damages. (*See* Docket Entry # 12 ¶¶ 59 & 62). For the following reasons, there is no legal basis for such claims under the South Carolina Constitution.

The South Carolina Court of Appeals has held that a party may not assert a money damage claim under the South Carolina Constitution because no statute creates such a cause of action:

> Both parties recognize South Carolina has not previously addressed this issue. Our review of cases throughout various jurisdictions shows that states are divided on whether a civil remedy can exist for the violation of a constitutional provision without enabling legislation. We will not create an implied cause of action for wrongful conviction in South Carolina because it is not for this court to create such an action when the legislature has specifically declined to do so. Considering the South Carolina Constitution does not provide for monetary damages for civil rights violations and the legislature has not enacted an enabling statute, we affirm the circuit court on this issue.

*See Palmer v. State*, 427 S.C. 36, 46, 829 S.E.2d 255, 261 (Ct. App. 2019); *accord Washington v. United States Dep't of Homeland Sec.*, 2021 U.S. Dist. LEXIS 39857, at *8 (D.S.C. Mar. 3, 2021) (citation and quotation marks omitted) (Ex. J), *report and recommendation adopted,* 2021 U.S. Dist. LEXIS 68453, at *4 (D.S.C. Apr. 8, 2021) ("Defendants' motion to dismiss Washington's federal claims brought pursuant to 42 U.S.C. § 1983 for money damages, claims for violations of the South Carolina Constitution, and claim for civil conspiracy is GRANTED.") (Ex. K); *Boyd v. University of S.C. Police Dep't*, 2020 S.C.C.P. LEXIS 4930 (Richland Cty. Feb. 24, 2020) ("[T]here is no cause of action available for money damages under the South Carolina Constitution.") (Ex. L).

This Court has held that, because South Carolina does not have a counterpart to Section 1983, no claim for money damages exists for the violation of the South Carolina Constitution:

> Defendants also seek dismissal of Plaintiffs' claim under the South Carolina Constitution. Plaintiffs allege that "Defendants violated Plaintiffs' rights under the South Carolina Constitution, *inter alia* Article I, Section 3 thereof, protecting Plaintiff's liberty, by violating due process and subjecting them to cruel and unusual punishment." Am. Compl. ¶ 152. However, Plaintiff points to no constitutional provision or enabling statute allowing for civil damages for due process violations

or cruel and unusual punishment under the South Carolina Constitution. *Claims for civil damages for violations of the United States Constitution are brought pursuant to 42 U.S.C. § 1983, but South Carolina does not have a similar statute allowing for such claims. Accordingly, dismissal of this claim is appropriate.*

*See Rosendall v. Voight*, Civil Action 2017 U.S. Dist. LEXIS 220699, at *6-7 (D.S.C. Sep. 11, 2017) (emphasis added) (Ex. M), *report and recommendation adopted in relevant part*, 2018 U.S. Dist. LEXIS 76589 (D.S.C. May 7, 2018).

South Carolina law has never recognized a money damages claim for a violation of the state constitution's right to privacy or equal protection. To the contrary, the South Carolina Court of Appeals has determined that no cause of action exists for violations of the state constitution. Therefore, this Court should grant summary judgment in favor of all Defendants as to Plaintiffs' claims under the South Carolina Constitution.

**F.    The South Carolina Tort Claims Act Bars Plaintiffs' Outrage Claims (Count 6).**

Plaintiffs only assert Count 6 (reckless infliction of emotional distress/outrage) against Defendant County. Plaintiffs' claims against the County only exist to the extent the South Carolina Tort Claims Act ("SCTCA"), S.C. Code § 15-78-10, *et seq.*, allows them. The provisions of the SCTCA "establishing limitation[s] on an exemption to the liability of the state . . . *must be liberally construed in favor of limiting the liability of the state.*" S.C. Code Ann. § 15-78-20(f) (emphasis added). A "loss" under the SCTCA includes "bodily injury, disease, death, or damage to tangible property, including lost wages and economic loss to the person who suffered the injury, disease, or death, pain and suffering, mental anguish, and any other element of actual damages recoverable in actions for negligence, but *does not include the intentional infliction of emotional harm*." *See* S.C. Code § 15-78-30(f) (emphasis added). Additionally, a government entity is not liable for "employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." *See* S.C. Code § 15-78-60(17).

Construing the SCTCA "liberally in favor of limiting the liability of the state," numerous courts have concluded that it bars outrage claims. *See Newman v. South Carolina Dep't of Employment and Workforce*, 2010 U.S. Dist. LEXIS 122691, at *4 (D.S.C. Sept. 22, 2010)

{01162984.DOCX.2 }

("[A]mendment of the Complaint would not save this [outrage] cause of action, since the Department, as a state agency, has sovereign immunity with regard to this tort claim.") (Ex. N), *report and rec. adopted*, 2010 U.S. Dist. LEXIS 122640 (D.S.C. Nov. 18, 2010); *Ward v. City of N. Myrtle Beach*, 457 F. Supp. 2d 625, 646-47 (D.S.C. 2006) ("[T]he South Carolina Tort Claims Act excludes the intentional infliction of emotional harm from the definition of 'loss' for which a government may be liable under the Tort Claims Act."); *Harkness v. City of Anderson*, 2005 U.S. Dist. LEXIS 49054 (D.S.C. Oct. 25, 2005) ("Defendants argue they are immune from suit pursuant to the South Carolina Tort Claims Act . . . on the claim of outrage, otherwise known as intentional infliction of emotional distress. [Citation omitted.] The court agrees. The SCTCA does not waive sovereign immunity for this claim.") (Ex. O); *Trask v. Beaufort Cty.*, 392 S.C. 560, 573, 709 S.E.2d 536, 543 (Ct. App. 2011) ("Under the Tort Claims Act, a coroner is immune from suit for 'the intentional infliction of emotional harm.'"); *accord Lindquist v. Tanner*, 2012 U.S. Dist. LEXIS 125868 (D.S.C. April 12, 2012) ("Plaintiff concedes that her claim for 'intentional' infliction of emotional distress against the County Recreation Commission is barred by the South Carolina Tort Claims Act.'") (Ex. P), *report and rec. adopted in part*, 2012 WL 3839235 (D.S.C. Sept. 4, 2012); *Pruitt v. Charleston Cty. Sch. Dist.*, 2000 S.C.C.P. LEXIS 3069 (June 23, 2000 Comm. Pl. Charleston Cty.) ("Accordingly, based on the clear provisions of the Tort Claims Act, Doe's outrage claim is not actionable against this Defendant.") (Ex. Q). Likewise, the SCTCA bars Plaintiffs' reckless infliction of emotional distress/outrage claim.

Plaintiffs might argue that they can succeed on an outrage claim if they can prove that the County acted "recklessly" (rather than with intent to harm). However, bearing in mind that the SCTCA must be construed to minimize liability, this Court must construe the SCTCA's prohibition of claims for "intentional infliction of emotional harm" to include *all* outrage claims. *See* S.C. Code § 15-78-30(f). The SCTCA's use of the phrase "intentional infliction of emotional harm" — rather than "intentional infliction of emotional *distress*" — does not suggest that the legislature intended to impose outrage liability where the defendant's acts are "reckless" rather than intentional. Plaintiffs

can cite no controlling South Carolina law permitting a party to evade the SCTCA's prohibition of outrage claims by skillful use of the word "reckless."

For the foregoing reasons, the Court should grant the County summary judgment as to Plaintiff's outrage claim.

## G.     Plaintiffs Cannot Create a Genuine Issue of Material Fact as to Their Assault (Count 7) Claim.

"An 'assault' is an attempt or offer, with force or violence, to inflict bodily harm on another or engage in some offensive conduct."  *Mellen v. Lane*, 377 S.C. 261, 276, 659 S.E.2d 236, 244 (Ct. App. 2008).   "The elements of assault are: (1) conduct of the defendant which places the plaintiff, (2) in reasonable fear of bodily harm."  *See id.; accord Jones v. Winn-Dixie Greenville*, 318 S.C. 171, 175, 456 S.E.2d 429, 432 (Ct. App. 1995) ("[A]n assault occurs when a person has been placed in reasonable fear of bodily harm by the conduct of the defendant.").

Plaintiffs proffer no evidence that Defendants did anything to place them in apprehension of any unwanted physical contact during their strip searches.[7]  Plaintiffs can present no evidence that any Defendant verbally threatened Plaintiffs with imminent physical contact.  They cannot present any evidence that any Defendant physically menaced Plaintiffs in a manner that would support an assault claim.

To the contrary, the undisputed evidence shows that the strip searches involved no physical contact.  In fact, Munday and Devine testified that they were never subjected to offensive or unwanted touching during their strip searches.  (*See* Ex. R (Devine Depo.), at 37:7-15; Ex. S (Munday Depo.), at 42:17-22, 52:23-53:3).  This is consistent with the Detention Center's policies, under which "[a]t no time will officer(s) have physical contact with the inmate during the [strip] search, unless the officer(s) are using a justified use of force."  (*See* Ex. T (Detention Center Policy § 5.14), at 9-10).

---

[7]     To the extent Plaintiffs' Amended Complaint can be construed to assert an assault claim with regard to Plaintiffs' (particularly Plaintiff Munday's) *pat down* search, such claim must fail for the same reasons Plaintiff Munday's battery claim fails.

{01162984.DOCX.2 }

- 23 -

Far from testifying about a threat of imminent contact during the strip search, Plaintiff Munday conceded that the officer conducting her strip search was as far as twelve feet away from her and actually instructed her not to come any closer:

Q.      Okay.· How far away was she standing from you?

A.      Probably 10 to 12 feet.· I remember when she started telling me to take my clothes off, my bra was the final piece.· And I remember I took a step towards her, and she started to yell at me because I was approaching her, but she was far enough away that I couldn't reach her even if I were to lean forward.· So then I went to toss my bra to her because I couldn't pass it to her, and she was yelling at me because I was trying to move forward to get -- because she had asked me to give her my bra.  . . .

So I went to move forward, and that's when she started yelling at me.· I couldn't reach her in any other way, so that's why I would say she was 10 to 12 feet.

(*See* Ex. S (Munday Depo.), at 33:21-34:11).  She noted she "couldn't reach" the officer conducting the search, who instructed her not to come any closer.  As a result, Plaintiff Munday could not have possibly been in any reasonable apprehension of a physical contact.

## H.    **Plaintiff Munday Cannot Create a Genuine Issue of Material Fact as to Her Battery Claim (Count 8).**

The battery count of Plaintiffs Amended Complaint (Count 8) is asserted *only* on behalf of Plaintiff Munday:

90.     Without consent of Munday, a Beaufort County Officer Defendant willfully and maliciously sexually assaulted Munday at BCDC.

91.     The Beaufort County Officer Defendant intended to cause harmful and sexually offensive contact directly with Munday's sexual body parts, contact that offends a reasonable sense of personal dignity.

92.     The Beaufort County Officer Defendant intended to cause a harmful and offensive contact with Munday by the use of hands to make contact directly with Munday's sexual body parts.

(*See* Docket Entry # 12 ¶¶ 90-92).

The battery claim can only possibly relate to Munday's pat down search, *not her strip search*.  In fact, Plaintiff Munday testified that no one touched her at all during her strip search.

{01162984.DOCX.2 }

- 24 -

(*See* Ex. S (Munday Depo.), at 42:17-22 (testifying that "the only time she touched you was during the pat down search")).  For the reasons that follow, the Court should grant Defendants' motion for summary judgment as to Plaintiff Munday's battery claim.

**1.    The South Carolina Tort Claims Act Bars Plaintiff Munday's Battery Claim (Count 8) Against the County.**

As set forth above, under the SCTCA, the County "may not be held liable for "employee conduct outside the scope of his official duties or which constitutes actual fraud, *actual malice, intent to harm*, or a crime involving moral turpitude." *See* S.C. Code § 15-78-60(17) (emphasis added).  In this regard, intentional torts are typically prohibited against governmental entities under the SCTCA.  *See Stockholm v. Teaster*, 2014 U.S. Dist. LEXIS 75281, at *8 (D.S.C. June 3, 2014) (Ex. U) ("The SCTCA provides a limited waiver of immunity for tort actions against the state. However, the state has not waived its immunity for intentional torts."); *Harkness v. City of Anderson*, 2005 U.S. Dist. LEXIS 49054, at *11 (D.S.C. Oct. 25, 2005) ("[A]n employee's intentional torts are excluded from suit under the SCTCA.") (Ex. O); *Johnson v. Charleston Cty. Sch. Dist.*, 2018 S.C.C.P. LEXIS 3076, at *4 (Charleston Cty. July 16, 2018) (Ex. V) ("Defendant argues that because Plaintiffs' claim for false imprisonment is one for an intentional tort, it is entitled to immunity under the S.C. Tort Claims Act.  The Court agrees.").

Plaintiff Munday's own allegations, if believed, demonstrate that the SCTCA bars her battery claims.  Specifically, Munday alleges that "[t]he BCDC Officer Defendant's intentional contact with Munday's genitalia *served no penological purpose and was undertaken with the intent to gratify the officer's sexual desire and/or to humiliate* Munday."  (*See* Docket Entry # 12 ¶ 18 (emphasis added)).  In other words, Munday claims that, with regard to the pat down, the searcher acted for her own personal, sexual gratification.  Such conduct is outside the scope of employment and, as a result, cannot support a claim under the SCTCA.  *See Doe v. South Carolina State Budget & Control Bd.*, 329 S.C. 214, 220, 494 S.E.2d 469, 473 (Ct. App. 1997) ("In the present case, no cogent argument can be made that Roberson was furthering the business of his employer at the time he sexually assaulted Appellants."), *aff'd,* 337 S.C. 294, 523 S.E.2d 457 (1999).

{01162984.DOCX.2 }

- 25 -

Moreover, irrespective of the SCTCA, such conduct cannot support a finding of vicarious liability for the actions of the searcher.  In *Armstrong v. Food Lion, Inc.*, 371 S.C. 271, 639 S.E.2d 50 (2006), two Food Lion employees attacked the plaintiff on the store's premises, using the store's box cutters.  Food Lion obtained a directed verdict because *respondeat superior* liability was improper, as the employees acted beyond the scope of employment.  The Supreme Court affirmed:

> The act of a servant done to effect some independent purpose of his own and not with reference to the service in which he is employed, or while he is acting as his own master for the time being, is not within the scope of his employment so as to render the master liable therefor.  [*See Lane v. Modern Music, Inc.*, 244 S.C. 299, 136 S.E.2d 713 (1964).]  Under these circumstances the servant alone is liable for the injuries inflicted.  *Id.*  If a servant steps aside from the master's business for some purpose wholly disconnected with his employment, the relation of master and servant is temporarily suspended; this is so no matter how short the time, and the master is not liable for his acts during such time.  *Id.*

> The trial court appropriately granted a directed verdict because petitioners failed to produce any evidence that the Food Lion employees were acting within the scope of their employment or in furtherance of Food Lion's business when they attacked petitioners.  The only reasonable inference from the testimony is that Brown and Cameron attacked Ronnie for their own personal reasons and not for any reason related to their employment.  They were acting "to effect an independent purpose of their own."  *See Lane, supra* (act of servant done to effect some independent purpose of his own is not within scope of his employment).  Food Lion was not legally liable because the employees stepped away from their job of stocking shelves.  *See Lane, supra* (employer not liable where employee stepped away from the employer's business to play a prank); *Hamilton v. Davis*, 300 S.C. 411, 389 S.E.2d 297 (Ct.App.1990) (same).

*See Armstrong*, 371 S.C. at 276-77, 639 S.E.2d at 53.  Because Munday claims that an officer sexually touched her during the pat down for personal, sexual gratification (which Defendants specifically deny), the County cannot be vicariously liable for such conduct.

Therefore, the Court should grant the County summary judgment as to Munday's battery claim (Count 8).

**2.     The Court Should Grant Defendants Grant and Foot Summary Judgment on Munday's Battery Claim (Count 8) Because She Presents No Evidence That They Subjected Her to an Unwanted or Offensive Touching.**

"A battery is the actual infliction of any unlawful, unauthorized violence on the person of

another, irrespective of its degree; it is unnecessary that the contact be by a blow, as any forcible contact is sufficient." *Gathers v. Harris Teeter Supermarket, Inc*., 282 S.C. 220, 230, 317 S.E.2d 748, 754 (Ct. App. 1984). Plaintiff Munday's battery claim against Foot and Grant must fail because she can present no evidence that either Foot or Grant participated in her pat down in any way. Munday cannot proffer any evidence that Foot or Grant were even present during her pat down. Munday can proffer no evidence that either Foot or Grant ever touched her at any time. She can certainly not present any evidence that they committed any battery against her.

Additionally, Plaintiff Munday can cite no legal authority to impute liability to Foot and Grant for a battery that another Detention Center employee commits. As set forth above, Plaintiff Munday claims that an officer assaulted her for sexual gratification, which (if true) could not imaginably support vicarious liability. Plaintiff Munday can cite no authority imposing vicarious liability for an intentional tort — particularly one in which Plaintiff Munday claims a personal sexual motive, without penological purpose — on a superior or coworker of the actor. South Carolina law has never recognized such a claim. Therefore, the Court should grant Defendants Foot and Grant summary judgment as to Munday's battery claim (Count 8).

## I.     The Court Should Grant Summary Judgment as to Plaintiffs' Negligence Claims (Counts 5 and 9).

Plaintiffs' Amended Complaint includes two negligence claims: (a) Count 5 against the County only for negligence *per se* relying on S.C. Code § 24-5-90; and (b) Count 9 against all Defendants for negligence. For the reasons that follow, the Court should grant Defendants summary judgment on Plaintiffs' negligence claims.

### 1.     Plaintiffs' Negligence Claims (Counts 5 and 9) Must Fail Because Plaintiffs Present No Evidence of Physical Injury.

As set forth above, it is undisputed that, consistent with the County's policies, no one had any physical contact with either Devine or Munday (or any putative class member, for that matter) during their strip searches. Plaintiffs proffer no evidence of any physical impact or injury. Plaintiffs proffer no evidence of any bruises, cuts, bleeding or scarring. To the contrary, Plaintiffs

{01162984.DOCX.2 }
- 27 -

focus their claims entirely upon psychic injuries.  However, the law does not recognize tort liability for negligent infliction of emotional distress in these circumstances.   South Carolina only recognizes a true negligent infliction of emotional distress claim in the context of bystander liability (where the tortfeasor's negligence causes actual physical injury to a family member of the plaintiff).  *See Hughes v. United States Bank N.A. (In re Hughes)*, 627 B.R. 327, 334 (Bankr. D.S.C. 2021) ("South Carolina courts are clear, a negligent infliction of emotional distress claim is limited to situations involving bystander liability, such as where a plaintiff parent observes the death of their child."); *Land v. Barlow*, 2021 U.S. Dist. LEXIS 242196, at \*12 (D.S.C. Dec. 20, 2021) ("As shown by the case law discussed supra, the South Carolina Supreme Court has explicitly and repeatedly limited [negligent infliction of emotional distress] claims to situations where a plaintiff is a bystander to an accident.") (Ex. W).  Plaintiffs' negligence claims constitute an end-run around of our state's refusal to recognize such a cause of action.

In the distant past, South Carolina law did appear to allow recovery for negligently inflicted emotional distress.  In *Padgett v. Colonial Wholesale Distrib. Co.*, 232 S.C. 593, 604, 103 S.E.2d 265, 270 (1958), a truck struck the plaintiff's home (without impacting plaintiff), causing fright, cold exposure, weight loss, fever and a skin condition.  The Court concluded that the question of whether the shock caused recoverable injury should be submitted to the jury:

> We think that under the authorities above quoted, the trial Judge was correct in submitting to the jury the question of whether or not the respondent had sustained physical or bodily injury as a consequence of the shock, fright and emotional upset experienced by him.  If the respondent's bodily injury was proximately caused by the shock, fright and emotional upset as a result of the negligence and willfulness of the appellant, he was entitled to recover such damages as would compensate him for the injury so sustained.

*See id.*, 232 S.C. at 607-08, 103 S.E.2d at 272.  The Supreme Court made a metaphysical connection between physical harm and some psychic harms:

> The interdependence of the mind and body is in many respects so close that it is impossible to distinguish their respective influence upon each other.  It must be conceded that a nervous shock or paroxysm, or a disturbance of the nervous system, is distinct from mental anguish, and falls within the physiological, rather than the

psychological, branch of the human organism.

*See id.*, 232 S.C. at 605, 103 S.E.2d at 271 (citations omitted).

Subsequently, the Supreme Court cited *Padgett,* stating that "[w]e have recognized the rule that there is no liability for emotional distress without a showing that the distress inflicted is extreme or severe." *See Rhodes v. Security Fin. Corp. of Landrum*, 268 S.C. 300, 302, 233 S.E.2d 105, 106 (1977). Finding the evidence did not support recovery, the Court observed that "[w]hile there is testimony that appellant was emotionally upset from the attempt to collect the forged note, there is no showing that the attempts by respondent's agents to collect were unreasonable or abusive, nor that appellant's emotional upset was other than transient and trivial." *See id.* With *Rhodes,* the Court first began to limit recovery for negligent infliction of emotional distress.

Two years later, *Hudson v. Zenith Engraving Co.*, 273 S.C. 766, 770, 259 S.E.2d 812, 813 (1979), stated that "[i]n order to prevail in a tortious action in which the sole damages alleged are those of mental anguish, plaintiff must show that the conduct on the part of defendant was extreme and outrageous, causing distress that is of an extreme or severe nature." Two years thereafter, the Supreme Court quoted *Hudson* and *Rhodes*, and recognized the tort of *intentional* infliction of emotional distress). *See Ford v. Hutson,* 276 S.C. 157, 276 S.E.2d 776 (1981).

Importantly, in *Dooley v. Richland Hosp.*, 283 S.C. 372, 322 S.E.2d 669 (1984), the Court refused to allow a claim for negligent infliction of emotional distress where plaintiffs failed to show an actual physical injury supporting their claim. The Court stated that one criticism of negligent infliction of emotional distress is "that it will allow for fraudulent claims" and that "[o]ne method of eliminating this danger has been to require some type of physical injury in addition to any claimed emotional injury." *See id.*, 283 S.C. at 375, 322 S.E.2d at 671. Later that year, the Court refused to permit the recovery of emotional distress damages in a legal malpractice claim, despite a litany of claimed "physical" manifestations of the distress (including crying spells, headaches, change of hair color, and an inability to sleep with her spouse for several years). *See Caddel v. Gates*, 284 S.C. 481, 327 S.E.2d 351 (1984).

In *Kinard v. Augusta Sash & Door Co.*, 286 S.C. 579, 336 S.E.2d 465 (1985), the Supreme

{01162984.DOCX.2 }

Court recognized negligent infliction of emotional distress limited to a bystander who observes a death or serious physical injury:

> (a) the negligence of the defendant must cause death or serious physical injury to another; (b) the plaintiff bystander must be in close proximity to the accident; (c) the plaintiff and the victim must be closely related; (d) the plaintiff must contemporaneously perceive the accident; and (e) the emotional distress must both manifest itself by physical symptoms capable of objective diagnosis and be established by expert testimony.

*See id.*, 286 S.C. at 582, 336 S.E.2d at 465.  Under this tort, the defendant must still engage in conduct that causes a physical injury (to someone related to the plaintiff).

South Carolina currently only recognizes emotional distress damages: (a) when it results from a physical injury; (b) when there is outrage; and (c) in negligent infliction in a "bystander" case.   In the decades since *Kinard,* the Court has refused to extend liability beyond those circumstances:

- In *Babb v. Lee Cty. Landfill SC, LLC,* 405 S.C. 129, 141, 747 S.E.2d 468, 474 (2013), the Court refused to recognize emotional distress damages flowing from trespass and nuisance in the form of odors from a landfill: "In short, allowing recovery for personal annoyance and discomfort under the guise of trespass and nuisance would be the stealth recognition of an entirely new tort."

- In *Doe v. Greenville County School District*, 375 S.C. 63, 651 S.E.2d 305 (2007), the Court refused to extend the negligent infliction of emotional distress damages to encompass parents' claims stemming from sexual activity between their daughter and a school teacher: "[b]ecause South Carolina courts have limited the recognition of negligent infliction of emotional distress claims in circumstances such as the one presented in this case to bystander liability, Mr. and Mrs. Doe have not stated a claim which is cognizable under South Carolina law."

- In *Hansson v. Scalise Bldrs. of S.C.*, 374 S.C. 352, 358-59, 650 S.E.2d 68, 72 (2007), the Court held in the context of an outrage claim: "Under the heightened standard of proof for emotional distress claims emphasized in *Ford*, a party cannot establish a prima facie claim for damages resulting from a defendant's tortious conduct with mere bald assertions. To permit a plaintiff to legitimately state a cause of action by simply alleging, 'I suffered emotional distress' would be irreconcilable with this Court's development of the law in this area. In the words of Justice Littlejohn, the court must look for something "more"-in the

{01162984.DOCX.2 }

form of third party witness testimony and other corroborating evidence-in order
to make a prima facie showing of 'severe' emotional distress."

For the foregoing reasons, Plaintiffs' negligence claims must fail because the only injuries
they claim are from the alleged psychic trauma of non-contact strip searches.  They not no allege
any negligently-caused physical injuries.  They do not allege "bystander" liability.  Plaintiffs can
cite to no South Carolina law permitting a negligence claim in the absence of physical impact or
injury, for purely emotional injuries (or sequelae from emotional distress).  The Court should grant
all Defendants summary judgment as to both of Plaintiffs' negligence claims (Counts 5 and 9).

2.    **The Statute Underlying Plaintiffs' Negligence *Per Se* Claim (Count 5) Against the County Does Not Create a Private Right of Action.**

Plaintiffs' Count 5 asserts a negligence *per se* claim against the County alleging a violation
of South Carolina Code § 24-5-90, which states:

> It is unlawful to discriminate in the treatment of prisoners placed in the custody of
> the sheriff or local governing body.
>
> A violation of this section is a misdemeanor and, upon conviction, the person
> convicted must be fined not less than twenty-five dollars and imprisoned for not
> more than one year.

*See* S.C. Code § 24-5-90.

This Court has discussed in detail the requirement for negligence *per se* claim under South
Carolina law:

> A claim for negligence per se "is established by showing a statute created a duty to
> the plaintiff and the defendant breached that duty by violating the statute."  *Seals
> by Causey v. Winburn*, 314 S.C. 416, 445 S.E.2d 94, 96 (S.C. Ct. App. 1994) (*citing
> Whitlaw v. Kroger Co.,* 306 S.C. 51, 410 S.E.2d 251 (S.C. 1991)).  Generally, "[a]
> statute must permit a private cause of action in order for plaintiffs to maintain a
> civil suit" for negligence per se.  *Salley v. Heartland-Charleston of Hanahan, SC,
> LLC*, 2011 U.S. Dist. LEXIS 75159, 2011 WL 2728051, at *3 (D.S.C. July 12,
> 2011).  "However, that private cause of action need not be explicit." *J.R. v.
> Walgreens Boots Alliance Inc.*, 470 F. Supp. 3d 534, 553 (D.S.C. 2020).
>
> In order to show that the defendant owes him a duty of care arising from a
> statute, the plaintiff must show two things: (1) that the essential purpose of
> the statute is to protect from the kind of harm the plaintiff has suffered; and
> (2) that he is a member of the class of persons the statute is intended to

protect.

> *Whitlaw*, 410 S.E.2d at 252 [citation omitted]. "In South Carolina, however, for a statute to support a claim for negligence per se[,] a plaintiff must show that the statute was 'enacted for the special benefit of a private party.'" *Winley v. Int'l Paper Co*., No. 2:09-cv-02030-CWH, 2012 U.S. Dist. LEXIS 200882, 2012 WL 13047989, at * 10 (D.S.C. Oct. 23, 2012) (*citing Doe v. Marion*, 645 S.E.2d at 248). Thus, to survive a motion to dismiss on their claims for negligence per se, Plaintiffs must adequately plead that the "essential purpose" for each of the asserted statutes "is to protect from the kind of harm [P]laintiffs have allegedly suffered and whether [P]laintiffs are members of the class meant to be protected by the statutes." *Walgreens*, 470 F. Supp. 3d at 553.

*See In re Blackbaud, Inc.*, 2021 U.S. Dist. LEXIS 201211, at *29-30 (D.S.C. Oct. 19, 2021) (Ex. X).

The statute the Plaintiffs cite — which vaguely makes it "unlawful to discriminate in the treatment of prisoners" — does not support their negligence *per se* claim. First, the face of the statute does not suggest that the legislature intended to create a private right of action. Plaintiffs do not cite a safety statute or regulation enacted to protect identifiable people from specific physical injuries. Plaintiffs cannot show that the legislature enacted this statute for the purpose of preventing the specific alleged harm: *i.e.,* sexually discriminatory strip searches. In fact, Plaintiffs cannot proffer any evidence or legal authority specifically identifying the purpose of this statute. This general statute that merely sets forth the general policy of non-discrimination does not support a negligence *per se* claim. No South Carolina case supports the extension of negligence *per se* to this length.

### 3.    Plaintiffs' Negligence *Per Se* Claim Against the County (Count 5) Fails Under the Public Duty Rule.

"The public duty rule is a rule of statutory construction which aids the court in determining whether the legislature intended to create a private right of action for a statute's breach." *Vaughan v. Town of Lyman*, 370 S.C. 436, 442, 635 S.E.2d 631, 634 (2006) (recognizing that dispositive issue is not whether statute creates a duty, but whether legislature intended to provide private right of action). "Under this rule, statutes which create or define the duties of a public office create no duty of care towards individual members of the general public." *See Edwards v. Lexington Cty.*

{01162984.DOCX.2 }

*Sheriff's Dep't*, 386 S.C. 285, 291, 688 S.E.2d 125, 129 (2010). The statute here falls within the public duty rule, because it generally defines and sets limitations on the performance of public duties of those who run jails.

The South Carolina Supreme Court has carved out a narrow exception to the public duty rule if Plaintiffs satisfy the following six-part test:

> (1) an essential purpose of the statute is to protect against a particular kind of harm; (2) the statute, either directly or indirectly, imposes on a specific public officer a duty to guard against or not cause that harm; (3) the class of persons the statute intends to protect is identifiable before the fact; (4) the plaintiff is a person within the protected class; (5) the public officer knows or has reason to know the likelihood of harm to members of the class if he fails to do his duty; and (6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office.

*See Jensen v. Anderson County Dep't of Soc. Servs.*, 304 S.C. 195, 200, 403 S.E.2d 615, 617 (1991). Plaintiffs cannot show that this statute falls within the exception to the public duty rule. First, there does not exist an identifiable class of protected persons under the statute that can be identified before the fact. Additionally, as set forth above, Plaintiffs present nothing to support that the legislature intended the statute to specifically prevent harms from discriminatory strip searches. As a result, the exception to the public duty rule should not apply.

For the foregoing reasons, the Court should grant the County summary judgment as to Plaintiffs' negligence *per se* claim (Count 5).

**4.    The South Carolina Tort Claims Act Bars Plaintiffs' Negligence Claims (Count 9) as to Defendants Foot and Grant.**

In addition to the foregoing, the SCTCA bars Plaintiffs' negligence claim against Defendants Foot and Grant (Count 9). Under the SCTCA, "[a]n employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor." *See* S.C. Code § 15-78-70(a). An employee of a governmental entity may only be liable under the SCTCA "if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral

{01162984.DOCX.2 }

turpitude. *See* S.C. Code § 15-78-70(b). By definition, Plaintiffs' negligence claim relies on conduct that falls short of actual fraud, malice, intent to harm or crimes of moral turpitude. Instead, Plaintiffs claim that Foot and Grant were negligent in performing their work for the Detention Center. Consequently, the SCTCA bars Plaintiffs' negligence claims against Foot and Grant.

**J.      South Carolina Law Precludes Plaintiffs' Class Action.**

South Carolina law states that "a claim or action for the refund of taxes may not be brought as a class action in . . . any court of law in this State, and the department, *political subdivisions, or their instrumentalities may not be named or made a defendant in any other class action brought in this State.*" *See* S.C. Code § 12-60-80(C) (emphasis added). The highlighted "catch-all" language in the statute prohibits *any class action* against political subdivisions and instrumentalities. In *Aiken v. South Carolina Dep't of Revenue*, 429 S.C. 414, 839 S.E.2d 96 (2020), the Supreme Court held that the "catch-all" language of Section 12-60-80(C) precludes *all class actions against governmental entities, not merely those for the refund of "taxes."* The Court expressly recognized that the statute prohibits *all class actions — irrespective of the substantive subject-matter of the claim or the particular law under which the plaintiffs sue —* against "political subdivisions[] or their instrumentalities." Therefore, the Court should enter summary judgment in favor of Defendants as to Plaintiffs' class claims.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of all Defendants and against all Plaintiffs, and should dismiss all claims asserted with prejudice.

BARNWELL,     WHALEY,     PATTERSON, AND HELMS, LLC

By: s/ John W. Fletcher
M. Dawes Cooke, Jr., Esq.
John W. Fletcher, Esq.
P.O. Drawer H (29402)
211 King Street, Suite 300
Charleston, SC  29401
(843) 577-7700
*Counsel for Defendants*

Dated: May 2, 2022
Charleston, South Carolina

{01162984.DOCX.2 }