UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Cheryl A. Munday and Margaret Devine, on behalf of themselves and others similarly situated, | ) ) ) ) | C/A No. 9:20-02144-DCN-MHC |
| Plaintiffs, | ) ) | **REPORT AND RECOMMENDATION** |
| v. | ) ) ) | |
| Beaufort County, Philip Foot, Quandara Grant, John Does 1-5, and Jane Does 1-5, | ) ) ) ) | |
| Defendants. | ) ) | |

Before the Court is Plaintiffs' Motion for Class Certification ("Motion"). ECF No. 31.

Defendants filed a Response in Opposition to the Motion (ECF No. 34), and Plaintiffs filed a Reply

(ECF No. 36). After a hearing on Plaintiffs' Motion, Defendants filed a supplemental Response in

Opposition to the Motion (ECF No. 40),[1] and Plaintiffs filed a Reply (ECF No. 42). The Motion

is ripe for review.[2]

**BACKGROUND**

This case involves certain procedures used for female pre-classification[3] detainees at the

Beaufort County Detention Center ("BCDC" or "Center"). Defendant Beaufort County operates

---

[1] Defendants contend that, at the hearing, Plaintiffs "conceded that they were seeking only issue certification as to their equal protection claim" and that the Court requested supplemental briefing pertaining to Rule 23(c)(4) issue certification. ECF No. 40 at 1. While Plaintiffs conceded they were seeking certification of their equal protection claim only, as briefed in their supporting memoranda, they did not abandon their request for class certification under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, nor did the Court rule out class certification.

[2] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(f) (D.S.C.). Pursuant to those provisions, this Report and Recommendation is entered for review by the District Judge.

[3] A pre-classification detainee is an inmate who has been arrested and placed or housed in an area at the detention center prior to going to bond hearing. ECF No. 34-1 at 20, ll. 7–14.

BCDC. ECF Nos. 12 ¶ 7, 13 ¶ 5. Defendant Philip Foot ("Foot") is the Assistant County Administrator for Public Safety Division who oversees the BCDC. ECF Nos. 12 ¶ 8, 13 ¶ 6. Defendant Quandara Grant ("Grant") is a Colonel and the director of the BCDC. ECF Nos. 12 ¶ 9, 13 ¶ 6.

BCDC's practice has been to house female pre-classification inmates in general population while placing male pre-classification inmates in a separate pre-classification cell outside of general population. ECF No. 31-3 at 14, ll. 2–20. On February 27, 2015, BCDC began conducting a strip/visual body cavity search ("strip/vbc search")[4] on any pre-classification detainee placed in general population. ECF Nos. 31-4 and 31-5. Accordingly, because female pre-classification detainees are held in general population, BCDC conducts a strip/vbc search on every female pre-classification detainee[5] awaiting bond.[6] ECF No. 40-1 at ¶ 6. BCDC did not, however, do so for similarly situated male pre-classification detainees prior to May 5, 2020, as they were housed in a separate pre-classification cell outside of general population.[7] There is generally no dispute

---

[4] The terms "strip search" and "visual body cavity search" (vbc) are used interchangeably, and at times, the term "strip/vbc search" is used. A strip search involves partial or complete disrobing but not necessarily a body cavity inspection while a visual body cavity search involves visual inspection of rectal, vaginal and other body cavities. Strip/vbc searches involve removal of all clothing to permit inspection of all body openings including ears, nostrils, anus, navel, and mouth. ECF No. 31-2. They include a thorough inspection of the hair, crotch area, abdomen, soles of the feet, armpits, and areas between the fingers and toes. *Id.*

[5] "[W]e instruct [females] to remove their clothing one item at a time and hand them to the booking officer." ECF No. 31-3 at 3 (Black Dep. 18:25-19:2). "[W]e have them lift their breasts, raise their—both arms and then we have them bend over." (*Id.* 18:25-19:2). "Then we ask them to turn around and face the wall. We ask them to bend over at the waist, squat, reach back and grab their cheeks— their butt cheeks, spread and cough three times hard from the stomach." (*Id.* 20:5-9). The guards can tell when someone is coughing because they watch the movement of the "vagina and the anal." (*Id.* 34:12).

[6] Prior to February 27, 2015, women in pre-classification holding were not subject to strip searches, except pursuant to reasonable suspicion. ECF No. 40-1 at ¶ 5.

[7] According to Defendants, because of Covid protocols, as of May 5, 2020, pre-classification males are now also held in general population and, thus, also strip searched.  ECF No. 40-1 at ¶ 7.

between the parties that this practice was in effect at BCDC between February 27, 2015, and May 5, 2020. *See* ECF No. 40 at 2.

Plaintiff Cheryl Munday was arrested by the Bluffton Police Department on March 9, 2018, for driving under the influence, which charge was later dismissed. The arresting officer delivered her into the custody of BCDC officers for the booking process, where she underwent a full body pat down, strip search and visual body cavity search. ECF Nos. 12 at ¶¶ 15–19; 13 at ¶¶ 10, 12, 13. Plaintiff Margaret Devine was arrested by the Highway Patrol on January 17, 2019, for driving under the influence; the charge was later dismissed. After Plaintiff Devine was transported to BCDC to begin the booking process, a BCDC officer initiated a full body pat down followed by a strip search and visual body cavity search of her. ECF Nos. 12 at ¶¶ 20–24; 13 at ¶¶ 15, 18.

Plaintiffs have asserted several causes of action, for themselves and on behalf of others similarly situated. In the Motion before the Court, however, Plaintiffs seek to certify a class only for their claim under 42 U.S.C. § 1983, alleging a violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs claim that the procedures used by BCDC between February 27, 2015 and May 5, 2020, to process the intake of similarly situated female and male pretrial detainees, were different. Specifically, Plaintiffs allege these pre-classification women detainees were all subjected to routine strip/vbc searches, while similarly-situated men in pre-classification status were not. ECF No. 12 ¶¶ 4, 25–28. Plaintiffs seek certification of a class based upon the equal protection rights of women whom the BCDC subjected to strip/vbc searches, which they allege was in violation of the Constitutions and laws of the United States and South Carolina.[8]

---

[8] Plaintiffs' Motion seeks to certify a class under Rule 23(b)(3) of the Federal Rules of Civil Procedure (damages), or, in the alternative, Rule 23(c)(4) (issue class), addressing the manner in which female pre-classification detainees are strip-searched.

## CLASS DEFINITION

The proposed class is defined as: "Female pre-classification detainees in the custody of BCDC who, upon their admission to BCDC,[9] were strip/visual body cavity searched, while pre-classification males were not, from February 27, 2015, until May 5, 2020."[10]

## LEGAL STANDARD

Class certification is governed by Federal Rule of Civil Procedure 23. Rule 23(a) provides that one or more members of a class may sue or be sued as representative parties on behalf of all only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

In addition to the requirements of Rule 23(a), a class must also satisfy the requirements set forth in one of the three sub-parts of Rule 23(b). *See Gunnells v. Healthplan Servs.*, 348 F.3d 417, 423 (4th Cir. 2003). Moreover, "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable,' " often referred to as the "ascertainability"

---

[9] Plaintiffs' proposed class originally included the phrase "or return to BCDC from outside of BCDC" in addition to "upon their admission to BCDC." ECF No. 31 at 1. Plaintiffs' counsel conceded at the hearing that phrase should be removed from the proposed class definition, as it would include individuals who had been denied bond and were returned to BCDC and, as such, would have been subject to a strip search, regardless of gender.

[10] Plaintiffs proposed an open-ended date for the class definition: "until the class period closes," arguing that the class period "should close at such time as the unconstitutional practice stops or when the Court so orders (e.g., at the time of a verdict)." ECF No. 31-1 at 12. Defendants have presented evidence that as of May 5, 2020, male pre-classification detainees are housed in general population and strip searched, the same as the female pre-classification detainees. ECF No. 40-1 at ¶ 7. Plaintiffs have not contested that date as the end of the alleged unequal practice at issue.

requirement.[11] *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (citing *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)); *see also Tillman v. Highland Industries, Inc.*, No. 4:19-cv-02563-SAL, 2021 WL 4483035, at *5 (D.S.C. Sept. 30, 2021). Plaintiffs carry the burden of establishing that each of the requirements for class certification is satisfied. *See generally In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 236 n.6 (4th Cir. 2021); *George v. Duke Energy Retirement Cash Balance Plan*, 259 F.R.D. 225, 231 (D.S.C. 2009); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004) ("The plaintiffs who propose to represent the class bear the burden of demonstrating that the requirements of Rule 23 are satisfied.").

Though class certification should not be "conditioned on the merits of the case," the court may "look beyond the pleadings to the extent necessary to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Clark v. Experian Info. Sols., Inc.*, No. CIV.A.8:00-1217-24, 2001 WL 1946329, at *1 (D.S.C. Mar. 19, 2001). Ultimately, the court has broad discretion in deciding whether to certify a class, which must be exercised within the framework of Rule 23. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006); *Gunnells*, 348 F.3d at 424; *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).

---

[11] Defendants mount several arguments regarding the proposed class definition. ECF No. 34 at 2–7. To the extent those arguments are intended to dispute the threshold requirement that class members be readily identifiable, they are misplaced. The undersigned finds that the purported class members in this case are readily identifiable based upon the narrow definition of the class and for the reasons addressed herein. The putative class members can be identified "without extensive and individualized fact-finding." *See EQT Prod. Co.*, 764 F.3d at 358 (citation and internal quotation marks omitted). To the extent any of Defendants' arguments regarding the class definition are intended to challenge, or can be interpreted as challenging, the requirements for class certification under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, they are addressed in detail below.

## LEGAL ANALYSIS

Plaintiffs move for certification pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, alleging that questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

A.     Rule 23 Requirements for Certification.

The four prerequisites set forth in Rule 23(a) are that: (1) the members of the class are so numerous that joinder is impracticable; (2) one or more questions of law or fact are common; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) there is adequacy of representation. Fed. R. Civ. P. 23(a).

1. *Numerosity*.

Numerosity means there are enough persons in the class that joinder of them all as plaintiffs in one case is impracticable. *Lienhart*, 255 F.3d at 146. No specific number is required. *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (class with 74 persons; a much smaller class is also sufficient); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (18 class members); *In Re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 78 (D. Md. 1991) (explaining that "a class of as few as 25 to 30 members raises the presumption that joinder would be impracticable"); *Bradford v. AGCO Corp.*, 187 F.R.D. 600, 604 (W.D. Mo. 1999) (20 to 65 members). Defendants do not dispute that Plaintiffs have established numerosity, [12] ECF No. 34 at 8, and the undersigned finds the numerosity requirement is met.

---

[12] Defendant Grant testified that, on average, BCDC may have 20 females in general population. ECF No. 31-3 at 14 (Grant Dep. 23:11–16).

2. *Commonality and Typicality*

Commonality and typicality are closely related and often overlapping requirements. Under the former, the class must be united by a "common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dyer v. Air Methods Corps.*, No. 9:20-CV-2309-DCN, 2021 WL 1840833, at *5 (D.S.C. May 7, 2021) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Similarly, "[t]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id.* (alteration in original) (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)).

Defendants address the "commonality" and "typicality" factors together in summary fashion. ECF No. 34 at 2–8. According to Defendants, Plaintiffs have not met their burden of establishing commonality or typicality "because they cannot demonstrate that the proposed class members have all suffered a constitutional or statutory deprivation of privacy or the intentional infliction of emotional distress. Nor can they demonstrate that the class members have all suffered a search that was performed in an unreasonable manner." *Id.* These arguments miss the mark.

First, Defendants' arguments incorrectly assume Plaintiffs are moving to certify a class with regard to each of the causes of action in the Amended Complaint, including specifically the claim for intentional infliction of emotional distress. However, Plaintiffs have limited their class certification petition to their equal protection claim under the Fourteenth Amendment and are not seeking certification of any of the other claims alleged in the Amended Complaint. Moreover, Plaintiffs' class claim stems from the allegations of unequal treatment of men and women in

violation of the Fourteenth Amendment, not any privacy concerns or variations in the manner or reasonableness of the searches in violation of the Fourth Amendment.

Notably, Plaintiffs allege, and Defendants acknowledge, that BCDC employed a system-wide practice of strip searching all female pre-classification detainees but not all similarly situated male pre-classification detainees. There is a common pattern and practice that affects the class as a whole, along with a common contention that is capable of class-wide resolution. The common fact in this case is that all female pre-classification detainees automatically undergo a strip/vbc search while male pre-classification detainees do not.[13] Determination of the constitutionality of the practice will resolve an issue that is central to the claim of the class.

"Courts have consistently held that class actions challenging blanket strip search policies satisfy Rule 23(a)(2)'s commonality requirement." *Young v. Cty. of Cook*, No. 06-cv-552, 2007 WL 1238920, at *5 (N.D. Ill. Apr. 25, 2007); *see also Dodge v. Cty. of Orange*, 226 F.R.D. 177, 181–82 (S.D.N.Y. 2005) (commonality existed where all members of the class contended that a strip search policy existed, and that they were searched pursuant to the policy); *Marriott v. Cty. of Montgomery*, 227 F.R.D. 159, 172 (N.D.N.Y. 2005) (same); *Sutton v. Hopkins Cty., Ky.*, No. 03-cv-003, 2007 WL 119892, *4 (W.D. Ky. Jan. 11, 2007) ("Plaintiffs have alleged that the Defendants had a policy, custom, or practice of strip-searching persons on admission to and/or just

---

[13] During her deposition, Cpl. Jacquelyn Paige (Allmond) testified as follows: Q. Okay. So you actually do know the policy with regard to male detainees? A. I do, yes, sir. Q. So a male detainee who had no history of bringing contraband into the jail who also wasn't brought in on a drug charge and where the arresting officer did not request a strip search they would not have been strip searched? A. Correct. Q. So a male charged with a DUI with none of those factors would not have been strip searched, is that correct? A. Yes, sir unless there's reasonable cause. Q. But a female, regardless of those factors, would have been strip searched? A. Because they're going to the housing unit, yes, sir. ECF No. 31-3 at 9 (Paige (Allmond) Dep. 30:3–20).

prior to release from the . . . County Jail. . . . Given this allegation, the existence and constitutionality of the county's policy, custom or practice are common questions.").

Defendants suggest that Plaintiffs' claims are not typical of those in the class they want to represent because some putative class members would have been strip searched anyway, based upon reasonable suspicion.[14] ECF No. 34 at 6. This purported difference, however, "while arguably relevant as [a] defense[] to liability, do[es] not change the fact that this class action raises the same basic claim and shares common questions of law." *See Mack v. Suffolk Cty.,* 191 F.R.D. 16, 23 (D. Mass. 2000). While Rule 23(a)(2) requires Plaintiff to show that common questions of law or fact exist and that class members' claims are not in conflict with one another, it does not require that class members' claims be identical. *Id.* (citing *Guckenberger v. Boston University*, 957 F. Supp. 306, 325 (D. Mass. 1997); *Wilcox v. Petit*, 117 F.R.D. 314, 316 (D. Maine 1987)); *see also Marriott*, 227 F.R.D. at 172 (finding claims of representative parties, while involving a more detailed search than every member of the class, meet the typicality requirement as they are still based upon a strip search conducted pursuant to a blanket policy).

Indeed, the "commonality test has been characterized as a 'low hurdle' that is 'easily surmounted,' where all that is required is the existence of 'some common question of law or fact.'" *Case v. French Quarter III LLC*, No. 2:12-CV-02518-DCN, 2015 WL 12851717, at *4 (D.S.C. July 27, 2015) (quoting *In re Prudential Sec. Inc. Lts. P'ships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995) and *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 F.R.D. 48, 51 (S.D.N.Y. 1987)). "The commonality requirement of Rule 23(a)(2) does not require that all, or even most, issues be common, but only that common issues exist." *Id.* (citing *Central Wesleyan*

---

[14] To the extent Defendants also contend questions of whether reasonable suspicion existed to search each individual member of the class predominate over any other common issue in the case, those arguments are addressed below with regard to the requirements under Rule 23(b)(3).

*Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C. 1993), *aff'd*, 6 F.3d 177 (4th Cir. 1993).

Plaintiffs and the proposed class members share a common legal theory, i.e., that these searches

were unconstitutional because they were not based on a reasonable suspicion that the individuals

searched were concealing weapons or contraband but rather were conducted pursuant to a blanket

strip-search policy applied to female detainees but not to male detainees. The question of whether

the BCDC policy violates Plaintiffs' rights under federal law is shared by all members of the

putative class. Therefore, Plaintiffs have satisfied the requirements of Rule 23(a)(2) and (3) despite

the possibility of a varying defense to liability which may be raised regarding particular

individuals. *Mack*, 191 F.R.D. at 23; *Marriott*, 227 F.R.D. at 172.

3. *Adequacy*.

The adequacy requirement reviews whether the plaintiff has any interest antagonistic to the

rest of the class, and whether counsel is qualified. *S.C. Nat. Bank v. Stone*, 139 F.R.D. 325, 330

(D.S.C. 1991); *see also Case*, 2015 WL 12851717, at *5 (citing *Ganesh, LLC v. Computer Leasing

Ctrs., Inc.*, 183 F.R.D. 487, 490 (E.D. Va. 1998)). Plaintiffs must be able to adequately protect the

interests of the class members. *Talley v. ARINC, Inc.*, 222 F.R.D. 260, 268–69 (D. Md. 2004).

As an initial matter, "[t]he adequacy of Plaintiff's counsel, like that of the individual

Plaintiff, is presumed in the absence of specific proof to the contrary." *Case*, 2105 WL 12851717,

at *5 (quoting *S.C. Nat. Bank*, 139 F.R.D. at 330–31). Defendants do not contest the qualifications

or adequacy of Plaintiffs' counsel, and the undersigned finds they are qualified to represent and

protect the interests of the purported class.

Defendants argue, instead, that a fundamental conflict of interest exists between Plaintiffs

and putative class members because Plaintiffs have "made it clear that liability for their

experiences of sexual assault – which are not shared by the purposed class – will predominate over

the issue of equal protection." ECF No. 34 at 9. Defendants emphasize that both individual Plaintiffs also "plead causes of action in assault against all Defendants." *Id.* Merely asserting both individual and class-related claims, however, does not create a conflict of interest. *See Dyer*, 2021 WL 1840833, at *8 (denying motion to strike class allegations on the face of the complaint alone, including where defendant argued plaintiff was not an adequate class representative based on hypothetical conflicts with other class members).

Plaintiffs have asserted an equal protection claim, in addition to their assault claims. Defendants have not explained how these additional allegations somehow create a conflict on the uniform application of the strip search policy as to all female pre-classification detainees but not to similarly situated male pre-classification detainees. In short, the purported conflict appears hypothetical, at best. *See Gunnells*, 348 F.3d at 430 ("To defeat the adequacy requirement of Rule 23, a conflict 'must be more than merely speculative and hypothetical.'") (quoting 5 *Moore's Federal Practice* § 23.25[4][b][ii](2002)); *Brown v. Charles Schwab & Co.*, No. 2:07-CV3852 DCN, 2009 WL 4809426, at *7 (D.S.C. Dec. 9, 2009), *amended*, No. C/A 2:07-CV-03852DCN, 2010 WL 424031 (D.S.C. Feb. 1, 2010) ("[F]or a conflict of interest to prevent plaintiffs from meeting the requirement of Rule 23(a), that conflict must be fundamental. It must go to the heart of the litigation. At best, [defendant] has identified potential conflicts that, consequently, do not defeat a finding of adequacy.") (internal citations and quotation marks omitted).

Plaintiffs' "interests in this case coincide with those of the potential class members" in that they were all subjected to the strip search policy and "in that the named Plaintiffs seek a declaration that the practices, policies, and conditions complained of in the Complaint are unconstitutional." *Bowers v. City of Philadelphia*, No. 06-CV-3229, 2006 WL 2818501, at *3 (E.D. Pa. Sept. 28, 2006). The undersigned finds that Plaintiffs' interests are not antagonistic to those of the putative

class members, and Plaintiffs will adequately protect the interests of the class members, such that the requirements of Rule 23(a)(4) are satisfied.

B. <u>Plaintiffs Meet Rule 23(b) Requirements for Certification</u>

Having satisfied the requirements of Rule 23(a), Plaintiffs must also satisfy one of the requirements of Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs seek certification under Rule 23(b)(3), which empowers the court to certify a class when "the questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

1. *Predominance.*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Naparala v. Pella Corp.*, No. 2:14-CV-03465-DCN, 2016 WL 3125473, at *10 (D.S.C. June 3, 2016) (quoting *Amchem Prods.*, 521 U.S. at 623); *see also Lienhart*, 255 F.3d at 146 n.4. The predominance requirement is "far more stringent than the commonality requirement of Rule 23(a)." *Naparala*, 2016 WL 3125473, at *10 (quoting *Lott v. Westinghouse Savannah River Co*., 200 F.R.D. 539, 563 (D.S.C. 2000)); *see also Amchem Prods.*, 521 U.S. at 623–24. "Where the factual or legal issues common to all class members are outweighed by the number and significance of uncommon, individual issues, Rule 23(b)(3) is not satisfied." *Naparala*, 2016 WL 3125473, at *10 (citing *Amchem Prods*., 521 U.S. at 624). In weighing common issues against individual issues, "the paramount concern for the court is not merely the number of individual inquiries that may be required, but rather whether the nature of the individual inquiries involved is so complex as to outweigh the nature of the common issues sought to be resolved by class treatment." *Id.* (citation and internal quotation marks omitted).

Regarding whether Defendants are liable to the proposed class members for constitutional violations based on the shared characteristics of the strip searches identified above, Plaintiffs argue that common questions predominate over any affecting only individual class members. ECF No. 31-1 at 21–22. Plaintiffs emphasize that the issue of liability is readily resolved, as they do not argue a number of individualized legal points or require a great deal of individualized proof to establish most or all of the elements of their and the class members' legal causes of action. *Id.* Rather, Plaintiffs point to a single policy that prompted one identified act or omission that serves as the basis for all claims. *Id.* They maintain that the strip search is a specific, identifiable action pursuant to the same policy that is simply repeated over a period of time. *Id.*

Defendants argue, however, that the individual issues of "fact, damages and standing" will predominate in the case, such that the predominance requirement of Rule 23(b)(3) is not met. *See* ECF No. 40 at 5–7. They cite to *Windham v. American Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) for the proposition that where there is an "overwhelming large number of individual claims" presenting the "staggering problems of logistics," then the "damage aspect of (the) case predominate[s]" such that the case is "unmanageable as a class action." *Id.* at 5.

However, "[w]hile *Windham* might well support this court's decision should it deny class certification based on management concerns, it does not mandate that result. Indeed, the Fourth Circuit acknowledged in *Windham* that there are a variety of authorities which suggest that it is wrong to deny class certification based simply on 'difficulties of establishing injury and damages.'" *Crane v. Int'l Paper Co.*, C/A No. 3:02-3352-22, 2005 WL 3627139, at *12 (D.S.C. Apr. 19, 2005). As explained below, the undersigned concludes that a class action in this case would be manageable.

Notably, *Windham* is an antitrust lawsuit from 1977 that has little in common with this case. In *Windham*, there were three separate antitrust violations alleged, *see* 565 F.2d at 64, compared to the single alleged unconstitutional practice here. Plaintiffs' equal protection claim is not complex like multipronged antitrust claims. Here, Plaintiffs point to a single, identifiable unconstitutional practice that serves as the basis of their equal protection claim. Thus, liability should be readily resolved across the class because all putative class members were subject to the same allegedly unconstitutional practice.

The core issue of whether the policies and practices relating to strip searches at BCDC were lawful is the predominant issue that binds the class together in this case. "Generally, common questions of law or fact predominate if they represent a significant part of the case and can be resolved for all class members in a single adjudication." *Case*, 2015 WL 12851717, at *5 (citing *Haywood v. Barnes*, 109 F.R.D. 568, 581 (E.D.N.C. 1986)). "The mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (citation and internal quotation marks omitted).

Other class action lawsuits alleging unconstitutional strip searches align with the concept espoused in *Crane* and support a finding of predominance in this case. *See, e.g.*, *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006) (noting that "when plaintiffs are allegedly aggrieved by a single policy of defendants, such as the blanket policy at issue here, the case presents precisely the type of situation for which the class action device is suited") (citation and internal quotation marks omitted); *Jones v. Murphy*, 256 F.R.D. 519, 524 (D. Md. 2009) ("[T]he court is not convinced that individualized determinations regarding reasonable suspicion will

predominate or cause the class litigation to become unmanageable. Rather, whether and for how long a strip search custom or policy existed, the constitutionality of that policy, and to whom the policy was applied are the predominant liability issues in the case of each proposed class member.") (internal citations omitted); *see also Moyle v. Cty. of Contra Costa*, C-05-02324 JCS, 2007 WL 4287315, at 22 (N.D. Cal. Dec. 5, 2007) ("The core issue of whether the policies and practices relating to strip searches . . . were lawful is the predominant issue that binds the class together in this case and is sufficient to satisfy the requirements of Rule 23(b)(3).").

Defendants also posit that damage determinations are likely to differ as between plaintiffs because the impact of the strip searches on the individual plaintiffs will diverge widely. Even if individual damages do vary, individual damage calculations generally do not defeat a finding that common issues predominate. *See Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 272 (4th Cir. 2010) (finding that district court erred in concluding that individual issues of damages would predominate over issues common to the class); *Case*, 2015 WL 12851717, at *6 (citing *Gunnells*, 348 F.3d at 427); *Powers*, 501 F.3d at 619 ("Cases alleging a single course of wrongful conduct are particularly well-suited to class certification."). "In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations." *Case*, 2015 WL 12851717, at *6. "Quantitatively, almost by definition there will always be more individual damages issues than common liability issues. Qualitatively, however, liability issues may far exceed in complexity the more mundane individual damages issues." *Id.* (citation and internal quotation marks omitted); *see Gunnells*, 348 F.3d at 429. The common questions of law and fact in this instance have a direct impact on every class member's effort to establish liability and on every class member's entitlement to relief.

Defendants further argue that there may be factual differences because, for some putative class members, an officer could have had probable cause to strip search the detainee.[15] ECF No. 34 at 6. To be clear, Defendants do not argue those instances would be numerous, nor is there any evidence before the Court that strip searches based on particular episodes of probable cause are or were frequent.[16] Other courts have rejected this theory in strip search cases. *See In re Nassau Cty. Strip Search Cases*, 461 F.3d at 230 ("Further, as the District Court recognized, any such reasonable suspicion inquiries will be de minimis. . . . In light of the pervasive character of the common liability issues and the admittedly *de minimis* nature of individualized liability issues, we conclude that the District Court erred by holding that individual liability issues predominated over common ones[.]"); *Tardiff v. Knox Cty.*, 365 F.3d 1, 6 (1st Cir. 2004) ("If there was in fact a rule, custom or policy of strip searching every arrestee or a substantially overlarge category, then it is a fair guess that most arrestees so classed were strip searched on this basis. There might yet be some number as to whom defensible individual judgments to strip search were actually made or could have been made—two different situations with different legal implications; but whoever has the burden of identifying such persons, they may well not be numerous."). The undersigned agrees that, in this case, any individual factual issues over whether a pre-classification detainee would have been strip searched for reasonable suspicion does not predominate over the common issues raised by the blanket strip search policy.

---

[15] Defendants also argue that any pre-trial detainees who return to BCDC after a bond hearing would automatically be strip searched, such that including such female pre-trial detainees in the class definition would defeat the commonality and typicality requirements. ECF No. 34-6. As noted above, Plaintiffs agree to removing any such individuals from the proposed class, and the definition has been modified accordingly.

[16] Plaintiffs argue that "BCDC recently produced records which identify which males and females were strip searched based on reasonable suspicion. Only a *tiny* portion of females were strip searched on reasonable suspicion." ECF No. 42 at 3 (emphasis in original). No such records are before the Court.

Moreover, in weighing common issues against individual issues, "[t]he paramount concern for the court is not merely the number of individual inquiries that may be required, but rather whether the nature of the individual inquiries involved is so complex as to outweigh the nature of the common issues sought to be resolved by class treatment." *Naparala*, 2016 WL 3125473, at *10 (quoting *Brooks v. GAF Materials Corp.*, No. 8:11-cv-00983, 2012 WL 5195982, at *8 (D.S.C. Oct. 19, 2012)). The inquiries and information that may be needed to make a reasonable suspicion determination on a limited number of putative class members is not a complex inquiry and certainly does not outweigh the nature of the common issues sought to be resolved by class treatment in this case.

Defendants also emphasize that "[a]nother individual inquiry that the Court would need to conduct would be to ascertain which class members' claims fall outside the statute of limitations." ECF No. 40 at 7. The parties agree that South Carolina's three-year statute of limitations applies to Plaintiffs' claim under 42 U.S.C. § 1983.[17] *See Owens v. Baltimore City State's Att'ys. Off.*, 767 F. 3d 379, 388 (4th Cir. 2014) (explaining that the most analogous state-law cause of action for § 1983 suits is a personal-injury suit); S.C. Code Ann. § 15-3-535 (2005) (three-year statute of limitations). The parties further agree that a claim accrues "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nassim v. Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing *United States v. Kubrick*, 444 U.S. 111, 122–24 (1979)); *see Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307

---

[17] Although the South Carolina statute of limitations applies, the matter of when a cause of action has accrued under § 1983 is a question of federal law. *See McDonough v. Smith*, ___ U.S. ____, 139 S. Ct. 2149, 2155 (2019) ("Although courts look to state law for the length of the limitations period, the time at which a § 1983 claim accrues is a question of federal law, conforming in general to common-law tort principles." (citation and internal quotation marks omitted)); *Nassim v. Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)).

(4th Cir. 2020) (stating that a cause of action accrues when the plaintiff "has actual or constructive knowledge" of the claim).

According to Defendants, because the Complaint was filed on March 6, 2020, "any potential class member booked prior to March 6, 2017 is presumably barred from bringing a claim." ECF No. 40 at 7. Defendants contend that individualized, fact-intensive determinations will have to be made as to whether class members knew or should have known about BCDC's allegedly unconstitutional practice by March 6, 2017. The undersigned disagrees.

Indeed, in this case, it is difficult to imagine how the exercise of reasonable diligence would place a putative class member on notice of her potential claim during the two-year period between February 27, 2015 (the date the policy was implemented) and March 6, 2017. All female pre-classification detainees were strip searched and confined to BCDC's general population, while all males were held in a special pre-class holding cell. There is no evidence before the Court that males and females were permitted to communicate with one another while detained, nor that BCDC alerted any putative Plaintiff to its new strip search policy on February 27, 2015. Defendants have not provided any evidence or argument as to how Plaintiffs knew or should have known of their potential claims. Notwithstanding that it appears likely that most putative class members between February 27, 2015, and March 6, 2017, should not have known of a potential claim, the undersigned finds that the statute of limitations defenses at issue here do not defeat the predominance of common questions.

Ultimately, although affirmative defenses may arise and may affect different class members differently, these occurrences do not compel a finding that individual issues predominate over common ones in this instance. A sufficient constellation of common issues binds class

members together, such that the purported variations in the sources and application of defenses raised by Defendants does not foreclose class certification.

2. *Superiority*.

Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "depends greatly on the circumstances surrounding each case," and the "rule requires the court to find that the objectives of the class-action procedure really will be achieved in the particular case.'" *Stillmock*, 385 F. App'x at 274 (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Fed. Prac. & Proc.* § 1779 (3d ed. 2005)). When making this determination, the Court should "not contemplate the possibility that no action at all might be superior to a class action." *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 425 (E.D. Va. 2016) (citation and internal quotations marks omitted). Factors the court should consider include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing the class action." Fed. R. Civ. P. 23 (b)(3)(A)–(D). Ultimately, "[t]he goal is to ensure that class certification occurs only when economy and efficiency are reasonably likely to result." *Ganesh*, 183 F.R.D. at 491.

Here, each of the foregoing factors favors class certification. There is no prevalence of individual issues and little indication that class members prefer to maintain separate actions.[18]

---

[18] The undersigned notes five individual lawsuits have been filed subsequent to this one: 9:22-cv-00480-DCN-MHC; 9:22-cv-00482-DCN-MHC; 9:22-cv-00483-DCN-MHC; 9:22-cv-00484-DCN-MHC; and 9:22-cv-00485-DCN-MHC. Counsel for Plaintiffs in this action is the same for the plaintiffs in these other lawsuits, and the parties have suggested consolidating the cases.

Second, there is no existing litigation with which this case might interfere. Third, under the current facts, the use of the class action device will result in conservation of judicial resources and achieve economies of time, effort, and expense. The class action format is designed for this very situation where individuals seek to vindicate "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods.*, 521 U.S. at 617 (citation and internal quotation marks omitted). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). "A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Id.*

Defendants, citing *Parker v. Asbestos Processing, LLC*, No. 0:11-CV-01800-JFA, 2015 WL 127930, at *14 (D.S.C. Jan. 8, 2015), argue that class certification is not superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims. ECF No. 40 at 9. However, the facts in *Parker* are not analogous to the facts in this case. Indeed, in concluding that class certification did not meet Rule 23(b)(3)'s "superiority" requirement, the *Parker* court pointed to the "unique" circumstances of the controversy at issue that would make managing a class action particularly difficult:

> Resolution of [the issues of proximate cause and damages in a legal malpractice case alleging failure to advise clients of workers' compensation rights] raises the all-important question of whether a plaintiff had, at the time, a viable workers' compensation claim. Answering this question would involve a fact-intensive inquiry regarding questions such as:
>
> • Whether the plaintiff had asbestosis caused by his employment;
>
> • Whether the plaintiff was "disabled" for workers' compensation purposes;
>
> • Whether the plaintiff incurred lost wages;

> • Whether the plaintiff's claim was timely; and
>
> • Whether the plaintiff "contracted" asbestosis within two years of the last exposure as required by South Carolina law.
>
> To use the vernacular, to allow this case to proceed as a class action for certain simple and relatively straightforward common threshold issues [regarding whether the disclaimer in the contract of representation sufficiently advised the plaintiffs of their rights regarding workers' compensation] would be to allow the tail to wag the dog. The prospect of litigating, in one case, nearly 16,000 claims of workers' compensation disability issues, as well as damages, with only minimal advantage gained from the resolution of the threshold common issues, leads this Court to conclude, under Rule 23(b)(3)(D) that the "likely difficulties in managing a class action" render the class action device inferior to other available methods in this case.

2015 WL 127930, at *15. That is not the case here.

For most strip search claimants, class status is likely not only the superior means, but arguably the only feasible one to establish liability and damages. Other courts have observed that such concerns are particularly proper where, as here, the putative strip search class will likely include class members who are unable to litigate these cases individually. *See Gwiazdowski v. Cty. of Chester*, 263 F.R.D. 178, 190 (E.D. Pa. 2009) ("[C]ourts have concluded in similar 'strip search policy' cases that recovery by each putative class member would likely be small, and that each member would have little incentive to pursue its claims individually[.]"); *see also In re Nassau Cty. Strip Search Cases*, 461 F.3d at 230 ("[W]ithout class notification, most putative class members will not even know that they suffered a violation of their constitutional rights."); *Tardiff*, 365 F.3d at 7 ("It is enough for the superiority determination here that for most strip search claimants, class status here is not only the superior means, but probably the only feasible one . . . to establish liability and perhaps damages."); *Buzzarro v. Ocean Cty.*, No. CIV.A. 07-5665(FLW), 2009 WL 1617887, at *17 (D.N.J. June 9, 2009) (finding that "due to the nature of Plaintiffs' claims, most of the proposed class members would not independently assert their claims"). In sum, superiority and all other requirements of Rule 23(b)(3) are satisfied.

21

C.  <u>Class Notice</u>.

Under Fed. R. Civ. P. 23, adequate notice must be given to all absent class members to enable them to make an intelligent choice as to whether to opt-out of the class or to object. Under Rule 23(c)(2)(B), the parties should confer and prepare an appropriate plan of notice to submit to the Court for approval. Plaintiffs' request for allocation of the costs of mailing and providing class notice to Defendants will be deferred until such time as this Recommendation may be adopted by the District Judge.

## RECOMMENDATION

It is **RECOMMENDED** that Plaintiffs' Motion to Certify Class (ECF No. 31) be **GRANTED**, consistent with the revised class definition as set forth herein. It is further recommended that, if the District Judge adopts this Report and Recommendation, then: (a) the parties confer and submit a proposed notice to the Court, revised in accordance with the Court's findings; and (b) if the parties are unable to agree on the contents of the notice, submit to the Court a brief, joint statement explaining any outstanding issues. The proposed notice or joint statement should be due within ten days from any order adopting this Report and Recommendation.

It is so **RECOMMENDED**.

The parties are referred to the Notice Page attached hereto.

Molly H. Cherry
United States Magistrate Judge

May 2, 2022
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).