UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Cheryl A. Munday and Margaret Devine, on behalf of themselves and others similarly situated, | ) ) ) | C/A No. 9:20-02144-DCN-MHC |
| | ) | |
| Plaintiffs, | ) ) | **REPORT AND RECOMMENDATION AND ORDER** |
| v. | ) ) | |
| Beaufort County, Philip Foot, Quandara Grant, John Does 1-5, and Jane Does 1-5, | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

Before the Court is Defendants' Motion for Summary Judgment ("Motion"). ECF No. 48.

Plaintiffs filed a Response in Opposition to the Motion (ECF No. 56)[1], and Defendants filed a

Reply (ECF No. 63). The Motion is ripe for review.[2]

## BACKGROUND

This case involves certain procedures used for female pre-classification detainees at the

Beaufort County Detention Center ("BCDC" or "Detention Center"). A pre-classification detainee

is an inmate who has been arrested and placed or housed in an area at the detention center prior to

going to a bond hearing. ECF No. 34-1 at 20:7–14. Once a pre-trial detainee goes to a bond hearing

and cannot produce a bond, upon returning to BCDC, he or she is then classified to a different area

---

[1] Within their Response, Plaintiffs seek leave to amend their Amended Complaint several times. Although no formal motion has been filed, the undersigned addresses Plaintiffs' requests for leave to amend at the appropriate substantive sections herein.

[2] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(f) (D.S.C.). Pursuant to those provisions, this Report and Recommendation is entered for review by the District Judge.

at BCDC, such as in general population or, depending on the inmate's behavior, maximum or super maximum security. ECF No. 34-3 at 21:3–18.

Defendant Beaufort County operates BCDC. ECF Nos. 12 ¶ 7, 13 ¶ 5. Defendant Philip Foot ("Foot") is the Assistant County Administrator for Public Safety Division who oversees BCDC. ECF Nos. 12 at ¶ 8, 13 ¶ 6. Defendant Quandara Grant ("Grant") is a Colonel and the director of the BCDC. ECF Nos. 12 at ¶ 9, 13 ¶ 6. Defendants John Does 1–5 are described in the Amended Complaint as "BCDC Supervisory Defendants" responsible for the training, supervision, control, assignment, and discipline of County personnel at BCDC, and for the formulation, administration, and enforcement of the policies, rules, regulations, and practices of BCDC. ECF No. 12 at ¶ 10. Defendants Jane Does 1–5 are described in the Amended Complaint as "BCDC Officer Defendants" who were, at all times relevant to this action, Beaufort County employees who worked as correctional officers at BCDC. *Id.* at ¶ 11.

### BDCD Strip Search Policy and Practice

Prior to February 27, 2015, pursuant to BCDC policy, female pre-classification detainees were not strip searched,[3] unless reasonable suspicion existed. ECF No. 40-1 at ¶ 5. Moreover, at that time, no inmate was strip searched upon going into BCDC's general population, absent a specific reason. ECF No. 48-2 at 5, Grant Dep. at 52:7–53:9. According to Defendants, this policy resulted in the passing of contraband from pre-classification inmates going into the general population. *Id.*

---

[3] The terms "strip search" and "visual body cavity search" (vbc) are used throughout this Report and Recommendation and, and at times, the term "strip/vbc search" may be used. A strip search involves partial or complete disrobing but not necessarily a body cavity inspection, while a visual body cavity search involves visual inspection of rectal, vaginal and other body cavities. Strip/vbc searches involve removal of all clothing to permit inspection of all body openings including ears, nostrils, anus, navel, and mouth. ECF No. 31-2. They include a thorough inspection of the hair, crotch area, abdomen, soles of the feet, armpits, and areas between the fingers and toes. *Id.*

On February 27, 2015, BCDC adopted a policy ("Policy") that all inmates being moved from pre-classification to other areas of BCDC, including general population, would be strip searched. The Policy provides in relevant part:

> Sub:  Strip Search of all Inmates leaving Pre-Class
>
> 1. Effective this date all inmates being moved from Pre-Class to other areas of the facility will be strip-searched as a matter of policy.
>
> 2. The Pre-Class officer assisted by other members of the shift will strip search all inmates that are being moved by Classifications to other areas of the facility, as part of the process of changing uniforms.

ECF No. 40-1 at ¶ 6.[4]

BCDC's practice ("Practice") has been to house female pre-classification inmates in general population while placing male pre-classification inmates in a separate pre-classification cell outside of general population. ECF No. 31-3 at 14, Black Dep. 24:2–20. Because female pre-classification detainees are held in general population at the outset, BCDC conducts a strip/vbc search on every female pre-classification detainee[5] awaiting a bond hearing. ECF No. 40-1 at ¶ 6. BCDC did not, however, do so for similarly situated male pre-classification detainees prior to May 5, 2020, as they were housed in a separate pre-classification cell outside of general population.[6]

---

[4] The citation provided by Defendants for the referenced Policy is an affidavit of Quandara Grant; however, the Policy is not attached to the affidavit. Plaintiffs attached a copy of the Policy to an earlier brief in the case. ECF No. 31-4 at 2.

[5] "[W]e instruct [females] to remove their clothing one item at a time and hand them to the booking officer." ECF No. 31-3 at 3, Black Dep. 18:25–19:2. "[W]e have them lift their breasts, raise their—both arms and then we have them bend over." *Id.* "Then we ask them to turn around and face the wall. We ask them to bend over at the waist, squat, reach back and grab their cheeks—their butt cheeks, spread and cough three times hard from the stomach." *Id.* at 20:5–9. The guards can tell when someone is coughing because they watch the movement of the "vagina and the anal." *Id.* at 34:12.

[6] According to Defendants, because of Covid protocols, as of May 5, 2020, pre-classification males are now also held in general population and, thus, also strip searched. ECF No. 40-1 at ¶ 7.

There is no dispute between the parties that this Practice was in effect at BCDC between February 27, 2015, and May 5, 2020. *See* ECF No. 40 at 2.

<u>Plaintiffs' Experiences at BCDC[7]</u>

Plaintiff Cheryl Munday ("Munday") was arrested by the Bluffton Police Department on March 9, 2018, for driving under the influence, which charge was later dismissed. The arresting officer delivered her into the custody of BCDC officers for the booking process, where she underwent a full body pat down, strip search and visual body cavity search. ECF Nos. 12 at ¶¶ 15–19; 13 at ¶¶ 10, 12, 13. At the onset of the booking process, Munday alleges that a BCDC officer reviewed her personal information and commented that she "look[ed] great," before informing her that she was subject to a full body "pat down" and conducting the pat down. ECF No. 12 at ¶¶ 15–17. Munday alleges that the officer placed her hands on Munday's ankles and worked her way up the legs, grabbing Munday's crotch and running a finger along her vaginal area. *Id.*; *see also* ECF No. 56 at 23–24. Munday alleges that the officer inserted a finger into her vagina until clothing prevented it from going further inside. *Id.* Munday claims that the pat down continued to her upper body where the officer attempted to insert her hands under Munday's bra. *Id.*

According to Munday, following the pat-down, she was taken to a small area known as the "strip-search room" and required to remove her clothing. ECF No. 12 at ¶¶ 15–17. While nude, she contends she was required several times to bend over, spread her buttocks and cough. *Id.* Munday further contends that the officer conducting the strip search became angry and started shouting. *Id.* She claims that the door remained open during the strip search so that passersby could

---

[7] The facts regarding Plaintiffs' experiences are taken largely from the allegations in the Amended Complaint, as cited by Defendants throughout their Motion. ECF No. 12. Although Plaintiffs cited to some portions of Plaintiff Munday's deposition transcript, ECF No. 56 at 24, they do not include copies of either Plaintiff's deposition transcript with their Response. Defendants attach excerpts of Plaintiffs' depositions to their Motion; however, the excerpts are heavily redacted.

see her naked body. *Id.* Munday alleges that she was led back to the lobby, where she witnessed a male arrestee being booked, who was only patted from the knees down only and that the man's groin or buttocks were not searched. *Id.* at ¶ 19.

Plaintiff Margaret Devine ("Devine") was arrested by the Highway Patrol on January 17, 2019, for driving under the influence; the charge was later dismissed. According to Devine, after she was transported to BCDC to begin the booking process, a BCDC officer initiated a full body pat down followed by a strip search and visual body cavity search of her. ECF No. 12 at ¶¶ 20– 24. Devine alleges that she was led to a shower stall and required to remove her clothes. ECF No. 12 at ¶ 22. She contends that the shower stall was open so that passersby were able to see in. *Id.* After Devine removed her clothes, two guards allegedly instructed her to turn around, face a wall, bend over from the waist so that her backside and genitalia were exposed, and cough. *Id.* Devine claims that, despite her compliance, the officers ordered her to "cough harder and louder." ECF No. 12 at ¶ 23. The guards then allegedly ordered her to take a shower while they watched. *Id.* She claims that the guards required her to shower again, making sure to wet her hair completely. ECF No. 12 at ¶ 24.

<u>Claims in Case</u>

Plaintiffs have asserted seven causes of action against all Defendants and two causes of action against Beaufort County only, as noted: (1) 42 U.S.C. § 1983 for violations of the Fourth Amendment; (2) 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment; (3) Article I, Section 10 of the South Carolina Constitution regarding privacy; (4) Article I, Section 3 of the South Carolina Constitution regarding equal protection; (5) Negligent Deprivation of Statutory Rights under South Carolina Tort Claims Act (against Defendant Beaufort County only); (6) Reckless Infliction of Emotional Distress (against Defendant Beaufort

County only); (7) Assault; (8) Battery; and (9) Negligence. Plaintiffs are also seeking attorneys'
fees under 42 U.S.C. § 1988(b).

Defendants have moved for summary judgment on all of Plaintiffs' claims, as well as their
request for attorneys' fees.

## LEGAL STANDARD

Summary judgment is appropriate if a party "shows there is no genuine dispute as to any
issue of material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ.
P. 56(a). Under the framework established in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the
party seeking summary judgment shoulders the initial burden of demonstrating to the Court that
there is no genuine issue of material fact. *Id*. at 323. Once the movant has made this threshold
demonstration, the non-moving party, to survive the motion for summary judgment, must
demonstrate that specific, material facts exist which give rise to a genuine issue. *Id*. at 324.

Under this standard, the evidence of the non-moving party is to be believed and all
justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, although the Court views all the underlying facts
and inferences in the record in the light most favorable to the non-moving party, the non-moving
"party nonetheless must offer some 'concrete evidence from which a reasonable juror could return
a verdict in his [or her] favor.'" *Williams v. Genex Servs., LLC*, 809 F.3d 103, 109 (4th Cir. 2015)
(quoting *Anderson*, 477 U.S. at 256). That is to say, the existence of a mere scintilla of evidence
in support of the plaintiff's position is insufficient to withstand the summary judgment motion.
*Anderson*, 477 U.S. at 252. Likewise, conclusory or speculative allegations or denials, without
more, are insufficient to preclude the granting of the summary judgment motion. *Thompson v.
Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). "Only disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. To survive summary judgment, the non-movant must provide evidence of every element essential to his action on which he will bear the burden of proving at a trial on the merits. *Celotex Corp.*, 477 U.S. at 322.

## LEGAL ANALYSIS

### A. **Plaintiffs' Claims Under 42 U.S.C. § 1983**

"Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted).

Plaintiffs bring two claims under § 1983, alleging that Defendants violated their rights under the Fourth Amendment (Count 1) and the Equal Protection Clause of the Fourteenth Amendment (Count 2). Defendants have moved for summary judgment on both claims.

### 1. Fourth Amendment (Count 1)

Plaintiffs allege that Defendants subjected them to "unnecessary, demeaning, outrageous and intrusive strip and body cavity search[es]" that violated their rights to be secure "against unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendments to the United States." ECF No. 12 at ¶ 48.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const., Amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (finding that the Fourth Amendment is made applicable to the states through the

Fourteenth Amendment). It is well established that assessing a search's reasonableness "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In conducting this analysis, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* The Fourth Circuit employs the *Bell* test "to determine the reasonableness of a broad range of sexually invasive searches," including strip searches and visual body cavity searches. *United States v. Edwards*, 666 F.3d 877, 883 (4th Cir. 2011) (internal quotation marks omitted) (strip search of arrestee); *see Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020) (strip search of prison visitor); *Leverette v. Bell*, 247 F.3d 160 (4th Cir. 2001) (visual body cavity search of prison employee).

In *Bell*, the United States Supreme Court held that a prison policy requiring all inmates and pretrial detainees to submit to visual body cavity searches following contact visits did not violate the Fourth Amendment. *See* 441 U.S. at 558 ("[Although p]retrial detainees [] retain some Fourth Amendment rights upon commitment to a corrections facility, we nonetheless conclude that these searches do not violate that Amendment. The Fourth Amendment prohibits only unreasonable searches, and under the circumstances, we do not believe that these searches are unreasonable.") (internal citations omitted); *Calloway*, 948 F.3d at 201 ("While the [*Bell*] Court recognized that such searches were invasive, it reasoned that they were nonetheless reasonable even absent individualized suspicion in light of the prison officials' 'significant and legitimate security interests.'") (quoting *Bell*, 441 U.S. at 560); *Frazier v. Kimbrell*, C/A No. 4:19-2384-MGL-TER, 2021 WL 1799346, at *3 (D.S.C. Apr. 12, 2021) ("A body cavity search does not violate an inmate's Fourth Amendment rights if the search is reasonable and not motivated by punitive

intent.") (citing *Bell*, 441 U.S. at 545–46, 558–61), *report and recommendation adopted,* 2021 WL 1791455.

In 2012, the Supreme Court held that the Fourth Amendment does not prohibit a policy requiring the strip searching of all detainees who will be in a jail's general population:

> The admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself. . . . Detecting contraband concealed by new detainees, furthermore, is a most serious responsibility. Weapons, drugs, and alcohol all disrupt the safe operation of a jail. . . . Something as simple as an overlooked pen can pose a significant danger. Inmates commit more than 10,000 assaults on correctional staff every year and many more among themselves. . . . There is a substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk when he is admitted to the general population. . . .

*Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 333–34 (2012); *see id*. at 340 ("The Court holds that jail administrators may require all arrestees who are committed to the general population of a jail to undergo visual strip searches not involving physical contact by corrections officers.") (Alito, J., concurring).

    *a.  Beaufort County*

Plaintiffs make no argument in their Response regarding their Fourth Amendment claim against Beaufort County. The undersigned deems the arguments abandoned or waived. *See Jones v. Fam. Health Ctr., Inc.*, 323 F. Supp. 2d 681, 690 (D.S.C. 2003) (finding that Plaintiff waived claims not addressed in an opposition memorandum, even though counsel advised the court that she had not intended to abandon those claims), *aff'd sub nom. Jones v. Fam. Health Centers, Inc.*, 98 F. App'x 959 (4th Cir. 2004). Accordingly, the undersigned recommends granting Defendants' Motion for Summary Judgment as to any Fourth Amendment claims against Beaufort County.

b.  *Individual Defendants*

As to Defendants Foot and Grant, Plaintiffs do not argue that either of them personally participated in or conducted any strip search of either Plaintiff. Instead, Plaintiffs contend Defendants Foot and Grant are liable in their supervisory capacities because they knew or should have known "their subordinates were strip searching all female pre-classification detainees, but not all similarly situated males during the class period." ECF No. 56 at 15. However, all of Plaintiffs' arguments regarding Defendants' subordinates are premised upon alleged unequal treatment of female and male pre-classification detainees when conducting strip searches.[8] *See id.* This claim of unequal treatment is founded upon an alleged violation of the Equal Protection Clause of the Fourteenth Amendment, not the Fourth Amendment.

Plaintiffs make no argument, nor point to any evidence in the record, as to how any of the individual Defendants or their subordinates—including any Doe Defendants—violated Plaintiffs' Fourth Amendment rights to be free from "unreasonable searches and seizures." Although Plaintiffs have described the strip searches in their Amended Complaint as "unnecessary, demeaning, outrageous and intrusive," they do not appear to dispute the general validity of BCDC's Policy of strip searching detainees, like themselves, who are in contact with BCDC's general population. Indeed, the law is clear that a strip search in that context is permissible. *See*

---

[8] Specifically, Plaintiffs argue the following:

> Foot and Grant knew that female pre-classification detainees were not afforded a separate pre-classification holding area like males were. Grant, who approved the new strip search policy in 2015, logically knew that her subordinates were strip-searching all female pre-classification detainees, but not all similarly situated males. Foot also knew that pre-classification males were excepted from strip-searches. Despite such knowledge, Foot and Grant made no effort to relocate female pre-classification detainees into a separate holding area or to afford them the comparable comforts males enjoyed.

ECF No. 56 at 15 (citations omitted).

*Florence*, 566 U.S. at 333–34. Nor do Plaintiffs make any arguments regarding application of the *Bell* test to determine the reasonableness of the contested searches. *See Bell*, 441 U.S. at 559; *Edwards*, 666 F.3d at 883; *see also Calloway*, 948 F.3d at 201.

Instead, Plaintiffs' arguments pertain only to BCDC's Practice of treating male and female pre-classification detainees differently, which is addressed below in the analysis of Plaintiff's claim under the Equal Protection Clause of the Fourteenth Amendment. Because Plaintiffs make no argument in their Response, nor point to any evidence, regarding the unreasonableness of or punitive intent behind their specific strip searches, *see Frazier*, 2021 WL 1799346, at *3, the undersigned finds that Plaintiffs have failed to create a genuine dispute of material fact regarding their Fourth Amendment claim. Accordingly, the undersigned recommends granting Defendants' Motion for Summary Judgment on Plaintiffs' § 1983 claim against the individual Defendants, including Defendants Foot and Grant and the Doe Defendants, based upon a violation of their Fourth Amendment rights.

2. Equal Protection Clause (Count 2)

Plaintiffs allege that the unequal treatment of men and women detainees deprived them of "clearly established protections afforded by the equal protection guarantees of the 14[th] Amendment." ECF No. 12 at ¶ 53. Specifically, Plaintiffs claim that the procedures used by BCDC between February 27, 2015, and May 5, 2020, to process the intake of similarly situated female and male pretrial detainees were different because, while all women in pre-classification status were housed in general population and subjected to routine strip/vbc searches, similarly-situated men in pre-classification status were not. ECF No. 12 ¶¶ 4, 25–28.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

XIV, § 1. The Clause "is essentially a direction that all persons similarly situated should be treated alike." *Fisher v. King*, 232 F.3d 391, 399 (4th Cir. 2000) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

"An equal protection violation occurs in one of two ways: (1) when the government explicitly classifies people based on [sex], or (2) when a law is facially neutral, but its administration or enforcement disproportionately affects one class of persons over another and a discriminatory intent or animus is shown." *Monroe v. City of Charlottesville*, 579 F.3d 380, 388 (4th Cir. 2009). Thus, to analyze a claim under the Equal Protection Clause, the first step is to identify the classification at issue. That determination, in turn, informs the government's burden of proof.

Certain laws or regulations distinguish among groups on their face. Others are facially-neutral but nonetheless disproportionately affect certain groups. With respect to the latter category, a viable Equal Protection claim exists only when the plaintiff can demonstrate that a disparate impact and discriminatory intent nonetheless lie behind the facially-neutral law. *See, e.g., Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272–74 (1979); *Veney v. Wyche*, 293 F.3d 726, 730–31 (4th Cir. 2002) ("To succeed on an equal protection claim, [a detainee] 'must first demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'") (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). By contrast, with respect to the former, where a line is overtly drawn on the basis of gender, a suspect classification is established by definition and there is no need to establish discriminatory intent.

If a plaintiff makes either showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Veney*, 293 F.3d at 731 (quoting *Morrison*, 239 F.3d at 654).

    *a. Beaufort County*

        i. Different Treatment

According to Defendants, the Court need not engage in any scrutiny at all (and they need not advance any justification for their actions) because a valid Equal Protection claim must establish that women were treated differently from men and that such unequal treatment stemmed from a discriminatory intent. Defendants argue that, while women and men pretrial detainees were undoubtedly treated differently, it was the result of a facially neutral policy that requires all detainees moving to general population, male and female, to be strip searched. ECF No. 48-1 at 12–13. They contend, under the circumstances, Plaintiffs have to—and cannot—show discriminatory intent, such that their claim fails.

This argument ignores, however, that BCDC's Policy, which applies to inmates "being moved from Pre-Class to other areas of the facility," is not at issue in this case. Rather, Plaintiffs' claims are based upon their pre-classification status alone, at the outset of their arrest, not their movement from pre-classification to any other area of the facility.[9] ECF No. 12 at ¶¶ 25, 27. Indeed, it is undisputed that BCDC's Practice was to conduct a strip search on every female pre-

---

[9] Even construing Defendants' argument liberally, it begs the question why female pretrial detainees were housed in general population at the outset, while male pretrial detainees were not. The separate housing, in and of itself, is not facially neutral but, instead, an explicit classification based on sex. *See Monroe*, 579 F.3d at 388. This explicit classification, which resulted in the strip searching of female pretrial detainees but not male pretrial detainees, is subject to scrutiny, as addressed further herein below.

classification detainee awaiting bond between February 27, 2015, and May 5, 2020, but not on male pre-classification detainees during that time. *See generally* ECF No. 40-1.

Viewing the evidence in the light most favorable to Plaintiffs, the undersigned agrees with Plaintiffs that BCDC's Practice of strip-searching female pre-classification detainees but not male pre-classification detainees—between February 27, 2015, and May 5, 2020—is not gender neutral but, instead, "intentional disparity in treatment from other similarly situated inmates" based on sex. *See King v. Rubenstein*, 825 F.3d 206, 221 (4th Cir. 2016) (reversing dismissal of inmate's equal protection claim alleging that he was treated differently from two other inmates when he was required to have surgery to remove implants in his penis while they were not required to undergo surgery); *see also Bullock v. Dart*, 599 F. Supp. 2d 947, 957 (N.D. Ill. 2009) (finding that jail's practice of strip-searching and returning to housing areas all male detainees, including possible discharges, while "segregating female possible discharges from the remainder of the female court returns, such that female actual returns may elect to avoid strip searches, is not gender-neutral on its face").

### ii. Scrutiny

State action that is explicitly based on sex generally is subject to certain scrutiny, and the burden is on the State to justify its action thereunder.[10] *United States v. Virginia,* 518 U.S. 515, 533 (1996). The Fourth Circuit has explained that when equal protection challenges arise in a

---

[10] Defendants argue in their initial brief that BCDC's strip search Policy is subject to intermediate scrutiny. ECF No. 48-1 at 13–15. "Intermediate scrutiny, [ ]means 'it must be established at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Adkins v. Rumsfeld*, 464 F.3d 456, 468 (4th Cir. 2006) (quoting *Nguyen v. INS*, 533 U.S. 53, 60 (2001)). However, for the first time in Reply, Defendants argue that a more relaxed constitutional standard applies. ECF No. 63 at 9–12. The undersigned has analyzed the issues in this case under a more relaxed standard, as explained above.

prison or jail context, "courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner." *Veney*, 293 F.3d at 732 (evaluating equal protection claim brought by jail inmate). Under this more deferential standard, courts must determine whether the disparate treatment is "reasonably related to [any] legitimate penological interests." *Id.* (explaining that while courts are to "apply this deferential standard even when the alleged infringed constitutional right would otherwise warrant higher scrutiny[,] . . . this more deferential review does not make [the court] ignorant to the concerns that justify application of a heightened standard outside of the prison context") (citation and internal quotation marks omitted).

In determining whether an action is reasonable under this deferential standard, courts consider the following factors: (1) whether there is a valid, rational connection between the policy and penological interest; (2) whether an alternative means of exercising the right remains available to the inmate; (3) the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives that accommodate prisoners' rights at de minimis cost to valid penological interests. *Morrison*, 239 F.3d at 655 (citing *Turner v. Safley*, 482 U.S. 78, 89–90 (1987)). The undersigned concludes that even under *Morrison*'s less rigorous standard, Plaintiffs have set forth sufficient evidence to support an Equal Protection claim against BCDC, at least at this stage of the litigation.

Here, with regard to the first factor, Defendants emphasize that all female pre-classification detainees, unlike their male counterparts, were held in the jail's general population area where weapons and contraband posed a danger. ECF No. 48-1 at 14. As such, they contend they "had a legitimate penological interest in preventing the smuggling of contraband into general population." ECF No. 63 at 12.

Preventing the passage of contraband is undoubtedly a legitimate penological interest. *See Jehovah v. Clarke*, 798 F.3d 169, 178 (4th Cir. 2015) ("Promoting the inmates' safety and health is a legitimate concern."); *Veney*, 293 F.3d at 732 ("Prison safety and security are legitimate penological interests that [the court] must consider."). Notably, Defendants cite to *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318 (2012), for the proposition that "general population dramatically magnifies the dangers posed by weapons and other contraband." *Id.* However, while the *Florence* case acknowledged jail officials may strip search individuals who have been arrested for any crime before admitting them to jail, it does not authorize differential treatment by jail officials.[11]

Defendants' argument, again, begs the question why female pretrial detainees are placed in general population in the first instance, thereby subjecting them to strip searches, while male pretrial detainees were not. *See* footnote 9, *supra*. Indeed, Defendants contend that the strip search of female pre-classification detainees was not "because they are female" but, instead, a "byproduct of the logistical fact that women pre-classification [detainees] must be placed in general population, whereas there exists a separate pre-classification holding area for male [detainees]."[12] ECF No. 48-1 at 13. According to Defendants, this different treatment was "in part due to the requirement, under the Minimum Standards for Local Detention Facilities in South Carolina [that]

---

[11] The undersigned notes the obvious security concerns raised in the *Florence* case; however, it bears mentioning here the "Year End Reports for Beaufort County Detention Center" for 2010, 2011, 2012 and 2015, which show that Defendants conducted 18,402 "shakedowns" of inmates' cells prior to adoption of the strip-search practice at issue here and found no serious contraband. ECF No. 56-1.

[12] The undersigned has replaced the word "prisoners," used by Defendants in their brief, with "detainees," as this case concerns arrestees detained in a detention center and awaiting an initial bond hearing, not convicted prisoners. *See Bell*, 441 U.S. at 545 (distinguishing between "pretrial detainees, who have not been convicted of any crimes," and "convicted prisoners"); *Williamson v. Stirling*, 912 F.3d 154, 176, 184 (4th Cir. 2018) (same).

'[f]emale inmates shall be housed in an area separated from normal auditory and visual contact with male inmates.'" ECF No. 63 at 7.

This argument segues into the fourth *Morrison* factor: the absence of ready alternatives that accommodate prisoners' rights at de minimis cost to valid penological interests. Specifically, two ready alternatives appear to present themselves: (1) placing female pre-classification detainees in a separate pre-classification holding area so that they would not need to be strip searched, or (2) placing male pre-classification detainees in general population so that they, too, would be strip searched.

As to the first alternative, Defendants argue that BCDC could not modify its existing structure to separate pre-classification female detainees. *Id.* Their argument boils down to the following: "There is no evidence to support that the location of the female pre-classification area was the result of a gender-based reason. Instead, it was a result of the neutral realities of the construction of the Detention Center." *Id.*

This argument, however, is unavailing at this stage in the litigation. Indeed, at least some courts have recognized that such "neutral realities," *id.*, are not sufficient to justify treating male and female inmates differently: "Vague and general references to funding and space constraints cannot justify a policy that resulted directly in the strip and visual body cavity searches of thousands of female arrestees, while permitting their male counterparts to rest in the relative comfort and security of [ ] lockups." *Ford v. Suffolk County*, 154 F. Supp. 2d 131, 151 (D. Mass. 2001); *see also Bukhari v. Hutto*, 487 F. Supp. 1162, 1171–72 (E.D. Va. 1980) ("The Court sympathizes with defendants who must deal with the fiscal reality that providing for a wide range of programs for a smaller number of prisoners entails a greater cost. However, such seemingly practical considerations may not be used to justify official inaction or legislative unwillingness to

17

operate a prison system in a constitutional manner.") (citations and internal quotation marks omitted).

Plaintiffs emphasize that, despite two studies in 2008 and 2017 to address capacity challenges, Defendants did not attempt to identify existing space that could house female pre-classification detainees separately. ECF No. 56 at 12–13. In 2008, the Beaufort County Administrator commissioned a study on BCDC overcrowding, concluding that:

> The final recommendation is the construction of a new detention center space. This recommendation, although the most expensive, is unavoidable given the increase in population of Beaufort County and other circumstances that unfortunately exist in society. . . . The amount required is yet to be determined; however, planning for location and funding should begin now.

ECF No. 56-2 at 28.

A second study followed in 2017. ECF No. 56-1. That study identified six different options to satisfy an ultimate capacity of approximately 900–1,000 inmates to meet future needs. *Id.* at 6. For each option, schematic drawings were prepared and studied, along with estimates of probable construction costs. *Id.* at 7. As noted by Plaintiffs, during the course of the second study, Defendants did not attempt to identify space that could house female pre-classification detainees. ECF No. 56-3, David Dep. at 16:12–23, 17:8–11, 19:3–12.

Defendants have not offered any explanation or argument to address the funding and space constraints. Nor have Defendants presented any argument regarding the second question: why, if there was no way to house female pre-classification detainees in a separate space, male pre-classification detainees could not also be placed in general population. Tellingly, Defendants eventually removed the pre-classification holding area for male detainees during the pandemic and placed them in general population. There is no evidence before the Court to suggest that this change strained BCDC resources. *See Morrison*, 239 F.3d at 655 (third factor). This measure alone indicates an ability to treat male and female pre-classification detainees equally, and that there was

18

a "ready alternative" available to accommodate female pre-classification detainees' rights "at de minimis cost to valid penological interests." *See id.* (fourth factor); *see also Jones v. Murphy*, 567 F. Supp. 2d 787, 791 (D. Md. 2008) (denying defendants' motion for summary judgment and explaining: "To treat male and female arrestees equally for search purposes, however, Central Booking officials simply needed either to stop searching male arrestees to their underwear, or to start searching all arrestees to their underwear. The latter is exactly what the Division voluntarily began doing in January of 2006. . . . [T]he January 2006 decision to search all arrestees to their last layer of clothing demonstrates just how readily available a constitutional alternative was to the [jail].").

Under these circumstances, Defendants have not established that Beaufort County is entitled to summary judgment on this claim. Accordingly, the undersigned recommends denying Defendants' Motion for Summary Judgment on Plaintiff's § 1983 claim against Beaufort County alleging a violation of the Equal Protection Clause of the Fourteenth Amendment.[13]

b.     *Defendants Foot and Grant[14]*

Plaintiffs assert claims under 42 U.S.C. § 1983 against Defendants Grant and Foot in their individual and official supervisory capacities based on alleged violations of Plaintiff's Fourteenth Amendment rights arising from the strip searches. ECF No. 35 at 11–16. Defendants argue that they are entitled to qualified immunity.

---

[13] Defendants also seek summary judgment on Plaintiffs' claim for attorneys' fees (Count 10), based upon the argument that Plaintiffs' claims under 42 U.S.C. § 1983 must fail. In light of the recommendation that summary judgment be denied on Plaintiffs' claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment, the undersigned recommends denying Defendants' request for summary judgment on the issue of attorneys' fees.

[14] Because of the finding on qualified immunity, the undersigned has not addressed Defendants' other arguments on individual liability.

Under the doctrine of qualified immunity, "[p]ublic officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 611 (2015); *Iko v. Shreve*, 535 F.3d 225, 237 (4th Cir. 2008) (explaining that pursuant to qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.") (internal quotation marks omitted); *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.").

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry: (1) "whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right"; and (2) "whether the right in question was 'clearly established' at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (internal quotation marks and citations omitted). In the Fourth Circuit, plaintiffs bear the burden of proof to show that a constitutional violation occurred, while "defendants bear the burden of showing that the violation was not clearly established, and they are therefore entitled to qualified immunity." *Mays v. Sprinkle*, 992 F.3d 295, 302 n.5 (4th Cir. 2021). Courts have discretion to

decide the order in which to consider these two prongs. *Pearson*, 555 U.S. at 236; *see Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (explaining that courts can "skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case") (quoting *Pearson*, 555 U.S. at 232) (internal quotation marks omitted). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656.

As to the first prong of the qualified immunity analysis, for purposes of Defendants' Motion only, the undersigned assumes a constitutional violation under the Fourteenth Amendment by Defendants Foot and Grant and the Doe Defendants. With regard to the second prong, however, the undersigned agrees with Defendants that it was not clearly established at the time of the arrest that any Individual Defendant's conduct—strip searching, or allowing strip searching, of female pre-classification detainees but not male pre-classification detainees under the circumstances presented at BCDC—violated Plaintiffs' Equal Protection rights under the Fourteenth Amendment. *See* ECF No. 49-1 at 13; ECF No. 55 at 8.

When inquiring whether a constitutional right is clearly established, a court must first "define the precise right into which [it is] inquiring." *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 907 (4th Cir. 2016). After defining the right, the court then asks whether it was clearly established at the time the officers acted. *Id.* A right satisfies this standard when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015); *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013).

For a right to be clearly established, "existing precedent[15] must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) ("This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (internal quotation marks omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Armstrong*, 810 F.3d at 907 (quoting *Wilson v. Layne,* 526 U.S. 603, 615 (1999)). Indeed, a right may be clearly established if "a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017) (alterations omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (stating that a right may be clearly established if it is "manifestly apparent from broader applications of the constitutional premise in question"). Thus, officers can be "on notice that their conduct violates established law even in novel factual circumstances." *Armstrong*, 810 F.3d at 907 (quoting *Hope*, 536 U.S. at 741).

Nonetheless, even though general statements of law may provide notice, courts must not "define clearly established law at a high level of generality," *Mullenix*, 577 U.S. at 12 (quoting *al-*

---

[15] "The universe of existing precedent is not unlimited," and courts in the Fourth Circuit "ordinarily need not look beyond the decisions of the Supreme Court, th[e] Fourth Circuit court of appeals, and the highest court of the state in which the case arose." *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014) (citations and internal quotation marks omitted); *see also Ferrera v. Hunt*, 2012 U.S. Dist. LEXIS 45444 (D.S.C. March 19, 2012), *report and recommendation adopted in part*, 2012 U.S. Dist. Lexis (March 28, 2012); *but see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017) ("In the absence of controlling authority that specifically adjudicates the right in question, a right may still be clearly established . . . based on a consensus of cases of persuasive authority from other jurisdictions.") (citations and internal quotation marks omitted).

*Kidd*, 563 U.S. at 742). Rather, courts must examine "whether the violative nature of *particular* conduct is clearly established." *Id.* (emphasis in original) (quoting *al-Kidd*, 563 U.S. at 742). This examination is "undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "If the right was not clearly established in the specific context of the case – that is, if it was not clear to a reasonable [official] that the conduct in which he allegedly engaged was unlawful in the situation he confronted – then the law affords immunity from suit." *Parrish v. Cleveland,* 372 F.3d 294, 301 (4th Cir. 2004).

Plaintiffs argue that, at the time they were strip searched, "equal protection rights in the prison context were well established." ECF No. 56 at 16. Plaintiffs define the relevant issue as the "differential treatment of male and female pre-classification detainees regarding strip-searches in violation of Plaintiffs' right to Equal Protection under the Fourteenth Amendment." *Id.* at 19. However, framing the issue in this manner, specifically the law regarding equal protection under the Fourteenth Amendment, is cast at a high level of generality and does not by itself create clearly established law outside an obvious case.

As noted above, the Supreme Court has held that "courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *See District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). As the Fourth Circuit has "spelled out with specificity, qualified immunity protects law officers from bad guesses in gray areas, and it ensures that they may be held personally liable only for transgressing bright lines."

*Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (citation and internal quotation marks omitted).

Here, the relevant issue for purposes of qualified immunity is whether strip searching female pre-classification detainees but not male pre-classification detainees violates equal protection where the female pre-classification area is in general population and the male pre-classification area is not. The parties do not point to any controlling authority from the United States Supreme Court, the Fourth Circuit or this District sufficiently similar to the situation the individual Defendants confronted in this case that would have made clear to them that their conduct under BCDC's Practice violated Plaintiffs' equal protection rights. Nor is there a consensus of cases of persuasive authority from other jurisdictions that would otherwise make it "sufficiently clear that every reasonable official would have understood" that what the individual Defendants did in this case violated that right. *See Mullenix*, 577 U.S. at 11; *Hill*, 727 F.3d at 321.

Notably, prior to BCDC's Practice, the United States Supreme Court held that the Fourth Amendment does not prohibit a policy requiring the strip searching of all detainees who will be in a jail's general population. *See Florence*, 566 U.S. at 333–34. Defendant Grant testified that "[o]nce the case law came out saying that we could strip search prior to them entering general population, then we changed." ECF No. 48-1, Grant Dep. at 41:17–20. The issue here under the Equal Protection Clause of the Fourteenth Amendment arises from the different locations of the pre-classification areas for men and women at the time at BCDC. Under these circumstances, the undersigned cannot find that the law was "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11; *Hill*, 727 F.3d at 321.

Accordingly, the undersigned recommends finding that Defendants Grant and Foot, as well as any Doe Defendants, are entitled to qualified immunity on Plaintiffs' § 1983 claim under the Fourteenth Amendment and granting their Motion for Summary Judgment on this claim.

### B. Claims for Violations of the South Carolina Constitution (Counts 3 and 4)

Plaintiffs also allege that Defendants violated their rights under Article I, § 10 (Count 3) and Article I, § 3 (Count 4) of the South Carolina Constitution. In those causes of action, Plaintiffs request only money damages. *See* ECF No. 12 at ¶¶ 59 & 62. In their Response to Defendants' Motion, Plaintiffs have conceded that the South Carolina Constitution does not provide for monetary damages for civil rights violations and, as such, have withdrawn Counts 3 and 4 from their Complaint.[16] Accordingly, the undersigned recommends granting summary judgment to Defendants, including any Doe Defendants, on these claims. *See Palmer v. State*, 829 S.E.2d 255, 261 (S.C. Ct. App. 2019) (explaining that "the South Carolina Constitution does not provide for monetary damages for civil rights violations and the legislature has not enacted an enabling statute"); *Rosendall v. Voight*, C/A No. 4:17-cv-0821-BHH-TER, 2017 WL 9674476, at *2 (D.S.C. Sept. 11, 2017) (South Carolina does not have a statute allowing for civil damages for violations of the state constitution), *report and recommendation adopted*, 2018 WL 2093722 (D.S.C. May 7, 2018).

---

[16] In this instance, Plaintiffs seek leave to file a Second Amended Complaint to strike "Count 6"; however, the alleged violations of the South Carolina Constitution are contained in Counts 3 and 4 of Plaintiffs' Amended Complaint. ECF No. 12 at 15–16. Moreover, to the extent Plaintiffs want to file a Second Amended Complaint to incorporate the allegations supporting their claims in Counts 3 and 4 into their negligence claim or any other claims in the case, the undersigned finds that exercise unnecessary. There are no additional substantive allegations contained in Counts 3 and 4 (as set forth in paragraphs 57 – 62) from the rest of the Amended Complaint and Plaintiffs already have sufficiently "restate[d] and incorporate[d]" all of the paragraphs into their negligence cause of action. ECF No. 12 at 16. Accordingly, the undersigned recommends denying any request to amend.

### C. Outrage (Count 6), Assault (Count 7) and Battery (Count 8) Claims

Plaintiffs' sixth cause of action is for "reckless infliction of emotional distress/outrage" against Defendant Beaufort County only. Plaintiffs' seventh cause of action is for assault against all Defendants. Plaintiff Munday's eighth cause of action is for battery against all Defendants. Plaintiff Devine did not assert a claim for battery.

Defendants argue that, under the provisions of the South Carolina Tort Claims Act ("SCTCA"), Defendant Beaufort County is not liable for intentional infliction of emotional harm or other intentional conduct by an employee. ECF No. 48-1 at 21–22. They also contend that Plaintiffs' claims for assault and Plaintiff Munday's claim for battery are barred by the SCTCA. *Id.* at 23–25.

A "loss" under the SCTCA includes "bodily injury, disease, death, or damage to tangible property, including lost wages and economic loss to the person who suffered the injury, disease, or death, pain and suffering, mental anguish, and any other element of actual damages recoverable in actions for negligence, but does not include the intentional infliction of emotional harm." *See* S.C. Code § 15-78-30(f). Additionally, a government entity is not liable for "employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." *See* S.C. Code § 15-78-60(17).

a.  Outrage (Count 6)

With regard to the claim for outrage, Plaintiffs agree that a "loss" under the SCTCA does not include "intentional" infliction of emotional harm and that a governmental entity is not liable for employee conduct that constitutes an intent to harm. ECF No. 56 at 22. Indeed, there is no dispute here that intentional infliction of emotional harm is not a recoverable loss against Beaufort County under the SCTCA.

However, Plaintiffs emphasize they have not alleged that any Defendant's actions were "intentional" but, instead, contend they were "reckless." Indeed, the title of Count Six is "Reckless Infliction of Emotional Distress (Outrage)," and the allegations are limited to "reckless" conduct, not "intentional conflict." ECF No. 12 at 18, ¶ 72 (the Defendants "recklessly discriminated in their treatment of Plaintiffs"), ¶ 77 (Defendants' conduct "was reckless"), ¶ 81 ("County should be held liable to Plaintiffs . . . given [the individual Defendants'] reckless infliction of emotional distress"). Nor have Defendants pointed to any evidence that would prove otherwise, specifically that the only evidence before the Court involves intentional and not reckless conduct.

While the cause of action is traditionally referred to as "outrage" or "intentional infliction of emotional distress," it includes reckless conduct. Specifically, "[t]o recover for outrage—otherwise known as intentional infliction of emotional distress—a plaintiff must establish[, among other elements], the following: (1) the defendant intentionally *or recklessly* inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct." *Bass v. S.C. Dep't of Soc. Servs.*, 780 S.E.2d 252, 260 (S.C. 2015) (emphasis added) (quoting *Argoe v. Three Rivers Behavioral Health, L.L.C.*, 710 S.E.2d 67, 74 (S.C. 2011) (citing *Hansson v. Scalise Builders of S.C.*, 650 S.E.2d 68, 70–71 (S.C. 2007))); *Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981).

Defendants argue for liberal construction of the SCTCA to bar this claim, citing to the statute and numerous cases that have concluded the SCTCA bars outrage claims. ECF No. 48-1 at 21–23; *see also* S.C. Code Ann. § 15-78-20(f) (". . . limitation[s] on an exemption to the liability of the state . . . must be liberally construed in favor of limiting the liability of the state."). However, the cases cited by Defendants involve claims for "intentional" infliction of emotional distress, addressing the intentional aspect of the cause of action. But South Carolina courts have made clear

that while negligent conduct cannot give rise to an intentional infliction of emotional distress, *either* intentional *or* reckless conduct can. *See, e.g.*, *Bergstrom v. Palmetto Health All.*, 596 S.E.2d 42, 48–49 (S.C. 2004) (explaining that if defendant hospital "*recklessly or* intentionally made repeated and coercive efforts to separate a mother from her newborn infant, that might well constitute outrageous conduct that . . . conceivably could cause severe emotional distress. However, the evidence presented at trial revealed that, while Hospital's staff arguably may have acted negligently in failing to follow certain policies, the staff did not act *recklessly or* intentionally in the extreme or outrageous manner described in the complaint," such that a directed verdict at trial would have been appropriate) (emphasis added).

As Plaintiffs note, a plain reading of the SCTCA indicates that only intentional, not reckless, conduct is included, and "[t]he Court is not required to examine statutory construction when the statute is plain and unambiguous." *Thao v. Nationwide Affinity Ins. Co. of Am.*, No. 7:17-CV-02403-AMQ, 2018 WL 2971784, at *4 (D.S.C. June 13, 2018) "Legislative history only can be resorted to for the purpose of solving doubt, not for the purpose of creating it." *Id.* (quoting *Timmons v. S.C. Tricentennial Comm'n*, 254 175 S.E.2d 805, 817 (S.C. 1970)).

In this case, Plaintiffs limited the allegations in their Amended Complaint to "reckless" conduct. Therefore, the undersigned cannot say, at this stage of the litigation, that the claims are barred by the SCTCA. *See Bass*, 780 S.E.2d at 258, 261 (upholding general jury verdict against state agency on SCTCA claims of gross negligence and outrage premised on reckless conduct). Moreover, Defendants do not present any other arguments in support of summary judgment on this clam. Accordingly, the undersigned recommends denying Defendants' Motion for Summary Judgment on this claim, as set forth in Plaintiffs' Amended Complaint.

28

b.    Assault Claim (Count 7) and Battery Claim (Count 8)

Defendants move for summary judgment on Plaintiffs' claims for assault and on Plaintiff

Munday's battery claim.

i.    *Devine*

Plaintiff Devine has withdrawn her assault claim and seeks leave to file a Second Amended

Complaint removing her claim for assault. ECF No. 56 at 23. The undersigned recommends

granting Defendants' Motion for Summary Judgment as to Plaintiff Devine's claim for assault,

including as to any Doe Defendants, and denying Plaintiff's request to file an amended complaint

to account for the removal, as it is unnecessary.

ii.    *Munday*

Plaintiff Munday has withdrawn her battery claim, though not her claim for assault. She

seeks leave to file a Second Amended Complaint removing her claim for battery. The undersigned

recommends granting Defendants' Motion for Summary Judgment as to Plaintiff Munday's claim

for battery, including as to any Doe Defendants, and denying Plaintiff Munday's request to file a

Second Amended Complaint, as it is unnecessary under the circumstances.

As to Plaintiff Munday's claim for assault,[17] it is based solely upon her pat down and not

her strip search. She does not contend that either Defendant Foot or Grant assaulted her. Instead,

Munday alleges in her Amended Complaint that "[t]he BCDC Officer Defendant's intentional

contact with Munday's genitalia served no penological purpose and was undertaken with the intent

---

[17] "An 'assault' is an attempt or offer, with force or violence, to inflict bodily harm on another or engage in some offensive conduct." *Mellen v. Lane*, 659 S.E.2d 236, 244 (S.C. Ct. App. 2008). "The elements of assault are: (1) conduct of the defendant which places the plaintiff, (2) in reasonable fear of bodily harm." *See id.; accord Jones v. Winn-Dixie Greenville*, 456 S.E.2d 429, 432 (S.C. Ct. App. 1995) ("[A]n assault occurs when a person has been placed in reasonable fear of bodily harm by the conduct of the defendant.").

to gratify the officer's sexual desire and/or to humiliate Munday." ECF No. 12 at ¶ 1. Plaintiff Munday contends that her testimony regarding her experience during her pat down makes it "both abundant and clear that she was assaulted by an employee of the BCDC." ECF No. 56 at 23.

In other words, Munday claims that, as to the pat down, the unnamed officer acted intentionally for her own personal, sexual gratification or to humiliate Plaintiff. Such conduct, however, is intentional and outside the scope of employment. Accordingly, pursuant to the provisions of the SCTCA, it cannot support a claim under the SCTCA against Defendant Beaufort County. *See Doe v. South Carolina State Budget & Control Bd.*, 494 S.E.2d 469, 473 (S.C. Ct. App. 1997) ("In the present case, no cogent argument can be made that Roberson was furthering the business of his employer at the time he sexually assaulted Appellants."), *aff'd*, 523 S.E.2d 457 (S.C. 1999).

Moreover, Plaintiff has not alleged, nor otherwise established, that either Defendant Foot or Grant assaulted her. Finally, as for any assault claim as to the unnamed Defendant BCDC Officer, Plaintiffs have not identified the unnamed officer who allegedly conducted the pat down. While they have identified the names of three individuals they now want to add to the Amended Complaint as the "Doe Defendants," they have not argued or alleged that any of those individuals participated or were involved in the pat down of Plaintiff Munday. Accordingly, the undersigned recommends granting Defendants' Motion for Summary Judgment on this claim.

### D. Plaintiffs' Negligence Claims (Counts 5 and 9)

Plaintiffs' Amended Complaint includes two negligence claims: (a) Count 5 against Beaufort County only for negligence per se, based upon S.C. Code § 24-5-90; and (b) Count 9 against all Defendants for negligence.

Plaintiffs have indicated in their Response that they are withdrawing their claim for negligence against Defendants Foot and Grant (Count 9), and they seek leave to file a Second Amended Complaint removing these Defendants from this claim. ECF No. 56 at 29. The undersigned recommends granting summary judgment to Defendants Foot and Grant on the negligence claim and denying Plaintiffs' request to file a Second Amended Complaint as unnecessary.

The remaining negligence (Count 9) and negligence per se (Count 5) claims against Defendant Beaufort County are addressed below.

1. Negligence Claim (Count 9)

Defendants argue that Plaintiffs' negligence claim should be dismissed because they have no evidence of any physical impact or injury, such that the claim is barred under South Carolina law. ECF No. 48-1 at 27–31. In their Response, Plaintiffs cite to *Padgett v. Colonial Wholesale Distrib. Co.*, 103 S.E.2d 265 (S.C. 1958), for the proposition that they can recover damages for the physical manifestation of emotional injuries. ECF No. 56 at 25. Moreover, Plaintiffs contend that "they were not questioned about these injuries or their physical manifestations during their depositions but will offer testimony at trial on these issues." *Id.* Finally, Plaintiff Munday contends that she offered testimony about "the physical injury she suffered when assaulted by an employee of BCDC." ECF No. 56 at 26.

According to Defendants, South Carolina case law subsequent to the *Padgett* case has made clear that damages for emotional distress are recoverable only in limited circumstances, including when it results from a physical injury or as bystander liability, and does not allow a cause of action for negligently caused emotional distress outside of those scenarios. ECF No. 48-1 at 28–31. However, at least one South Carolina case seems to suggest damages may be recovered by a direct

victim for bodily injuries suffered as a result of emotional and mental distress. *See Bray v. Marathon Corp.*, 553 S.E.2d 477 (S.C. Ct. App. 2001) ("We do agree with Bray in her assertion that damages may be recovered in South Carolina for bodily injuries suffered as a result of emotional and mental distress caused by a defendant's negligence in the absence of any physical impact."), *affirmed in part, reversed in part by* 588 S.E.2d 93 (S.C. 2003).

Regardless, the undersigned need not resolve any dispute over the evolution of South Carolina state law because, even assuming South Carolina allows recovery under a negligence theory for bodily injuries suffered as a result of emotional distress, Plaintiffs have not pointed to any evidence in the record to establish any bodily injury suffered as a result of emotional or mental distress caused by Beaufort County's or any of the Does' negligence. Plaintiffs indicate they were not asked about these bodily injuries in their depositions and intend to present such evidence at trial; however, they are opposing a summary judgment motion and must produce evidence now sufficient to create a material question of fact. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support that assertion by citing to . . . the record, including . . . affidavits or declarations. . . .").

With regard to Plaintiff Munday's argument that her testimony supports evidence of bodily harm, the testimony at issue pertains to Plaintiff Munday's assault claim and purported intentional conduct by the officer in question, not any negligence claim. Moreover, the deposition citations provided reference physical contact with Plaintiff Munday but not physical injury. Indeed, Plaintiff Munday argues the physical contact by a BCDC Officer during the pat down put her in fear of bodily harm, not that she suffered bodily harm. *See* ECF No. 56 at 23–24.

Accordingly, the undersigned recommends granting Defendants' Motion for Summary Judgment on Plaintiffs' negligence claim, as set forth in Count 9.

2. <u>Negligence Per Se Claim (Count 5)</u>

Plaintiffs' Count 5 asserts a negligence per se claim against Defendant Beaufort County, alleging a violation of South Carolina Code § 24-5-90, which states: "It is unlawful to discriminate in the treatment of prisoners placed in the custody of the sheriff or local governing body. A violation of this section is a misdemeanor and, upon conviction, the person convicted must be fined not less than twenty-five dollars and imprisoned for not more than one year." *See* S.C. Code Ann. § 24-5-90.

"Negligence per se is negligence arising from a defendant's violation of a statute." *Salley v. Heartland-Charleston of Hanahan, SC, LLC*, No. 2:10-CV-00791, 2011 WL 2728051, at *3–4 (D.S.C. July 12, 2011) (quoting *Wogan v. Kunze*, 623 S.E.2d 107, 117–18 (S.C. Ct. App. 2005)). A statute must permit a private cause of action for plaintiffs to maintain a civil suit. "In determining whether a statute creates a private cause of action [in South Carolina], the main factor is legislative intent." *Id.* (alteration in original) (quoting *Doe v. Marion*, 645 S.E.2d 245, 248 (S.C. 2007)).

"The legislative intent to grant or withhold a private right of action for violation of a statute or the failure to perform a statutory duty is determined primarily from the language of the statute." *Id.* (quoting *Doe*, 645 S.E.2d at 248). In this respect, the general rule is that a statute which does not purport to establish a civil liability, but merely makes provision to secure the safety or welfare of the public as an entity, is not subject to a construction establishing a civil liability. *Id.* When a statute does not specifically create a private cause of action, one can be implied only if the legislation was enacted for the special benefit of a private party. *Id.*

The search for the legislative intent in South Carolina comports with the standards used for testing federal rights of action. *Id.* (citing *Williams–Garrett v. Murphy*, 106 F. Supp. 2d 834, 842 (D.S.C. 2000)). Courts determining whether federal statutes grant a private cause of action "begin

with the presumption that if a statute does not expressly create a private cause of action, one does not exist." *Id.* (quoting *Ormet Corp. v. Oh. Power Co.*, 98 F.3d 799, 805 (4th Cir. 1996)). "By now, Congress is well aware of this presumption and how to provide private remedies." *Id.*

Nonetheless, courts may infer the existence of a private cause of action by applying the well settled test which requires a determination of the following: (1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; (3) whether implication of a private remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action sought is one traditionally relegated to state law. *Id.* at *3–4 (citing *Ormet Corp.*, 98 F.3d at 805).

In this instance, Plaintiffs' negligence per se claim under S.C. Code § 24-5-90 fails because the regulation does not provide for a private cause of action. The parties have not identified any court that has addressed whether this statute creates a private right of action. However, the regulation lacks any language indicating the South Carolina legislature intended to authorize a private right of action. Although there is no language in the statute indicating its scope and purpose, the statute does not appear to have been "enacted for the special benefit of a private party," as *Doe* requires. Rather, the statute provides for the welfare of the general prison population. While Plaintiffs, during their time as inmates at BCDC, certainly fall within the class of individuals covered by the statute, there is no indication of legislative intent to create a private right of action.[18] In fact, the statute criminalizes the conduct, suggesting an implicit intent to deny a civil remedy.

---

[18] In light of the ruling, the undersigned has not addressed Defendants' arguments under the public duty rule, which is a "rule of statutory construction which aids the court in determining whether the legislature intended to create a private right of action for a statute's breach." *Vaughan v. Town of Lyman*, 635 S.E.2d 631, 634 (S.C. 2006) (recognizing that dispositive issue is not whether statute creates a duty, but whether legislature intended to provide private right of action).

And, the cause of action sought by Plaintiffs in this case, creating a negligence claim based upon alleged discriminatory treatment, is one traditionally relegated to state law, whether via a traditional common law negligence claim or a discrimination claim.

Accordingly, the undersigned recommends granting Defendant Beaufort County's Motion for Summary Judgment on Plaintiffs' negligence per se claim, as set forth in Count 5.

### E.     John and Jane Doe Defendants

Plaintiffs filed this lawsuit against Beaufort County, Philip Foot and Quandara Grant, as well as ten "Doe" defendants:

> 10. Defendants John Does 1-5 (collectively, "BCDC Supervisory Defendants") were and are now responsible for the training, supervision, control, assignment, and discipline of both sworn and civilian personnel of the County who work in, operate, administer, and manage BCDC, and for the formulation, promulgation, adoption, application, administration, and enforcement of the policies, rules, regulations, and practices of BCDC. At this time, Plaintiffs do not know the identities and capacities of the BCDC Supervisory Defendants and therefore sue these Defendants by fictitious names. Plaintiffs will seek to amend this Complaint to include one of more of the BCDC Supervisory Defendants' true names and capacities when ascertained.

> 11. Defendants Jane Does 1-5 (collectively, "BCDC Officer Defendants") were at all times relevant herein employees of the County who worked as correctional officers at BCDC. At this time, Plaintiffs do not know the identities of the BCDC Officer Defendants and therefore sue these Defendants by fictitious names. Plaintiffs will seek to amend this Complaint to include one of more of the BCDC Officer Defendants' true names when ascertained.

ECF No. 12 ¶¶ 10–11. Plaintiffs now seek leave to amend their Amended Complaint to name Jacqueline Allmond, Aundrea Black, and Eloise Colson as individual defendants, indicating these individuals conducted strip searches of female pre-class detainees. ECF No. 56 at 3.

The undersigned is mindful that "[l]eave to amend should be denied only if some reason exists for denial such as undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, or futility in allowing the amendment." *See Federal Beef Processors v. CBS Inc.*, 858 F. Supp. 125, 126 (D.S.C. 1994). However, as noted above, the undersigned has recommended

summary judgment as to Plaintiffs' claims under 42 U.S.C. § 1983 against any individual Defendant, including the Doe Defendants. *See* Section A, *supra.* Accordingly, if the recommendation is adopted, any effort to add these three individuals as defendants in this case, premised upon their general involvement in conducting strip searches of female pre-classification detainees, is moot.

Even if Plaintiffs' request for leave to amend were not moot, however, the request is denied on the basis of undue delay and futility. *See Federal Beef Processors,* 858 F. Supp. at 126. As Defendants have argued, Plaintiffs have known of the identities of these three individuals since at least November 2, 2020, when Defendants served discovery responses upon Plaintiffs that identified them as officers involved in the strip searches. Under the Second Amended Scheduling Order, the deadline for filing amendments to the pleadings was December 16, 2020.[19] ECF No. 10. Under the Third Amended Scheduling Order, discovery closed on February 27, 2022. ECF No. 26. In short, this case has been pending for two years, discovery has closed, and the time to amend the pleadings in this case has expired. Plaintiffs did not move to amend their pleading to identify the individuals at issue until filing their Response in Opposition to Defendants' Motion for Summary Judgment on May 31, 2022. Under the circumstances, any request to amend is denied based upon undue delay.

---

[19] "Although designation of a 'John Doe' defendant is not favored in the federal courts, it is permissible when the identity of the alleged defendant is not known at the time the complaint is filed and plaintiff could identify the defendant through discovery." *Treece v. S.C. Dep't of Mental Health SCDMH*, No. CIVA3:08-03909DCNJRM, 2010 WL 1254927, at *2 (D.S.C. Mar. 24, 2010) (citing *Schiff v. Kennedy*, 691 F.2d 196, 197–98 (4th Cir. 1982)). Such actions are only permissible against "real, but unidentified, defendants." *See Schiff*, 691 F.2d at 197. "However, once filed, it is incumbent upon a plaintiff to amend his pleadings to correctly identify the specific individuals involved so that the matter may proceed to judgment." *See Anderson v. Davies*, No. CA 3:10-2481-CMC-JRM, 2012 WL 1038663, at *6 (D.S.C. Mar. 28, 2012).

Moreover, in light of the undersigned's recommendations above, including to dismiss the § 1983 claim against the individual Defendants based upon qualified immunity, Plaintiffs' effort now to identify certain John and Jane Doe Defendants largely appears futile.[20] Under these circumstances, the undersigned denies Plaintiffs' request to amend their Amended Complaint in this action to name the newly identified individuals as defendants in this case.

## RECOMMENDATION AND ORDER

It is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED, in part,** and **DENIED, in part.** It is **RECOMMENDED** that summary judgment be **GRANTED**:

- to all Defendants, including any Doe Defendants, on Plaintiffs' claims under 42 U.S.C. § 1983 for violations of the Fourth Amendment (Count 1);

- to Defendants Foot and Grant, as well as Doe Defendants, on Plaintiffs' claims under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment (Count 2);

- to all Defendants, including any Doe Defendants, on Plaintiffs' claims under Article I of the South Carolina Constitution (Count 3 and Count 4);

- to all Defendants, including any Doe Defendants, on Plaintiffs' assault claim (Count 7);

- to all Defendants, including any Doe Defendants, on Plaintiff Munday's battery claim (County 8);

- to Defendant Beaufort County on Plaintiffs' negligence per se claim (Count 5); and

- to all Defendants, including any Doe Defendants, on Plaintiffs' negligence claim (Count 9).

---

[20] Indeed, the only potential cause of action in this case that could lie against any individual defendant is for assault by the unidentified BCDC Officer. However, as set forth above, neither Plaintiff has alleged that any of the newly identified individuals – Jacqueline Allmond, Aundrea Black, and Eloise Colson – committed an assault against them.

To the extent Plaintiffs seek to amend their Amended Complaint to comport with the aforementioned recommendations, the undersigned **RECOMMENDS** denying the request for the reasons set forth above.

It is further **RECOMMENDED** that Defendants' Motion for Summary Judgment be **DENIED** as to Plaintiffs' claims against Defendant Beaufort County under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment (Count 2) and for outrage/reckless infliction of emotional distress (Count 6), as well as to Plaintiffs' request for attorneys' fees under 42 U.S.C. § 1988(b) (Count 10).

If these recommendations are adopted by the District Judge, the only claims remaining in this case will be Plaintiffs' claims, on behalf of themselves and others similarly situated, against Beaufort County under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment (Count 2), including the request for fees under 42 U.S.C. § 1988(b), and Plaintiffs' individual claims against Beaufort County for outrage/reckless infliction of emotional distress (Count 6).

Finally, it is **ORDERED** that Plaintiffs' request to amend their Amended Complaint to name Jacqueline Allmond, Aundrea Black, and Eloise Colson as Defendants is **DENIED.**

It is so **RECOMMENDED** and **ORDERED**.

The parties are referred to the Notice Page attached hereto.

Molly H. Cherry
United States Magistrate Judge

October 28, 2022
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).