**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | | |
|---|---|---|
| CHERYL A. MUNDAY and MARGARET DEVINE, *on behalf of themselves and others similarly situated*, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 9:20-cv-02144-DCN |
| vs. | ) ) | **ORDER** |
| BEAUFORT COUNTY; PHILIP FOOT; QUANDARA GRANT; JOHN DOES 1–5; and JANE DOES 1–5, | ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on Magistrate Judge Molly H. Cherry's report and recommendation ("R&R"), ECF No. 76, that the court grant in part and deny in part defendant Beaufort County's ("Beaufort County" or the "County") motion for summary judgment, ECF No. 48. For the reasons set forth below, the court adopts the R&R in part and rejects the R&R in part and grants the motion in part and denies the motion in part.

## I.  BACKGROUND

The R&R ably recites the facts of the case, and the parties do not object to the R&R's recitation thereof. Therefore, the court will only briefly summarize material facts as they appear in the R&R for the purpose of aiding an understanding of the court's legal analysis.

1

This matter arises from certain procedures in place at the Beaufort County Detention Center[1] ("BCDC") that are used for female pre-classification detainees.[2]  Once a pre-trial detainee goes to a bond hearing and cannot post a bond, upon returning to BCDC, he or she is then classified to a different area at BCDC, such as in general population or, depending on the inmate's behavior, maximum or super maximum security.  ECF No. 34-3 at 21:3–18.  On February 27, 2015, BCDC adopted a policy (the "policy") that all inmates moved from pre-classification to other areas of BCDC, including general population, would be strip searched.  See ECF No. 31-4 at 2.  However, BCDC's practice (the "practice") has been to house female pre-classification inmates in general population while placing male pre-classification inmates in a separate pre-classification cell outside of general population.  ECF No. 31-3 at 14, Black Dep. 24:2–20.  Because female pre-classification inmates are housed in general population from the outset, the practice resulted in BCDC conducting a strip search on every female pre-classification detainee awaiting a bond hearing.  ECF No. 40-1 ¶ 6.  BCDC, however, did not do so for similarly situated male pre-classification detainees prior to May 5, 2020, because they were housed in a separate pre-classification cell outside of general population.

The two named plaintiffs in this case, Cheryl Munday ("Munday") and Margaret Devine ("Devine") (collectively, "plaintiffs") allege they were impacted by this practice.  Specifically, each of them describes being arrested for driving under the influence (each

_____

[1] Defendant Beaufort County operates BCDC. ECF Nos. 12 ¶ 7, 13 ¶ 5.

[2] A pre-classification detainee is an inmate who has been arrested and placed or housed in an area at the detention center prior to going to a bond hearing.  ECF No. 34-1 at 20:7–14.

had that charge later dismissed), brought into BCDC for holding, and subjected to a public strip search and visual body cavity search—all while similarly situated men were not subjected to such a search.

Plaintiffs filed the instant case on March 6, 2020, in the Beaufort County Court of Common Pleas on behalf of themselves and a class of all similarly situated women who were subjected to the practice and the policy.[3]  ECF No. 1-1, Compl.  On June 5, 2020, Beaufort County removed the case to federal court.  ECF No. 1.  This case was referred to Magistrate Judge Molly Cherry for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.).  On August 5, 2020, plaintiffs filed an amended complaint, now the operative complaint. ECF No. 12, Amend. Compl.  The plaintiffs brought various state and federal claims against Beaufort County, Assistant County Administrator for the Public Safety Division Philip Foot ("Foot"), Director of the BCDC Colonel Quandara Grant ("Director Grant"), John Does 1–5 (described as "BCDC Supervisory Defendants"), and Jane Does 1-5 (described as "BCDC Officer Defendants") (collectively, "defendants").  Amend. Compl. ¶¶ 7–11.

On May 2, 2022, defendants filed a motion for summary judgment.  ECF No. 48. On May 31, 2022, plaintiffs filed a response in opposition, ECF No. 56, to which defendants replied on June 14, 2022, ECF No. 63.  On October 28, 2022, Magistrate

---

[3] Specifically, the class is defined as "all women who have been admitted to the Beaufort County Detention Center while waiting for bail to be set or for an initial court appearance, women who have been arrested on default warrants and held in the Beaufort County Detention Center, and women who have been held in protective custody in the Beaufort County Detention Center. . . . These women have all been unlawfully subjected to routine strip searches, including degrading visual body cavity searches of their anuses and vaginas."  Compl. ¶ 4.

Judge Cherry issued the R&R that recommended the motion for summary judgment be granted in part and denied in part and recommended that plaintiffs' request to amend their amended complaint to name new defendants be denied.  ECF No. 76, R&R.  On November 13, 2022, Beaufort County objected to the R&R, ECF No. 79, to which plaintiffs responded on November 28, 2022, ECF No. 80, and defendants filed a sur-reply on December 1, 2022, ECF No. 81.  As such, the motion has been fully briefed and it is now ripe for review.

## II.  STANDARD

### A.  Order on R&R

This court is charged with conducting a de novo review of any portion of the magistrate judge's R&R to which specific, written objections are made.  28 U.S.C. § 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of the magistrate judge.  See Thomas v. Arn, 474 U.S. 140, 149–50 (1985).  The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination rests with this court.  Mathews v. Weber, 423 U.S. 261, 270–71 (1976).  The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge . . . or recommit the matter to the magistrate judge with instructions."  28 U.S.C. § 636(b)(1).  The court is charged with making a de novo determination of any portion of the R&R to which a specific objection is made.  Id.

However, in the absence of a timely filed, specific objection, the court reviews the R&R only for clear error.  Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (citation omitted).  Furthermore, "[a] party's general objections are

4

not sufficient to challenge a magistrate judge's findings." <u>Greene v. Quest Diagnostics</u> <u>Clinical Labs., Inc.</u>, 455 F. Supp. 2d 483, 488 (D.S.C. 2006) (citation omitted). When a party's objections are directed to strictly legal issues "and no factual issues are challenged, de novo review of the record may be dispensed with." <u>Orpiano v. Johnson</u>, 687 F.2d 44, 47 (4th Cir. 1982) (citation omitted). Analogously, <u>de novo</u> review is unnecessary when a party makes general and conclusory objections without directing a court's attention to a specific error in a magistrate judge's proposed findings. <u>Id.</u>

**B. Summary Judgment**

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id.</u> at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. <u>Id.</u> at 255.

# III.  DISCUSSION

The R&R recommended that the court grant summary judgment on Count 1 (violations of the Fourth Amendment pursuant to 42 U.S.C. § 1983 brought against all defendants), Count 2 (violations of the Equal Protection Clause pursuant to 42 U.S.C. § 1983 brought against the individual defendants), Count 3 (violation of the Fourth Amendment analogue in the South Carolina Constitution, Art. I § 10, brought against all defendants), Count 4 (violation of the Equal Protection Clause analogue in the South Carolina Constitution, Art. I § 3, brought against all defendants), Count 5 (negligent deprivation of statutory rights under the South Carolina Tort Claims Act ("SCTCA") brought against Beaufort County), Count 7 (assault brought against all defendants), Count 8 (battery brought against BCDC Officer Defendants and Beaufort County), and Count 9 (negligence brought against all defendants).  See R&R at 37–38.  However, the R&R recommended that the court deny summary judgment with respect to three counts: (1) Count 2 (violations of the Equal Protection Clause pursuant to 42 U.S.C. § 1983 brought against Beaufort County), id. at 11–19; (2) Count 6 (outrage brought against Beaufort County), id. at 26–28; and (3) Count 10 (attorneys' fees under 42 U.S.C. § 1988(b)), id. at 38.

Neither party objects to the R&R's recommendation to grant summary judgment as to Counts 1, 3, 4, 5, 7, 8, or 9, and in the absence of a timely filed, specific objection, the court reviews the R&R only for clear error.  Diamond, 416 F.3d at 315.  A review of the record for clear error indicates that the R&R accurately summarized this case and the applicable law.  Accordingly, the court adopts the magistrate judge's R&R as to Counts 1, 3, 4, 5, 7, 8, and 9, and grants defendants' motion for summary judgment on those

6

claims. Additionally, the R&R recommends finding all claims against individual

defendants—included as part of Count 2—barred by qualified immunity. Neither party

objects to this conclusion. The court finds no clear error and grants summary judgment

on plaintiffs' claims against individual defendants included in Count 2 and denies

plaintiffs' request to amend the complaint to name individual defendants.[4] Defendants,

---

[4] The R&R addressed plaintiffs' claims asserted against defendants Foot and Director Grant under 42 U.S.C. § 1983 based on violations of plaintiffs' Fourteenth Amendment rights and found them to be barred by the doctrine of qualified immunity. R&R at 19–25. Neither party contests this recommendation, and the court reviews the R&R only for clear error. Diamond, 416 F.3d at 315. Given that the court denies summary judgment for Count 2 and 10 as asserted against Beaufort County, it finds it relevant to briefly include the qualified immunity analysis for the equal protection claims asserted against the individual defendants under the same claims.

The doctrine of qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The two prongs of the qualified immunity test may be applied in any order. Pearson v. Callahan, 555 U.S. 223, 236 (2009). "Qualified immunity shields federal and state officials [individually] from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Fauconier v. Clarke, 966 F.3d 265, 280 (4th Cir. 2020) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)). In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." Parrish v. Cleveland, 372 F.3d 294, 301 (4th Cir. 2004).

The R&R found that though a constitutional violation could likely be established under the first prong, under the second prong, the right was not clearly established at the time of the violation. R&R at 21–24. Again, the court reiterates the challenged practice at issue: housing female pre-classification detainees in general population and subjecting them to strip-searches when similarly situated male detainees were housed outside of general population and were not subjected to such searches. The magistrate judge noted that the parties have pointed to no controlling authority from the Supreme Court, the Fourth Circuit, or this district sufficiently like the situation individual defendants confronted in this case that would have made it clear to them that their conduct under BCDC's practice violated plaintiffs' equal protection rights. R&R at 24. As such, the R&R recommended the court find that plaintiffs' § 1983 claims based in equal protection brought against

object to the magistrate judge's recommendation with regards to Counts 2 (against

Beaufort County), 6, and 10, ECF No. 79. In concrete terms, then, the court reviews <u>de</u>

<u>novo</u> the magistrate judge's conclusions regarding Counts 2, 6, and 10 and the parties'

objections in turn.

### A. Count 2: Equal Protection Claims against Beaufort County

The R&R recommended that summary judgment be denied for plaintiffs' claims

against Beaufort County under 42 U.S.C. § 1983 for violations of the Equal Protection

Clause of the Fourteenth Amendment. Beaufort County objects to this recommendation

for two reasons. First, the County argues that plaintiffs have not created a genuine issue

of material fact as to discriminatory intent. ECF No. 79 at 9. Second, under scrutiny

deferential to prison officials,[5] defendants argue that plaintiffs cannot create a genuine

issue of material fact of a constitutional violation. <u>Id.</u> at 12. The court summarizes the

law of equal protection for pre-classification detainees before examining the arguments in

turn.

At issue in this case is Beaufort County's alleged violation of the Fourteenth

Amendment's equal protection clause, which states, in relevant part, that "[n]o State

shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S.

---

individual defendants Director Grant, Foot, and the Doe Defendants are barred by
qualified immunity, and the court adopts that recommendation.

[5] It is admittedly confusing whether defendants seek intermediate scrutiny or a
more deferential scrutiny proposed by <u>Morrison v. Garraghty</u>, 239 F.3d 648, 654 (4th Cir.
2001). Defendants have been inconsistent in their briefs as to which level of scrutiny
they seek. <u>See, e.g.</u>, ECF Nos. 48-1 at 13–15 (applying intermediate scrutiny); 63 at 9–
12 (seeking deferential scrutiny under <u>Morrison</u>); 79 (same); 81 (same). For the sake of
this order, the court assumes that defendants are requesting the more deferential standard
under <u>Morrison</u> notwithstanding their failure to request that standard in their original
motion for summary judgment. <u>See</u> ECF No. 48-1 at 13–15.

Const. amend. XIV, § 1.  The clause requires that similarly-situated individuals be treated alike.  Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)).  "To succeed on an equal protection claim, a plaintiff must first demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).  "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."  Id.

### 1.  Different Treatment

According to the Fourth Circuit, unequal treatment constituting an equal protection violation "occurs in one of two ways: (1) when the government explicitly classifies people based on race, or (2) when a law is facially neutral, but its administration or enforcement disproportionately affects one class of persons over another and a discriminatory intent or animus is shown."  Monroe v. City of Charlottesville, 579 F.3d 380, 388 (4th Cir. 2009).  Express classifications are those that are "explicitly stated on the face of a statute or in the reasons given for its administration or enforcement."  Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 819 (4th Cir. 1995).  Suspect facially neutral classifications are simply those that are not explicitly stated but are nevertheless applied.  Id. at 818–19.

Defendants disagree with the R&R's finding that the challenged practice constituted facial discrimination on the basis of gender—which meant that discriminatory intent was unnecessary to prove.  See R&R at 13–14.  The challenged action is BCDC's

practice of housing female pre-classification detainees in general population requiring a strip search on every female pre-classification detainee awaiting bond between February 27, 2015, and May 5, 2020, but not housing similarly situated male pre-classification detainees in general population thereby allowing them to avoid strip-searches without reasonable suspicion during that time.  R&R at 13–14 (citing ECF No. 40-1); ECF No. 79 at 1–4 (explaining the strip-search policy at the prison).  As the magistrate judge highlights, plaintiffs challenge BCDC's practice, not its policy applying to all inmates "being moved from Pre-Class to other areas of the facility."  R&R at 13.  The separate housing whereby female pretrial detainees were housed in general population at the outset, while male pretrial detainees were not, is not facially neutral but rather an explicit classification based on sex.  Id. at 13 n.9.

Beaufort County objects to the R&R's characterization and reiterates that the strip searches and search policy are facially gender-neutral because they call for searches of all detainees who move into contact with general population inmates.  ECF No. 79 at 10.  Rather, Beaufort County argues that "[t]he searching of female inmates is the result of the fact that female pre-classification detainees happen to be located in general population, whereas there exists a separate pre-classification holding area for male detainees."  Id. at 10–11.  Further, Beaufort County emphasizes that the plaintiffs are not arguing that they were housed in inferior housing as compared to male pre-classification detainees—which the County admits is "an explicit classification based on sex"—but rather plaintiffs are challenging the strip searches which were incidental to that difference in housing.  Id. at 11.  Plaintiffs disagree with the County and argue that Beaufort County's practice of strip-searching all female pre-classification detainees, but not all similarly situated males,

is not gender neutral but, instead, intentional disparity in treatment from other situated inmates based on sex.  ECF No. 80 at 3.

The court finds Beaufort County's objections without merit.  At its core, the action challenged is BCDC's practice of placing male pre-classification detainees in housing separate from general population inmates—which meant they were not automatically subjected to strip searches—whereas female pre-classification detainees were placed in general population and were always subjected to strip searches.  R&R at 13 n.9.  Ignoring the preliminary decision to house only one gender with general population inmates and to solely focus on the policy of strip-searching prisoners joining general population inmates requires the court to bury its head in the sand.  "[T]he Supreme Court outlined . . . a 'simple test' for identifying facial sex discrimination: such discrimination appears 'where the evidence shows treatment of a person in a manner which but for that person's sex would be different.'"  Bauer v. Lynch, 812 F.3d 340, 347–48 (4th Cir. 2016) (quoting City of L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702, 711 (1978)).  Had plaintiffs been male, they would have been placed in separate pre-classification detainee housing and would have in all likelihood avoided the strip search.  Consequently, BCDC's practice clearly falls under the category of facial sex discrimination.  Finding the practice to purposefully discriminate between similarly situated persons on the basis of gender, the court next examines the appropriate level of scrutiny to determine whether there are disputes over material facts such that this claim should survive summary judgment.

### 2. Scrutiny

Ordinarily, a state regulation or policy will be presumed to be valid and will be sustained if the classification is rationally related to a legitimate state interest.  See City of Cleburne, 473 U.S. at 440.  When the state classifies by race, alienage, or national origin, however, special concerns are implicated and strict scrutiny applies.  See id.; see also United States v. Virginia, 518 U.S. 515, 533 (1996) ("VMI") (applying intermediate scrutiny for classifications based on gender).  Such factors are "so seldom relevant to the achievement of any legitimate state interest" and, therefore, "are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others."  Id.

Outside the prison context, alleged discrimination on the basis of gender is subject to an intermediate level of scrutiny.[6]  See Veney v. Wyche, 293 F.3d 726, 732 (4th Cir.

---

[6] Plaintiffs strongly argue that intermediate scrutiny is the appropriate standard for the instant case notwithstanding the prison context.  ECF No. 80 at 4–5 (citing ECF No. 56 at 9–14 and adopting all those arguments by reference).  Importantly, some courts have determined that gender-based equal protection claims in the prison context receive intermediate scrutiny.  See, e.g., Harrison v. Kernan, 971 F.3d 1069, 1076 (9th Cir. 2020) (holding that prison regulations which facially discriminate on the basis of gender must receive intermediate scrutiny); Roubideaux v. N.D. Dep't of Corr. & Rehab., 570 F.3d 966, 974–75 (8th Cir. 2009) (applying intermediate scrutiny in gender-based prison cases); Pitts v. Thornburgh, 866 F.2d 1450, 1454–55 (D.C. Cir. 1989) (same); Williamson v. Maciol, 839 F. App'x 633, 638 (2d Cir. 2021) (same); Dinote v. Danberg, 601 F. App'x 127, 130 (3d Cir. 2015) (same); Pariseau v. Wilkinson, 1997 WL 144218, at *1 (6th Cir. Mar. 27, 1997); but see Glover v. Johnson, 198 F.3d 557, 561 (6th Cir. 1999) (declining to decide the appropriate level of scrutiny for equal protection claims in the prison setting because the district court properly found no disparate treatment).  For a classification to survive intermediate scrutiny, the government must show that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.  See VMI, 518 U.S. at 533.  In a prison context, the penological interests may still factor into the analysis of an equal protection claim because such considerations properly inform whether there exists an important state interest.  Harrison, 971 F.3d at 1079.

2002). "When equal protection challenges arise in a prison context, however, courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner." <u>Morrison</u>, 239 F.3d at 654–55. "[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.'" <u>Washington v. Harper</u>, 494 U.S. 210, 223 (1990) (quoting <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)); <u>but see</u> <u>Johnson v. California</u>, 543 U.S. 499, 506–10 (2005) (holding that a prison's facially racially discriminatory policy must be analyzed by a reviewing court under strict scrutiny and limiting <u>Turner's</u> reasonable-relationship test "only to rights inconsistent with proper incarceration"); <u>Harrison v. Kernan</u>, 971 F.3d 1069, 1076 (9th Cir. 2020) (extending <u>Johnson's</u> holding of strict scrutiny for racial classifications in a prison context to require intermediate scrutiny for gender classifications in a prison context). The plaintiffs in the instant case were pre-classification detainees—not convicted prisoners—and it is debatable whether the same standard of review applies to them requiring deferential scrutiny rather than intermediate scrutiny.[7] However, the court need not resolve that

---

[7] Beaufort County emphasized that the lesser standard also applies to pretrial detainees who have been accused of crimes, not just prisoners, though the cases cited are not direct authority on the issue of equal protection in prison policy. <u>See</u> ECF No. 79 at 13 n.6. Pre-trial detainees retain, at a minimum, the same rights enjoyed by convicted prisoners. <u>See</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 545 (1979). Moreover, the Supreme Court has found that in some contexts pre-trial detainees retain greater rights than convicted prisoners. <u>See</u> <u>id.</u> at 534–37 (holding that pre-trial detainees possess a clearly established constitutional right to be free from punishment, whereas convicted prisoners have a right to be free from cruel and unusual punishment). It is unclear whether pre-trial detainees are subject to a different standard of review than convicted prisoners in the equal protection context. Neither the Supreme Court nor the Fourth Circuit has clearly set forth a lower standard for pre-trial detainees with regards to equal protection claims. The court declines to establish a new standard now in part because the court finds there is gender-

question at this time because it agrees with the magistrate judge's analysis—that Beaufort County's gender-based practice fails—even under a more deferential standard.[8]

"[W]hile a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner claims under the equal protection clause . . . must still be analyzed in light of the special security and management concerns in the prison system." Morrison, 239 F.3d at 655. "To succeed on an equal protection claim, a prisoner must first show that [s]he was treated differently from others who were similarly situated and that the unequal treatment resulted from intentional or purposeful discrimination." Daye v. Rubenstein, 417 F. App'x 317, 318 (4th Cir. 2011). After the prisoner makes such a showing, the prisoner "must allege facts that, if 'true, would demonstrate that disparate treatment lacks justification under the requisite level of scrutiny.'" Id. at 318–19 (quoting Veney, 293 F.3d at 731). In a prison context, subject to the discussion above, courts "must determine whether the disparate treatment is 'reasonably related to [any] legitimate penological interests.'" Veney, 293

---

based discrimination even under the more deferential standard applied to convicted prisoners.

[8] Were the court to apply intermediate scrutiny the challenged practice would clearly fail. For a classification to survive intermediate scrutiny, the government must show that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. See VMI, 518 U.S. at 533 (1996). In other words, "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." Id. at 531. Beaufort County argued that space constraints, funding, limited resources, and the risk of contraband required them to house male and female pre-classification detainees differently, see ECF No. 79 at 19–20, but thereafter have failed to explain their ability to accommodate their current gender-neutral policy of housing all pre-classification detainees in general population and subjecting everyone to strip searches, see id. at 4. Under intermediate scrutiny, Beaufort County has to date not demonstrated an exceedingly persuasive justification for its gender-based practice of housing female detainees in general population requiring them to be strip searched. See VMI, 518 U.S. at 531.

14

F.3d 726, 732 (4th Cir. 2002) (quoting <u>Shaw v. Murphy</u>, 532 U.S. 223, 225 (2001)).

Courts apply a four-part test to determine whether a prison policy is constitutional:

> (1) whether there is a valid, rational connection between the policy and the penological interest; (2) whether an alternative means of exercising the right remains open to prison inmates; (3) the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

<u>Morrison</u>, 239 F.3d at 655 (citing <u>Turner</u>, 482 U.S. at 89–91).

The R&R found that even under <u>Morrison's</u> less rigorous standard, plaintiffs have set forth sufficient evidence to support an equal protection claim against BCDC at this stage of the litigation, and the court agrees. R&R at 15–19. The court examines the four factors in turn.

The first <u>Morrison</u> factor does not conclusively establish that the challenged practice had a valid, rational connection to a penological interest. <u>See</u> 239 F.3d at 655. Defendants argue that because female pre-classification detainees, unlike their male counterparts, were housed in the jail's general population area where weapons and contraband posed a danger, preventing the passage of contraband using strip searches was a legitimate penological interest. ECF No. 79 at 14; R&R at 15–16 (citing ECF No. 63 at 12). The court agrees that preventing access to contraband is clearly a legitimate concern. <u>See</u> <u>Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington</u>, 566 U.S. 318, 332–34 (2012) ("Detecting contraband concealed by new detainees . . . is a most serious responsibility. Weapons, drugs, and alcohol all disrupt the safe operation of a jail."); <u>McRae v. Johnson</u>, 261 F. App'x 554, 558 (4th Cir. 2008) ("[I]n the prison setting, suppression of contraband, maintaining discipline and security among the inmate population, maintaining the health and safety of inmates and staff, and preventing

15

prisoners from quickly changing their appearance constitute compelling governmental interests."). However, the action challenged is not the search itself but rather its unequal application to male versus female pre-classification detainees, for which the court finds the defendants have not established a valid, rational connection.[9]

The court evaluates the second through fourth Morrison factors together and finds that ready alternatives could have accommodated the pre-classification detainees' rights at de minimis costs to valid penological interests. See 239 F.3d at 655. Preliminarily, female pre-classification detainees had no alternatives but to consent to the strip search. In contrast, Beaufort County had other options besides a gender-based housing practice. Alternatives are directly relevant since "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." Turner, 482 U.S. at 90. The R&R identified two easy alternatives: (1) placing female pre-classification detainees in a separate pre-classification holding area so that they would not need to be strip searched, or (2) placing male pre-classification detainees in general population so that they, too, would be strip searched. R&R at 17. In its response in opposition to the R&R, Beaufort County focuses on why "the record does not support a genuine issue of material fact as to either of these alleged alternatives." ECF No. 79 at 17.

First, Beaufort County argues that there is no evidence in the record to support that the County "could have simply relocated female pre-classification detainees

---

[9] Additionally, the court echoes the R&R by noting that though contraband raises obvious security concerns in a prison setting, the "Year End Reports for [BCDC]" for 2010, 2011, 2012, and 2015, show that defendants conducted 18,402 "shakedowns" of inmates' cells prior to adoption of the strip-search practice at issue here and found no serious contraband at BCDC. See R&R at 16 n.11 (citing ECF No. 56-1).

somewhere outside of general population." Id.  Rather, to do so the County would have

been required to construct new buildings—which the County argues would impose much

more than a de minimis burden.  Id. at 17–18.  Beaufort County argues that the R&R's

consideration of this issue improperly placed to burden on the County to explain the

funding and space constraints.  Id. at 19 (citing R&R at 18).[10]  As such, the County urges

the court to find that this first alternative was not truly a viable alternative—certainly not

one that would impose nothing more than a de minimis burden to the County's

penological interests.  Id.

The court agrees with the R&R and finds that defendants' arguments regarding

funding and space constraints arguments are unavailing.  See R&R at 17.  "Vague and

general references to funding and space constraints cannot justify a policy that resulted

directly in the strip and visual body cavity searches of thousands of female arrestees,

while permitting their male counterparts to rest in the relative comfort and security of []

lockups." Ford v. City of Boston, 154 F. Supp. 3d 131, 151 (D. Mass. 2001); see also

Victory v. Berks Cnty., 2019 WL 5266147, at *14 (E.D. Pa. Oct. 17, 2019) (denying

summary judgment where county defendant failed to address why female inmates were

treated differently than male inmates with regards to housing beyond conclusory remarks

---

[10] Further, the defendants' critique of the R&R for misplacing the burden of proof
is without merit—read in full, the R&R clearly based its conclusions on the plaintiffs'
pleadings and briefs.  See R&R at 18 (citing ECF No. 56-3, Davis Dep. at 16:12–23,
17:8–11, 19:3–12) ("As noted by Plaintiffs, during the course of the second study,
Defendants did not attempt to identify space that could house female pre-classification
detainee.").  Certainly, the R&R noted that "Defendants have not offered any explanation
or argument to address the funding and space constraints," but in so doing the magistrate
judge acknowledged that the plaintiffs raised this as an issue in their response in
opposition to the motion for summary judgment, ECF No. 56 at 12–14, to which
defendants replied without adequately addressing that deficit, ECF No. 63 at 7.

about the structure of the reentry center and limited employee bandwidth).  Fiscal

limitation concerns cannot justify unconstitutional conduct.  See Bukhari v. Hutto, 487 F.

Supp. 1162, 1171–72 (E.D. Va. 1980).  However, even if the court were to credit the

defendants' argument and find that the first alternative imposed more than a de minimis

burden—which it does not—the second alternative, strip search everybody, even more

clearly shows that a constitutional alternative existed that the defendants could have

employed rather than continue with an unequal gender-based practice.

Second, Beaufort County argues that also housing male pre-classification

detainees among general population inmates would not merely incur a de minimis

impact.  ECF No. 79 at 19.  Rather, it would greatly increase the opportunities for

contraband to be introduced into the general population.  Id.  It would also require

significantly more resources as every detainee entering general population would need to

be strip searched, which would quickly consume "the [c]ounty's scarce resources."  Id. at

19–20.  In evaluating these arguments, the court may consider the defendants' voluntary

change from a discriminatory policy to a non-discriminatory policy to find that a readily

available constitutional alternative existed.  Jones v. Murphy, 567 F. Supp. 2d 787, 791

(D. Md. 2008) (finding relevant to the fourth Morrison factor that the prison's later

decision to search all arrestees to their last layer of clothing regardless of gender

demonstrated a clear and readily available constitutional alternative to the prison's

previously gender-discriminatory strip search policy).  As defendants have conceded,

because of COVID-19 protocols, pre-classification males are now also held in general

population and, thus, are also strip searched.  R&R at 3 n.6 (citing ECF No. 40-1, Grant

Aff. ¶ 7).  There is no evidence before the court to suggest that this change strained

BCDC resources, and when the magistrate judge noted as much, the defendants failed to rebut such a finding in either their response in opposition or their sur-reply.  See R&R at 18; ECF Nos. 79, 81.  This alternative demonstrates that the County was able to treat male and female pre-classification detainees equally at de minimis cost to valid penological interests, but chose not to.  R&R at 18–19.

As such, the court finds that there exists a dispute over a material fact as to the constitutionality of Beaufort County's practice of placing female pre-classification detainees in general population and subjecting them to strip searches, when male pre-classification detainees were housed separate from convicted prisoners and not subjected to such searches.  For the foregoing reasons, the court denies the motion for summary judgment on Count 2 as alleged against Beaufort County.

### B.  Count 10: Attorneys' Fees (42 U.S.C. § 1988(b))

The R&R recommended that summary judgment be denied for plaintiffs' request for attorneys' fees under 42 U.S.C. § 1988(b).  Defendants object to Count 10 but provide no reasoning for their objection.  See generally ECF No. 79.  Section 1988(b) provides that in an action to enforce a provision of § 1983—here, the equal protection claims against Beaufort County—the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.  See 42 U.S.C. § 1988(b).  Since the equal protection claim against Beaufort County survives, so too does the claim for affiliated attorneys' fees.

### C.  Count 6: Outrage/Reckless Infliction of Emotional Distress

At issue in Count 6 is whether plaintiffs may recover for reckless infliction of emotional distress since the SCTCA explicitly excluded liability for intentional infliction

19

of emotional harm by a government entity.  See R&R at 26–28.  The R&R recommended

that summary judgment be denied for outrage (i.e., reckless infliction of emotional

distress) because a plain reading of the SCTCA indicates only intentional, not reckless,

conduct is included.  Id. at 28.  Defendants object to this conclusion and argue that the

SCTCA bars plaintiffs' outrage claims and rest their argument on a laundry list of court

cases purportedly holding as much.[11]  ECF No. 79 at 20.  The court examines these

arguments in turn.

The court starts with the elements of an outrage claim.  Under South Carolina law,

intentional infliction of emotional distress is also known as the tort of outrage.  Callum v.

CVS Health Corp., 137 F. Supp. 3d 817, 856 (D.S.C. 2015).  The South Carolina

Supreme Court has "held that in order to recover for intentional inflict of emotional

distress, the complaining party must establish that:

> (1) the defendant intentionally or recklessly inflicted severe emotional
> distress, or was certain, or substantially certain, that such distress would
> result from his conduct;
>
> (2) the conduct was so "extreme and outrageous" so as to exceed "all
> possible bounds of decency" and must be regarded as "atrocious, and utterly
> intolerable in a civilized community;"

---

[11] Defendants cite several cases that ostensibly hold that the SCTCA bars outrage claims against government entities, See ECF No. 79 at 21–22 (citing Newman v. S. C. Dep't of Emp. & Workforce, 2010 WL 4791932, at *2 (D.S.C. Sept. 22, 2010), report & recommendation adopted, 2010 WL 4666360 (D.S.C.  Nov. 18, 2010); Ward v. City of N. Myrtle Beach, 457 F. Supp. 2d 625, 646–47 (D.S.C. 2006); Harkness v. City of Anderson, 2005 WL 2777574, at *4 (D.S.C. Oct. 25, 2005); Trask v. Beaufort Cnty., 709 S.E.2d 536, 543 (S.C. Ct. App. 2011); accord. Lindquist v. Tanner, 2012 WL 3839237, at *4 (D.S.C. Apr. 12, 2012), report & recommendation adopted in part, 2012 WL 3839235 (D.S.C. Sept. 4, 2012).  The magistrate judge discounted this string citation by explaining that defendants failed to differentiate between outrage cases based on reckless conduct versus those based on intentional conduct when considering a bar by the SCTCA.  R&R at 27.  The court similarly finds these citations not entirely instructive as to the specific nuance at issue.

(3) the actions of the defendant caused plaintiff's emotional distress; and

(4) the emotional distress suffered by the plaintiff was "severe" such that "no reasonable man could be expected to endure it."

Hansson v. Scalise Builders of S.C., 650 S.E.2d 68, 70 (S.C. 2007) (quoting Ford v. Hutson, 276 S.E.2d 776,778 (S.C. 1981) (adopting elements from Rest. (2d) of Torts § 46)) (emphasis added). Importantly, the conduct that may give rise to an outrage claim may be either intentional or reckless. See id. However, though varying levels of conduct may give rise to an outrage claim, the name of the tort remains the same: intentional infliction of emotional distress. Id.

In pertinent part, the SCTCA defines "loss" to mean "bodily injury, disease, death, or damage, to tangible property, including lost wages and economic loss to the person who suffered the injury, disease, or death, pain and suffering, mental anguish, and any other element of actual damages recoverable in actions for negligence, but does not include the intentional infliction of emotional harm." S.C. Code. § 15-78-30(f) (emphasis added). Thus, the court is confronted with a question of ambiguity: whether the legislature in drafting the statute referenced the tort of intentional infliction of emotional distress or referenced the state of mind requirement for outrage claims such that only a subclass of claims—those alleging reckless behavior—were permissible as asserted against the State.[12]

---

[12] In contrast, the R&R found the statutory construction unambiguous. See R&R at 28. According to the magistrate judge and the plaintiffs, "a plain reading of the SCTCA indicates that only intentional, not reckless, conduct is included, and '[t]he Court is not required to examine statutory construction when the statute is plain and unambiguous.'" Id. (quoting Thao v. Nationwide Affinity Ins. Co. of Am., 2018 WL 2971784, at *4 (D.S.C. June 13, 2018). As such, since the plaintiffs limited the allegations in their amended complaint to "reckless" conduct, the magistrate judge could not say that the claims were barred by the SCTCA at this stage of the litigation. Id.

This court is not the first court to confront this ambiguity. The magistrate judge noted one South Carolina Supreme Court case that in applying the law of outrage implicitly accepted that outrage claims based in recklessness were not barred. R&R at 28 (citing Bass v. S.C. Dep't of Soc. Servs., 780 S.E.2d 252 (S.C. 2015) (upholding a general jury verdict against state agency on SCTCA claims of gross negligence and outrage premised on reckless conduct)). However, this court has previously weighed in on this issue and directly considered whether the SCTCA bars outrage claims based in recklessness and held all outrage claims to be barred. See, e.g., Anderson v. Dorchester Cnty., 2021 WL 1186637, at *15 (D.S.C. Mar. 30, 2021). This court's decision and reasoning were adopted by another court in the district. Faulkner v. York Cnty. Sch. Dist., 2022 WL 673684, at *9 (D.S.C. Mar. 7, 2022) (applying the reasoning in Anderson). The court sees no need to diverge from its previous analysis, but nevertheless reiterates the most salient features. First, South Carolina courts have long treated reckless conduct as possessing an element of willfulness, which more closely aligns with intentional torts than those arising from negligence. Anderson, 2021 WL 1186637, at *15. Second and more fundamentally, "it [is] hard to believe that the South Carolina legislature would explicitly exclude from recovery any loss caused by 'the intentional infliction of emotional harm,' but not exclude from recovery the very same harm when the emotional distress was inflicted recklessly." Id. (quoting S.C. Code § 15-78-30(f)). The language of the SCTCA is also informative because it explicitly asserts that "[t]he provision of this chapter establishing limitations on and exemptions to the liability of the State . . . must be liberally construed in favor of limiting the liability of the state." S.C. Code § 15-78-20(f). In aggregate, the court is convinced that the SCTCA as drafted

22

intended to bar all outrage torts brought against the State, not just those alleging intentional conduct.

Consequently, the court departs from the magistrate judge's recommendation in this respect and instead grants defendants' motion for summary judgment on Count 6, finding that plaintiffs' claim of outrage against Beaufort County is barred by the SCTCA.

## IV.   CONCLUSION

For the foregoing reasons the court **ADOPTS** the R&R in part and **REJECTS** the R&R in part and **GRANTS** the motion in part and **DENIES** the motion in part. Specifically, the court **ADOPTS** the R&R's recommendation that defendants' motion for summary judgment be **GRANTED** as to Counts 1, 3, 4, 5, 7, 8, 9, and 2 (as asserted against individual defendants).  The court also **ADOPTS** the R&R's recommendation that defendants' motion for summary judgment be **DENIED** as to Counts 2 (as asserted against Beaufort County) and 10.  Finally, the court **REJECTS** the R&R's recommendation and **GRANTS** defendants' motion for summary judgment as to Count 6.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 27, 2023**
**Charleston, South Carolina**

23