IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
SOUTH CAROLINA—BEAUFORT DIVISION

| | | |
|---|---|---|
| Cheryl A. Munday and Margaret Devine, on behalf of themselves and others similarly situated, | ) ) ) ) | |
| | ) | Civil Action No. 9:20-cv-02144-DCN-MHC |
| Plaintiffs, | ) ) | |
| v | ) ) | |
| Beaufort County, Philip Foot, Quandara Grant, John Does 1-5 and Jane Does 1-5, | ) ) ) | |
| Defendants. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO RECONSIDER, ALTER, OR AMEND FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND/OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND/OR, IN THE FURTHER ALTERNATIVE, TO CERTIFY FOR IMMEDIATE APPEAL**

AND NOW COMES Defendant Beaufort County ("County"), by and through its undersigned counsel, and files the following Motion to Reconsider, Alter, or Amend Findings of Fact and Conclusions of Law, and/or, in the Alternative, for Summary Judgment, and/or, in the Further Alternative, to Certify for Immediate Appeal ("Motion"):

**INTRODUCTION**

Approximately three years ago, the Court granted individual Defendant Col. Quandara Grant, Director of the Beaufort County Detention Center, summary judgment based on qualified immunity. Relevantly, the Court concluded that the law governing equal protection in the context of the strip searches at issue in this case was not clearly established at the time of the challenged search practice. After conducting a bench trial to decide issues concerning municipal liability, the Court concluded that Defendant County could be liable because Col. Grant was a "final policymaker" who made decisions leading to the alleged equal protection violations. However, as a matter of law, the Court's qualified immunity ruling as to Col. Grant legally forecloses municipal liability because Plaintiffs cannot prove the deliberate indifference required under the law.

Alternatively, the court should reconsider its Findings of Fact and Conclusions of Law

because Col. Grant was not a final policymaker making a decision that could bind the County. If the Court does not accept Defendant County's substantive arguments, this case qualifies for Section 1292(b) certification.

<u>**BACKGROUND**</u>[1]

Plaintiffs commenced this class action on behalf of former female pre-classification ("preclass") detainees at the Beaufort County Detention Center ("Detention Center") who were strip searched before they were formally classified during the class period. Plaintiffs' only remaining substantive claim is that the County violated their equal protection rights because it searched all female preclass detainees, but did not also search all male preclass detainees. The Court conducted a bench trial limited to the issue of whether the County might be subject to municipal liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). On March 31, 2026, the Court entered its Findings of Fact and Conclusions of Law ("Findings and Conclusions"). (*See* Docket Entry # 158). For the reasons that follow, the Court should reconsider, alter, amend, and/or vacate its Findings and Conclusions and enter judgment in favor of Defendant County pursuant to the common law and the Federal Rules of Civil Procedure 52(b), 54(b), and 59(e) (and any other potentially applicable Rule). But first, Defendant County moves the Court for summary judgment pursuant to Rule 56 on the ground that the court's finding that Colonel Grant is the ultimate policymaker for the County forecloses Plaintiffs' Section 1983 claim against the County in light of the Court's grant of summary judgment to her. In the alternative, if the Court does not grant any of this relief, it should authorize an immediate appeal pursuant to 28 U.S.C. § 1292(b).

---

[1] The facts of this case have been summarized in detail in Defendant's prior filings. In the interest of efficiency, Defendant will not restate those factual recitations.

**ARGUMENTS**

**A.**     **The Court Should Enter Judgment in Favor of Defendant Because Its Prior Grant of Judgment to the Individual Defendants Absolutely Precludes the Potential Municipal Liability Set Forth in the Findings and Conclusions.**

This Motion initially presents a narrow but dispositive question of law: whether a municipality may be subjected to liability when the Court has already determined that the sole alleged final decisionmaker is entitled to qualified immunity because the relevant constitutional right was not clearly established.  The County respectfully submits that the law does not support liability under those circumstances.

The Court has found that the County is potentially liable under *Monell* solely because Colonel Quandara Grant ("Col. Grant") was the County's final policymaker with regard to the challenged practice.  Yet, the Court has previously found that the law was not sufficiently clear at the time that Col. Grant should have known that the practice might violate the Constitution.  The Court should reconsider, alter, amend, or vacate its Findings and Conclusions to grant judgment in favor of Defendant County because its prior Order (Docket Entry ## 76 and 82) granting summary judgment to individual Defendants Philip Foot ("Mr. Foot") and Col. Grant forecloses municipal liability as a matter of law.  In the alternative, Defendant County hereby moves for the entry of summary judgment on this ground pursuant to Federal Rule of Civil Procedure 56.[2]

On May 2, 2022, Defendants County, Mr. Foot, and Col. Grant filed Motion for Summary Judgment.  (*See* Docket Entry # 48).  The Magistrate Judge's Report and Recommendation on Defendants' Motion for Summary Judgment, *inter alia*, granted summary judgment to Defendants Col. Grant and Mr. Foot on Plaintiffs' Section 1983 equal protection claims.  Specifically, the Court found that they were entitled to qualified immunity because the equal protection right at issue was not clearly established at the time:

---

[2] The County is aware that the deadline for dispositive motions under the governing scheduling orders has passed.  However, the grounds for this motion did not exist until the Court based its conclusion on the *Monell* question upon its finding that Col. Grant was a "final policymaker."

> [T]he relevant issue for purposes of qualified immunity is whether strip searching female pre-classification detainees but not male pre-classification detainees violates equal protection where the female pre-classification area is in general population and the male preclassification area is not. ***The parties do not point to any controlling authority from the United States Supreme Court, the Fourth Circuit or this District sufficiently similar to the situation the individual Defendants confronted in this case that would have made clear to them that their conduct under BCDC's Practice violated Plaintiffs' equal protection rights***. ***Nor is there a consensus of cases of persuasive authority*** from other jurisdictions that would otherwise make it "sufficiently clear that every reasonable official would have understood" that what the individual Defendants did in this case violated that right. *See Mullenix,* 577 U.S. at 11; Hill, 727 F.3d at 321.
>
> Notably, prior to BCDC's Practice, the United States Supreme Court held that the Fourth Amendment does not prohibit a policy requiring the strip searching of all detainees who will be in a jail's general population. *See Florence*, 566 U.S. at 333–34. Defendant Grant testified that "[o]nce the case law came out saying that we could strip search prior to them entering general population, then we changed." ECF No. 48-1, Grant Dep. at 41:17–20. The issue here under the Equal Protection Clause of the Fourteenth Amendment arises from the different locations of the pre-classification areas for men and women at the time at BCDC. Under ***these circumstances, the undersigned cannot find that the law was "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."*** *Mullenix*, 577 U.S. at 11; *Hill*, 727 F.3d at 321.

(*See* Docket Entry # 76, at 24 (emphasis added)). Plaintiffs did not object to this recommendation, and this Court found it was not "clear error." As a result, the Court "grant[ed] summary judgment on plaintiffs' claims against individual defendants included in Count 2 and denies plaintiffs' request to amend the complaint to name individual defendants." (*See* Docket Entry # 82, at 7).

In its May 16, 2025, Response to Plaintiff's Proposed Trial Plan, Defendant County contended that, as a preliminary matter, the Court should decide whether trial is necessary in light of its disposition of the individual Defendants' motion for summary judgment. (*See* Docket Entry # 150, at 4). The Court and the parties were aware of this issue during the bench trial.[3] (*See* Tr. Transc., at 329:20-24 ("Because, from what I understand, one of Mr. Cooke's defenses is that once

---

[3] In fact, during the bench trial, Plaintiffs' counsel expressed an intention to file a Rule 54(b) motion seeking reconsideration of the grant of summary judgment to Col. Grant and Mr. Foot. However, Plaintiffs' elected not to file such a motion.

everybody gets qualified immunity, you can't do anything else going up the food chain. And right now the status is that all of the individual defendants have qualified immunity.")). In fact, Defendant County's proposed Findings of Fact and Conclusions of Law submitted to the Court[4] included an extensive discussion of that issue. (*See* Def.'s proposed Findings of Fact and Conclusions of Law, at 21-25). The Court's Findings and Conclusions did not address this question, but addressed only the *Monell* question.

The Court's holding in the Findings and Conclusions was based on its determination that Col. Grant was the County's final policymaker. (*See* Docket Entry # 158, at 17, 24). In essence, the Court held that the County may be held liable under the stringent standards applicable to municipal liability claims if Col. Grant made a policy decision that violated Plaintiffs' constitutional rights. Defendant respectfully submits that the grant of summary judgment to Col. Grant is incompatible with its finding of potential municipal liability. Therefore, the Court should reconsider, alter, or amend its Findings and Conclusions to enter judgment in favor of Defendant because there can be no municipal liability as a matter of law where the final policymaker is entitled to qualified immunity. Alternatively, Defendant County hereby moves the Court to grant it summary judgment because Plaintiffs cannot—consistent with the Court's prior ruling—show that the County's final policymaker was "deliberately indifferent."

As the Court is aware, the County cannot be liable unless Plaintiffs prove that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The Findings and Conclusions held, under the second basis[5] for *Monell* liability, that the County "may be subject to municipal liability under

---

[4] Defendant County submitted its proposed order to the Court by email (copied to Plaintiffs' counsel) on October 1, 2025.

[5] The Fourth Circuit has held that a "policy or custom" can exist:

(1) through an express policy, such as a written ordinance or regulation; (2) ***through***

§ 1983 because the strip-search policy giving rise to the alleged constitutional violations was the decision of Director Grant, ***who was the final policymaker for Beaufort County concerning BCDC***." (*See* Docket Entry 158, at 17 (emphasis added)). A plaintiff asserting this basis for a *Monell* liability must show "deliberate indifference" to her constitutional rights:

> Even if the superintendent and other school officials had possessed final policymaking authority, the Riddick plaintiffs would have another insurmountable hurdle to overcome. A municipality is not subject to section 1983 liability simply because a claimant is able to identify conduct attributable to the municipality. Rather, "the plaintiff must also demonstrate that, through its ***deliberate*** conduct, the municipality was the 'moving force' behind the injury alleged." *Bryan County*, 520 U.S. at 404. Accordingly, to impose section 1983 liability on a municipality, a claimant must first show that "a municipal decision reflects ***deliberate indifference*** to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411.

*Riddick v. Sch. Bd. of the City of Portsmouth*, 238 F.3d 518, 524 (4th Cir. 2000) (emphasis in original) (applying the "deliberate indifference" requirement to the second form of *Monell* custom or policy); *accord Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) (municipal liability attaches where final policymaker makes deliberate choice). In other words, to establish municipal liability for money damages, Plaintiffs must prove that the County acted with "deliberate indifference."[6] However, as discussed below, the Court's prior grant of summary judgment to the final policymaker based on qualified immunity forecloses deliberate indifference as a matter of law.

Under the Findings and Conclusions, Plaintiffs' municipal liability claims rest entirely on Col. Grant being the "final policymaker" for the County. The Court has not concluded that County

---

> ***the decisions of a person with final policymaking authority***; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (emphasis added) (*quoting Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

[6] Deliberate indifference "is a ***stringent standard of fault***, requiring proof that a municipal actor disregarded a ***known or obvious*** consequence of his action." *See Board of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997) (emphasis added).

Council or the County Administrator had actual or constructive knowledge of the strip search practice at issue, let alone any role in creating it. Instead, it concluded that municipal liability is only possible because of *Col. Grant's* decision concerning strip searches.

Therefore, for Plaintiffs to establish that the County acted with deliberate indifference, they must prove that ***Col. Grant*** acted with deliberate indifference, *i.e.*, that she disregarded the ***known or obvious*** consequence of her decision. The Court has already determined—as a matter of law and beyond a genuine issue of material fact—that the controlling law at the time would not "have made clear to [Col. Grant] that [her] conduct under BCDC's Practice violated Plaintiffs' equal protection rights."[7] (*See* Docket Entry # 76, at 24). The County could not have been deliberately indifferent to a right that was not clearly established to its final policymaker.[8] *See Ross v. Russell*, Civil Action No. 7:20-cv-000774, 2022 U.S. Dist. LEXIS 44567, at *42 (W.D. Va. Mar. 14, 2022) ("Because Ross's allegations fail to set forth deliberate indifference against any individual, the same policies cannot give rise to official-capacity liability, either."); *Word of Faith Fellowship, Inc. v. Rutherford Cty. Dep't of Soc. Servs.,* 329 F. Supp. 2d 675, 693 (W.D.N.C. 2004) ("[I]n order for the policy makers to act with deliberate indifference toward constitutional rights, those rights must be clearly established. [Citations omitted.] Therefore, the issue of municipal and official capacity liability in this case will necessitate the same reasoning as did the qualified immunity issue.").

The Fourth Circuit and its district courts have held that, where claims against individuals

---

[7]  If anything, the state of law at the time, with which Col. Grant was familiar, ***authorized*** strip searches of detainees who will be in a jail's general population. *See Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 333-34 (2012) (holding that policy of strip searching all inmates going to general population did not violate Fourth Amendment).

[8]  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages." *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011).

are dismissed because of qualified immunity, the plaintiff cannot succeed on municipal liability claims. *See Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012) ("Because we hold that all plaintiffs failed to state predicate § 1983 claims against the individual officers [because of qualified immunity], we must also hold that all plaintiffs have failed to state . . . *Monell* liability . . . claims."); *Crosby v. Colleton Cty. Sheriff's Office*, No. 2:22-cv-03897-RMG, 2023 U.S. Dist. LEXIS 229585, at *26 (D.S.C. Dec. 27, 2023) ("The Court finds that the Sheriff's Office and Sheriff Hill are entitled to summary judgment on Plaintiffs' *Monell* claim because the Court has already found that Mr. Crosby was not deprived on (sic) any constitutional rights."); *Davis v. Wright*, No. 3:14CV161, 2014 U.S. Dist. LEXIS 149213, at *10 (W.D.N.C. Oct. 21, 2014) ("As the Court has found no violation of constitutional rights [due to qualified immunity], there can therefore be no municipal liability."); *see also Howerton v. Fletcher*, 213 F.3d 171, 175 n.5 (4th Cir. 2000) ("[A] municipality cannot be held liable under section 1983 for inadequate training where individuals subject to the training program at issue did not violate the plaintiff's constitutional rights."); *Williamson v. Virginia Beach*, 786 F. Supp. 1238, 1264 (E.D. Va. 1992) ("The Fourth Circuit, and more recently the United States Supreme Court, have made clear, however, that there can be no municipal liability where the plaintiff's harm was not caused by a constitutional violation.").

Other courts have similarly concluded that dismissal of a claim for qualified immunity requires dismissal of municipal liability claims:

> Where the municipality has not directly inflicted an injury, however, "rigorous standards of culpability and causation must be applied," *id*. at 405, and a showing of deliberate indifference is required. The absence of clearly established constitutional rights -- what Justice O'Connor called "clear constitutional guideposts," 489 U.S. at 397 -- undermines the assertion that a municipality deliberately ignored an obvious need for additional safeguards to augment its facially constitutional policy. This is not an application of qualified immunity for liability flowing from an unconstitutional policy. Rather, ***the lack of clarity in the law precludes a finding that the municipality had an unconstitutional policy at all, because its policymakers cannot properly be said to have exhibited a policy of deliberate indifference to constitutional rights that were not clearly***

***established****.

*See Szabla v. City of Brooklyn Park*, 486 F.3d 385, 394 (8th Cir. 2007) (emphasis added) (*citing and quoting Owen v. City of Independence*, 445 U.S. 622 (1980)); *accord Lombardo v. City of St. Louis*, 38 F.4th 684, 692 (8th Cir. 2022) ("Because we have concluded that the constitutional right at issue here was not clearly established, Lombardo cannot prevail on her claims against the City."); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017) ("The absence of a clearly established right spells the end of this *Monell* claim."); *Townes v. City of N.Y.*, 176 F.3d 138, 143 (2d Cir. 1999) ("Similarly, municipal liability under a failure to train theory requires, in part, that municipal employees violate or are likely to violate a clearly established federal constitutional right."); *Macdonald v. Town of Eastham*, 946 F. Supp. 2d 235, 243 (D. Mass. 2013) ("[W]hile a municipality does not enjoy qualified immunity from damages liability resulting from an unconstitutional policy or decision [citation omitted], the conclusion that officers are immune from suit because the right allegedly violated was not clearly established also precludes municipal liability."), *aff'd*, 745 F.3d 8 (1st Cir. 2014).

In granting her summary judgment, the Court concluded that governing law in the Fourth Circuit (and even law from other jurisdictions) did not clearly establish to Col. Grant that the strip search practice violated equal protection rights. In its Findings and Conclusions, the Court concluded that the basis for potential municipal liability is that Col. Grant made a "decision" as the County's "final policymaker." This decision was apparently to strip search all preclass women because of their presence with general population at a time when the law "would [not] have made clear to [Col. Grant] that [her] conduct under BCDC's Practice violated Plaintiffs' equal protection rights." (*See* Docket Entry ## 76, at 24 and 82, at 7). Logically, Col. Grant cannot have "disregarded a ***known or obvious*** consequence of [her] action,"[9] where the law was not even clear that her decision might violate the constitution. "[A] municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet

---

[9]  *Board of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).

been clearly established." *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012). A finder of fact could never conclude that the County—through the decisions of Col. Grant as final policymaker—acted with deliberate indifference to Plaintiffs' equal protection rights.[10]

Therefore, the Court must enter judgment in favor of Defendant County because Plaintiffs cannot, as a matter of law, establish deliberate indifference, an essential predicate to municipal liability. Specifically, the Court should either: (a) reconsider, alter, or amend its Findings and Conclusions to enter judgment in favor of Defendant County; or (b) grant summary judgment in favor of Defendant County because there are no genuine issues of material fact and it is entitled to judgment as a matter of law.

**B.** **The Court Should Reconsider, Alter, or Amend Its Findings and Conclusions to Enter Judgment in Defendant's Favor.**

**1.** **The Court Should Reconsider, Alter, or Amend the Findings and Conclusions Because the Alleged Constitutional Violations Were Not the Result of a Final Policymaker's Decision.**

The only basis for the Court's finding of potential *Monell* municipal liability is the second category of *Monell* liability, *i.e.,* a policy or custom arising "through the decisions of a person with final policymaking authority." *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citation omitted)). Specifically, the Court held that Defendant "County may be subject to municipal liability under § 1983 because the strip-search policy giving rise to the alleged constitutional violations was the decision of Director Grant who possessed final policymaking authority for Beaufort County concerning BCDC."[11] (*See* Docket Entry # 158, at 24).

---

[10]  It is possible that there may be cases where a municipal claim could succeed even though individual defendants are held to be qualifiedly privileged; however, this is not such a case. The premise for liability is that Col. Grant, as a final policymaker, made a decision that violated Plaintiffs' constitutional rights. Plaintiffs cannot dispute that they can only succeed at trial if they can prove that Col. Grant acted with deliberate indifference. Dismissal for qualified immunity because the right was not clearly established is wholly inconsistent with a finding that Col. Grant acted with deliberate indifference.

[11] The County has contended that its only "final policymaker" is County Council. County Council is the elected body creating policy on its constituents' behalf. The County Administrator has

### a.    The Law and the Evidence Do Not Support the Court's Conclusion That Col. Grant Was a Final Policymaker for the County.

"While municipal policy is most easily found in municipal ordinances, it may also be found in formal or informal *ad hoc* policy choices or decisions of municipal officials authorized to make and implement municipal policy." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (quotation omitted). However, "'not every decision by every municipal official will subject a municipality to section 1983 liability.'" *Curry v. Town of Atl. Beach*, Civil Action No. 4:15-cv-3327-BHH-TER, 2017 U.S. Dist. LEXIS 22467, at *28 (D.S.C. Jan. 31, 2017) (*quoting Riddick v. School Bd. of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)). "[M]unicipal liability attaches only when the decision maker is the municipality's  governing body, a municipal agency, or an official possessing ***final authority to create official policy***." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (emphasis added). "[W]hether a particular official has final policymaking authority is a question of state law." *Starbuck v. Williamsburg James City Cty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (*quoting Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 737 (1989)).

"[T]he type of policymaking authority which can invoke §1983 liability is 'authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government.'" *Lytle v. Doyle*, 326 F.3d 463, 472 (4th Cir. 2003) (*quoting Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987)); *accord Gernetzke v. Kenosha Unified Sch. Dist. No. 1,* 274 F.3d 464, 468 (7th Cir. 2001) ("The question is whether the . . . decisionmaker . . . was at the apex of authority for the action in question."). "[C]ourts must distinguish between mere policymaking and final policy making authority because liability only attaches to ***final*** policy making authority." *Armstrong v. City of Greensboro*, 190 F. Supp. 3d 450, 474 (M.D.N.C. 2016) (emphasis added) (*citing Riddick*, 238 F.3d at 523); *accord Coming Up, Inc.*

---

statutory authority to administer and carry out policies that County Council created, but not the authority to *create* County policy. The evidence showed that County Council did not make a policy choice or decision to strip search pre-classification women—nor did the County Administrator, for that matter. Additionally, the evidence is undisputed that County Council and the County Administrator had no knowledge of the strip search practice at issue.

*v. City & Cty. of San Francisco*, 830 F. Supp. 1302, 1308 (N.D. Cal. 1993) ("[M]ere policymaking authority is not enough for §1983 liability to attach to the municipality[;] the official must possess final, unreviewable policymaking authority."), *modified on recons. on other grounds*, 857 F. Supp. 711 (N.D. Cal. 1994).  "When a municipal official's discretionary action 'is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.'" *Riddick*, 238 F.3d at 523 (*quoting City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

Assuming *arguendo* that Col. Grant[12]—the Detention Center's Director and highest-ranking officer—was the person who decided that preclass women should be strip searched because of their introduction to general population, Plaintiffs cannot satisfy the second prong of *Monell* liability, because the evidence does not support that she was the final policymaker.  Col. Grant's was given authority to manage the day-to-day operations of the Detention Center facility. She did this as a County employee, not an elected officeholder.  She was not an official empowered to make long-term policy choices binding on the citizens of the County.  That responsibility was left to others by statute.

Plaintiffs' constitutional claims are not based on equity in housing conditions, but upon the purported violation of their equal protection rights.  While Col. Grant was delegated broad authority to make housing decisions for the Detention Center, there is no evidence that she was delegated authority to make the County's discrimination or equal protection policy.  In most counties, the sheriff has custody over the jail and may be liable for acts of jailers.  *See* S.C. Code §24-5-10.  However, the sheriff may devolve his powers and duties relating to the jail and the appointment of a facility manager to the County's governing body.  *See* S.C. Code §24-5-12.  When the sheriff does this, "custody of the jail shall remain with *the governing body*."  *See id.* (emphasis

---

[12] There is no evidence that anyone superior to Col. Grant made any decisions about the strip search policy.  The witnesses all testified that they did not make any decision to search preclass women.  In fact, they did not know operational details such as who was being strip searched.

added).  This is the case in Beaufort County, where the Sheriff does not operate the Detention

Center.  Ultimate authority over the Detention Center (and the power to make final policy) resides

with the County's governing body, *i.e.,* County Council.

Under South Carolina statute, the County Administrator is statutorily required to "appoint

a qualified person as facility manager."  *See* S.C. Code § 24-5-20; *accord* Att'y Gen. Opin., 2017

S.C. AG LEXIS 64, *8 (Oct. 6, 2017) ("[Where] the county governing body has custody and

control of a county jail, the chief administrator of the county in which the jail is situated is

statutorily assigned to appoint and supervise the facility manager.").  "[T]he General Assembly

intended either the sheriff or the county governing body to have sole custody and control of the

county jail with a facility manager acting under such party's supervision"  *See id.*, at *9.  Among

other things, the facility manager "annually shall report to the governing body of his county the

actual condition of the jail, the repairs which may be wanted, and their probable cost."  *See* S.C.

Code §24-5-120.  Col. Grant was the Detention Center's facility manager, subject to the

supervision of the County Administrator.[13]

South Carolina law does not grant a facility manager broad final policymaking authority

for the County.  Instead, that position is one of operational facility management, with the ability

---

[13]  Col. Grant's operation of the Detention Center is also subject to state scrutiny and regulation.
For example, the Jail and Prison Inspection Division within the Department of Corrections
conducts inspections of county detention centers to "include *all phases of operation*, fire safety,
and health and sanitation conditions at the respective facilities."  *See* S.C. Code §§ 24-9-10 to -20
(emphasis added).  State law governs the construction and renovation of county detention centers.
*See* S.C. Code §24-9-40 ("In order to certify compliance with minimum design standards, the Jail
and Prison Inspection Division of the Department of Corrections and the State Fire Marshal shall
be provided with architectural plans before construction or renovation of any state or local
confinement facility.").  Additionally, state law makes it illegal "to discriminate in the treatment
of prisoners placed in the custody of the . . . local governing body."  *See* S.C. Code § 24-5-90.  It
also requires that in all "local detention facilities in the State, a separation of the sexes must be
observed at all times."  *See* S.C. Code § 24-13-10.  State law requires that local detention centers
"limit, when practical, bodily inspections of a female inmate by male officers when the female
inmate is naked or only partially clothed."  *See* S.C. Code §24-13-35.  At no time did any state
supervisory authority conclude that the Detention Centers strip search practices were potentially
unconstitutional.

to make operational policies.  Col. Grant was not a "final policymaker" whose decisions could support *Monell* liability.  Any decisions she made about Detention Center operations could not have the force of the law.  She was not empowered to set County policies concerning major policy issues, such as civil rights and gender equity.  County Council is the only authority with the power to make final policy regarding discrimination and has, in fact, promulgated such a policy:

> **Beaufort County Title VI Policy Statement** ***It is the policy of the County Council of Beaufort County***, South Carolina, hereafter referred to as "Beaufort County" or the "County" to comply with Title VI of the 1964 Civil Rights Act and its related statutes . . . .  To this end, Beaufort County assures that no person shall be excluded from participation in, denied the benefit of, or subjected to discrimination under any of its programs or activities on the basis of race, color, national origin, age, sex, disability, religion, or language regardless of whether programs and activities are Federally funded or not.

(*See* https://www.beaufortcountysc.gov/human-services/civil-rights.html (visited on April 7, 2026 (emphasis added)).

County Council members, County Administrators, and Detention Center officials testified unanimously that the policymaker in Beaufort County was County Council.  Col. Grant was hired to manage the Detention Center's day-to-day operations.  The evidence at trial supported that, as Director of the Detention Center, she was not a final policymaker, but was constrained by County Council and County Administrator.  Former Director of the Detention Center Phil Foot testified:

Q.    Were you still subject to county policies when you were the director?

A.    Yes.  I mean, we would follow HR's policies as far as hiring, firing, financial procurement, payroll, county-wide policies.

Q.    And you didn't make those policies, you followed those policies, correct?

A.    Correct.

Q.    Would that include any antidiscrimination policies that the county had?

A.    Correct.

(*See* Tr. Transc., at 288:6-16).  The only conclusion that can be drawn from the evidence is that,

Col. Grant was the operational head of the Detention Center, but not the County's final policymaker under *Monell* for the policies or practices giving rise to Plaintiffs' constitutional claims.

The Fourth Circuit Court of Appeals recently addressed an analogous situation in *Misjuns v. City of Lynchburg*, 139 F.4th 378, 385 (4th Cir. 2025), concerning the firing of a fire department employee following offensive social media posts attacking transgender individuals. The court rejected plaintiff's argument that the Fire Chief was the ultimate policymaker for the municipality because he had final authority to terminate employees, explaining:

> Caselaw is clear that "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). ***"[T]here is a marked difference between 'the authority to make final policy [and] the authority to make final implementing decisions.'"*** *Hunter v. Town of Mocksville, N.C.,* 897 F.3d 538, 555 (4th Cir. 2018) (*quoting Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro,* 64 F.3d 962, 966 (4th Cir. 1995)). For example, and as is analogous here, the Supreme Court has explained that a "County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy." *Pembaur*, 475 U.S. at 483 n.12. In another case, this Court found that "although a county police chief was authorized to make a final personnel decision, he did not have 'final policymaking authority' that would impute liability . . . to the county." . . . Accordingly, the fact that Wormser had the authority to fire Misjuns, which was pursuant to the City's Employment Policies and Procedures Manual, see J.A. 56, does not mean that he had final policymaking authority.

139 F.4th at 385 (emphasis added); *accord Shaw v. Burlington Cty. Corr.,* No. 1:11-CV-07056(RMB/JS), 2013 U.S. Dist. LEXIS 107817, at *20 (D.N.J. July 31, 2013) ("Plaintiff has failed to adduce evidence that demonstrates that either Warden Cox or Captain Scholtz are policymakers within the ambit of *Monell*, as required."); *Cortlessa v. County of Chester*, No. 04-1039, 2006 U.S. Dist. LEXIS 34513, at *22-23 (E.D. Pa. May 26, 2006) ("The mere fact that [the] Warden . . . as part of his duties, supervised prison officials is, by itself, insufficient to confer 'policymaker' status.").

As the United States Supreme Court has held, it is possible for Col. Grant to have certain

operational powers, without being a final policymaker:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees ***without also being the county official responsible for establishing county employment policy***.  If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability.  Instead, ***if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability***.  This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board.  However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 n.12 (1986) (emphasis added).  Similarly, the

Fourth Circuit held in *Greensboro*:

> Thus, even though Fire Chief Jones may have had final authority to determine whom to promote to captain and also to design the particular procedures to be used, he was not authorized to decide that promotional decisions could be made on the basis of an employee's union activity.  ***The discretion to hire and fire does not necessarily include responsibility for establishing related policy***.  And "it is the municipality's policies, not 'the subordinate's departures from them,' that must underlie [municipal] liability in such instances." *Crowley*, 890 F.2d at 687 (*quoting City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988)).

> In sum, the record demonstrates that ***"final policymaking authority" over employer-employee relations in the City of Greensboro rests only with the City Council and the City Manager***.  The record also shows that the City Manager had adopted an ***official policy of neutrality toward the union activities of city employees***. Thus, appellants cannot establish that the City formally adopted a municipal policy embodying anti-union animus, nor that Fire Chief Jones was authorized to adopt such a policy.

*See Greensboro Prof'l Fire Fighters Ass'n, Local 3157,* 64 F.3d at 966 (emphasis added).

In summary, Plaintiffs' claims are based on unconstitutional sex discrimination, and the

evidence does not support a finding that Col. Grant had ultimate policymaking authority for the

County on sex discrimination, or any equal protection, issues. For this reason, the Court should

4922-6188-8605, v. 4                                    - 16 -

reconsider, alter, or amend its Findings and Conclusions to reflect that Col. Grant was not a final policymaker for Defendant County. It should further amend its Findings and Conclusions to enter judgment in favor of the County.

> **b.** **The Court Erroneously Concluded That Col. Grant Had to Be a Final Policymaker Because County Council Did Not Create Its Own Policy or Exercise Meaningful Review.**

In the Findings and Conclusions, the Court based its determination that Col. Grant was a final policymaker on the absence of a formal County Council strip search policy and the County Administrator not providing "meaningful review" of her decisions:

> Because Beaufort County set no policy to be implemented and did not constrain Director Grant's policy and procedure decisions, Director Grant possessed final policymaking authority for BCDC, and the strip-search policy was adopted pursuant to that authority. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995) (analyzing the Supreme Court's decision in Pembaur to identify difference between "the authority to make final policy [and] the authority to make final implementing decisions.").

> Director Grant's decisions as to the policies and procedures of BCDC were ***not subject to "meaningful review"*** by Beaufort County.

(*See* Docket Entry # 158, at 22 (emphasis added)). The Court concluded that to find Col. Grant was not a final policymaker "would insulate Beaufort County from municipal liability in almost every case concerning detainee treatment at BCDC because Beaufort County has no detainee policies of its own and did not review the policies of Director Grant." (*See* Docket Entry # 158, at 23). For the reasons that follow, the Court's reasons for finding that Col. Grant was a final policymaker are contrary to the evidence and the facts.

> **i.** **Col. Grant's Decisions Were All Subject to the Policies and Review of the County's Actual Final Policymakers.**

The County does not dispute that it has delegated discretion to make operational facility policies to Col. Grant. She has the authority to decide what time lunch is served, methods of booking, and when strip searches occur. She has the authority to create a manual governing the

operation of the Detention Center. She has the authority to authorize memoranda concerning details of Detention Center operation. However, at all times, the official policies of the County and the potential for review and oversight by the County Administrator constrained her discretion in running the Detention Center. The Director of the Detention Center does not have *carte blanche* to do whatever she wishes without limitation. She does not have the power to make official County policy, particularly policy that violated equal protection rights. As a result, her decisions are not sufficient to support municipal liability.

"The mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. *Rather, the delegation must be such that the subordinate's discretionary decisions* are not constrained by official policies and *are not subject to review."* *See Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997) (emphasis in original). At all times, the County exercised potential constraint of Col. Grant through its official policies and other forms of review.

Donald P. Sommerville (former County Council Chair) testified that, had there been a complaint or report of discriminatory conduct at the Detention Center, the County would have investigated and taken appropriate action:

> Q.    And what I asked you wasn't so much the why it was being done, but if you investigated it and you learned that that was what was being done, then you would say, this is differential treatment. Then you might address why it was being done, right?
>
> A.    If I investigated it and found out that there were no the extenuating circumstances, then I would -- I might come to that conclusion. But I don't know whether there were extenuating circumstances. So, I have to be careful to say what I would conclude without knowing what those extenuating circumstances might be.
>
> Q.    Certainly. You'd want to get more answers, right?
>
> A.    Yeah. I mean, I've spent a great deal of my life investigating things, and people told me something was the case, and it turned out it was partially true but not totally true.

4922-6188-8605, v. 4                                                 - 18 -

> Q. Sure. But in this instance, the county council you're saying never became aware of anything that was going on over at the detention center? I think you said: I didn't know what was going on over there, right?
>
> A. Correct.

(*See* Tr. Transc., at 215:16-216:11). However, there is no evidence that a final policymaker ever received any notice of the strip search practice challenged in this lawsuit.

County Council does not have the authority to supervise the Director of the Detention Center; rather, this power is reserved to the County Administrator. Under state statute, "[e]xcept for the purposes of inquiries and investigations, the council shall deal with county officers and employees who are subject to the direction and supervision of the county administrator solely through the administrator, and neither the council nor its members shall give orders or instructions to any such officers or employees." *See* S.C. Code § 4-9-660. As former County Administrator Joshua Gruber testified, "the county administrator under that form of government is a specifically identified statutory position, and that person does possess the sole authority to run the day-to-day operations of that governmental jurisdiction." (*See* Tr. Transc., at 14:1-5). However, there is no evidence that the County Administrator, who alone had the statutory authority to supervise Col. Grant as a County employee, was ever aware that preclass women were being strip searched while preclass men were not.

County Administrators and Council members testified uniformly and without contradiction that they were never aware of complaints about unequal treatment of women or any issues with regard to strip searches at the Detention Center. (*See* Tr. Transc., at 43:11-18, 183:3-184:10, 211:1-6, 212:4-13, 213:18-22, 237:8-21, 238:9-239:20, and 295:6-16). There was no evidence of any complaints, reports, litigation, or other notification to the County Administrator or Council that preclass men and women were being treated differently with regard to strip searches. As a result, the issue never came before the County Administrator for his "review," and County Council had no reason to know about the strip search practice.

The County Administrator did not refuse or fail to act with regard to the strip search

practice at issue.  Rather, he simply never knew about it.  Given the number of employees and departments under the supervision of the County Administrator, it would be unreasonable for the Court to require him to micromanage the detailed operations of every department:

> Q. Let's talk a little bit about the responsibilities of the county administrator. Is it fair to say that the county administrator is the chief administrator officer for the county?
>
> A. Yes.
>
> Q. And the county administrator has supervision over various county departments and officials and employees; is that correct?
>
> A. Yes. . . .
>
> Q. Okay. Approximately -- in 2015, approximately how many employees did you have under you?
>
> A. Over a thousand.
>
> Q. And was that numerous departments under you as well?
>
> A. Well, I've been asked that question a couple times lately. And I've been thinking how many departments did I actually oversee. And then they say it's somewhere between 30 and maybe 45.  I'm not sure of the exact count.
>
> Q. All right. And given that volume of departments within your portfolio, did you have involvement of day-to-day operations of each and every one of those departments?
>
> A. No.
>
> Q. And did you create the internal operating policies and procedures for all those departments?
>
> A. No.
>
> Q. And in your style of serving as an administrator, were you a micromanager of all the departments under your purview?
>
> A. No. My reputation was just the opposite.
>
> Q. Okay. And were you ever involved directly in day-to-day operations of the detention center?

> A.    No.
>
> Q.    And from your observations, was the detention center professionally well run?
>
> A.    I believe it was.

(*See* Tr. Transc., at 148:7-15, 179:22-180:20).  Because the strip search practice was indisputably never brought to the County Administrator's attention, he never had the opportunity to review Col. Grant's decisions.  This does not mean, however, that he was not empowered to do so (or that he would not have done so had it been reported to him).

Importantly, the County Administrator's ignorance of the differential strip search practice at issue is not the result of an indifference to equal protection violations.  The differential strip search practice at the Detention Center was the product of a combination of circumstances, which would have required uncanny insight for someone not intimate with the details of the Detention Center's day-to-day operations to discern.  Even if the County Administrator was involved more closely in the operations of the Detention Center, it is highly unlikely that he would, or even could, discover the challenged strip search practice.  As will be discussed below, no written policy in the policy manual would have disclosed that the Detention Center was strip searching preclass women, but not preclass men.  To the contrary, the August 1, 2019 policy manual states only that: (a) detainees will be strip searched at intake only on reasonable suspicion; (b) detainees in general population will only be strip searched on reasonable suspicion; and (c) detainees will be strip searched when classified from preclass to population.  (*See* Pls.' Tr. Ex. 8 ¶¶ IV.B.(3)-(5)).  No reasonable County Administrator reading this would have any reason to believe that preclass women were being strip searched, while preclass men were not.

The Memorandum that will be discussed below (Plaintiffs' Exhibit 1)—which was not part of the policy manual—likewise does not say, directly or indirectly, that all female preclass detainees would be strip searched.  The Memorandum states only (without reference to gender) that detainees "***moved*** from Pre-Class to other areas of the facility will be strip searched as a matter

of policy." (*See* Pls.' Tr. Ex. 1 (emphasis added)). The plain language of the memorandum could not communicate to a reasonable County Administrator that women going into preclass would be strip searched. Joshua Gruber, former County Attorney and interim County Administrator, confirmed that the manual and memorandum did not communicate that preclass men and women were treated differently:

> [Q.]    So, the operative paragraph of Exhibit 1 -- by the way, which says it's a memo -- says: Effective this date, all inmates being moved from pre-class to other areas of the facility will be strip searched as a matter of policy. Okay.
>
> A.    Yes, sir.
>
> Q.    So, reading that sentence, even if you had full knowledge of Exhibits 7, 8 and 9, would you derive from this that this was calling for females to be strip searched as different circumstances than males were?
>
> A.    No, sir.

(*See* Tr. Transc., at 51:3-12).

Discovering the challenged practice would have required an extraordinary and unrealistic degree of operational insight. In the absence of a female preclass detainee specifically notifying him of the practice, he would have to find numerous clues and piece them together in a non-obvious way. First, he would have to know that all preclass women were being held in area B-1. Then, he would need to know that area B-1 also housed general population women. Next, he would need to know that there was a possibility that preclass and general population could interact with each other in a way that might lead to the passing of contraband. He would next need to discover that—contrary to every written policy in the manual or even the memorandum—the Detention Center was strip searching preclass women *coming into the preclass part of* area B-1. After that, he would need to discover that preclass men were housed in a separate area of the jail, apart from general population. Finally, the County Administrator would need to learn that, because of this convergence of facts, preclass women were being strip searched, but preclass men were not. He

4922-6188-8605, v. 4                                          - 22 -

would have to do this in the context of the hundreds of other things that are simultaneously occurring throughout the Detention Center and in the numerous other departments under his supervision. That would require a level of day-to-day exposure to the Detention Center that a County Administrator supervising over 1,000 employees and 30-45 departments could not reasonably be expected to exercise.

In light of the foregoing, Col. Grant was subject to limitations in the exercise of her discretion in operating the Detention Center. First, formal policies created by County Council, including policies governing human resources and discrimination, limited and constrainer her authority. She was certainly not authorized to do anything that could violate Plaintiffs' equal protection rights. Second, she was statutorily constrained by the County Administrator's oversight, review, and supervision. While the County Administrator was not able to specifically discover the challenged strip search practice, it is undisputed that, if he would have learned about it, he would have had the power to address it. In other words, Col. Grant was not the final policymaker for the County, even with regard to subjects involving the Detention Center.

As a result, the Court erred in concluding in the Findings and Conclusions that municipal liability might apply. It should reconsider, alter, or amend its Findings and Conclusions and enter judgment in favor of the County.

> **ii.     The Authority Cited in the Findings and Conclusions Does Not Support the Conclusion That Col. Grant Was a Final Policymaker.**

The Court relies on *Hunter v. Town of Mocksville*, 897 F.3d 538 (4th Cir. 2018), for its conclusion that that "Director Grant's decisions as to the policies and procedures of BCDC were not subject to 'meaningful review' by Beaufort County." (*See* Docket Entry # 158, at 22). In *Hunter*, three former police officers sued the Town and others, alleging wrongful termination in retaliation for reporting misconduct to the state. The district court granted the Town summary judgment on plaintiffs' First Amendment claims under Section 1983. It based this conclusion on

its determination that the Town Manager and/or Chief were not the Town's final policymakers for the Town for personnel matters (though they were final decisionmakers).  The Fourth Circuit reversed the grant of summary judgment to the Town on this cause of action.

By ordinance, the Town expressly conveyed to a Town Manager extremely broad control over employees: "Town personnel shall be employed by the Town Manager, within the appropriations for that purpose; the terms of the positions shall be at the will of the Town Manager. Fringe benefits shall be as specified from time to time by the Town Manager, subject to the approval of the Board."  The Fourth Circuit noted that this expressly granted the Town Manager absolutely unfettered control over employment issues:

> [U]nder the ordinance's plain language, the Town Board delegated to Bralley, as Town Manager, its statutory authority to set personnel policy for the Town.  In particular, *the ordinance confers on Bralley unconstrained authority to define nearly all terms of employment for Town personnel*, including all matters related to Plaintiffs' hiring, supervision, and discharge.  . . .  Put differently, since it *repealed its pre-existing personnel policies and enacted its current personnel ordinance, the Town Board has granted Bralley carte blanche authority* to make "formal or informal *ad hoc* 'policy' choices or decisions." . . .  Bralley wielded such authority—free of any constraints on her discretion—when she terminated Plaintiffs in violation of the First Amendment.

*See id.*, 897 F.3d at 556-57 (emphasis added) (citation omitted).  The Court held that the Town Manager was the Town's final policymaker for all employment issues:

> To hold otherwise would insulate the Town from liability in virtually every case— a result contrary to the principles underlying Section 1983.  If a municipality, like the Town, could expressly delegate to a municipal official the unfettered authority to make *all* employment decisions (excepting the award of "fringe benefits") without constraining whatsoever the official's exercise of that authority, then that municipality would have the ability to effectuate employment policy without incurring the risk of liability for any unconstitutional policies the official may effect on its behalf.

*See id.*, 897 F.3d at 558.

This case is readily distinguishable from *Hunter*, in that there is no evidence that the County Council ever expressly gave Col. Grant "unconstrained authority to define nearly all terms" related

to the Detention Center.  There is no evidence that the County *expressly gave* Col. Grant "carte blanche authority."  To the contrary, as discussed above, statute Col. Grant was subject to supervision and review by the County Administrator and was constrained by County Council ordinances and policies.  This case is not factually similar to *Hunter.*  Notably, in the more recent case of *Misjuns v. City of Lynchburg*, 139 F.4th 378, 385 (4th Cir. 2025) (discussed above), the Fourth Circuit held that a municipal fire chief was not the final policymaker, even though he had final authority to terminate employees.  The Court cited *Hunter* for the proposition that "there is a marked difference between 'the authority to make final policy [and] the authority to make final implementing decisions.'" 139 F.4th at 385.

The Court also relies on *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987), in its Findings of Fact and Conclusions of Law for the proposition that: "[a] municipal governing body may not avoid attribution of policy to itself simply by officially retaining unexercised ultimate authority to countermand a policy or to discipline or discharge the policymaker."[14]  In *Spell*, plaintiff filed a Section 1983 suit against a city and a police officer, alleging an assault by the officer while in custody.  The trial court entered judgment in favor of plaintiff following trial. On appeal, plaintiff argued, *inter* alia, the jury instructions improperly submitted the issue of municipal liability.  The Fourth Circuit affirmed, finding sufficient evidence to submit the city's liability to the jury and that the trial court properly instructed the jury on municipal liability.  Specifically, the court found that the evidence "was sufficient to support the jury verdict imposing municipal liability on either deficient training policy or condoned custom or usage theories."  *See id.*, 824 F.2d at 1391.  Thus, the Court concluded:

> Assuming the credibility of the most critical oral testimony adduced by plaintiff
> and assessing the total evidence in its most favorable light, there emerged a picture

---

[14] Notably, the case the Fourth Circuit relied on in *Spell* for this proposition asserted it only in *dicta.  See Bowen v. Watkins*, 669 F.2d 979, 989 (5th Cir. 1982) ("The question of municipal liability too the trial court found unnecessary to resolve, and ***we need not decide it now***, although we offer some guidance to the trial court in case it arises on remand.") (emphasis added).

of a police department whose members were either positively encouraged by training and deliberate cover-up to engage in uses of excessive force of the very type charged to McDaniel; or were tacitly encouraged to continue self-developed practices of this type by the deliberate failure of responsible municipal officials to exercise  discipline or corrective supervision to halt the widespread, ***known*** practices; or were encouraged or authorized by both in combination.  . . .

It was conceded that Dixon as Police Chief was formally subject in all of this to the ultimate authority of the City Manager, and of course to the City's governing body. But there was no evidence that either of these ever sought before the date of Spell's injury effectively to curb or correct the way in which Dixon, aided by his command level subordinates, was in fact exercising his formal authority to train and supervise members of the police department as a critical aspect of his general authority to "direct[] the full activities of the Police Department."

*See id.*, 824 F.2d at 1392-94 (emphasis added).  As discussed above, there is no evidence that County Council or the County Administrator knew of the strip search practice with regard to preclass women or that they could reasonably have been expected to know of it.  Therefore, actual County policymakers did not have the opportunity to meaningfully review that practice.  The evidence simply does not support that the County voluntarily and knowingly decided to disregard the allegedly unconstitutional practice.

For the foregoing reasons, the key authority cited in the Findings and Conclusions does not support that Col. Grant was a final policymaker.

**2.      The Court Should Reconsider, Alter, or Amend Its Findings and Conclusions Because the Strip Searches at Issue Were Not Pursuant to a Written Policy of the Detention Center.**

In its Findings and Conclusions, the Court determined that the strip searches forming the basis for Plaintiffs' claims were conducted because a written policy required them:

45.      On February 27, 2015, Director Grant authorized the issuance of a memorandum to all BCDC staff members that stated: "Effective this date all inmates being moved for Pre-Class to other areas of the facility will be strip searched as a matter of policy."  Pl. Ex. 1 (the "strip-search policy); see Tr. 133:16–19. . . .

49.      The strip-search policy only affected female pre-class detainees at BCDC. Tr. 99:13–15.  Because all female detainees were housed in Unit B-1, they were not moved to a different area of the facility, and therefore all female detainees at BCDC

were strip-searched at booking.  ***Further, the strip-search policy required that all female pre-class detainees to be strip-searched*** independent of whether there was reasonable suspicion that they were in possession of an item of contraband, unlike male detainees.  Tr. 106:2–108:2.

(*See* Docket Entry # 158, at 13-14 ¶¶ 45, 49 (emphasis added)).  For the reasons that follow, the evidence does not support the Court's finding that a written policy (or memorandum) required that all preclass women be strip searched.  Moreover, there is no evidence showing how the decision to engage in the *ad hoc* practice was made or communicated to employees of the Detention Center.

Initially, more than three years ago, the Court concluded and observed that Plaintiff's claims are not based on a policy set forth in a written memorandum, but on an unwritten practice. In its Order denying Defendants' motions for summary judgment, the Court wrote:

On February 27, 2015, BCDC adopted a policy (the "policy") that all inmates moved from pre-classification to other areas of BCDC, including general population, would be strip searched.  See ECF No. 31-4 at 2.  ***However, BCDC's practice (the "practice") has been to house female pre-classification inmates in general population while placing male pre-classification inmates in a separate pre-classification cell outside of general population***.  ECF No. 31-3 at 14, Black Dep. 24:2–20.  Because female pre-classification inmates are housed in general population from the outset, ***the practice resulted in BCDC*** conducting a strip search on every female pre-classification detainee awaiting a bond hearing.  ECF No. 40-1 ¶ 6.  BCDC, however, did not do so for similarly situated male pre-classification detainees prior to May 5, 2020, because they were housed in a separate pre-classification cell outside of general population.

(*See* Docket Entry # 82, at 2 (emphasis added).  The Court further noted that "plaintiffs challenge BCDC's ***practice, not its policy applying to all inmates*** 'being moved from Pre-Class to other areas of the facility.'"  (*See id.*, at 10 (emphasis added)).

Additionally, the Court's Conclusion is contrary to the plain language of the Detention Center's written policy manual.  That manual expressly addresses strip searches in three scenarios. As to strip searches on intake, which seem to be the searches at issue, the policy manual only permits searches upon reasonable suspicion:

3. **Arrestee Strip Searches at Intake:**

a. A strip search of an arrestee at Intake shall only be conducted when there is reasonable suspicion that he/she may be in possession of an item of contraband. Normally, only frisk searches on newly admitted inmates will be done. If contraband/evidence is recovered, follow Procedure VI in this Policy for preservation of evidence. An Incident Report will be completed with the results of the search even if no contraband is found.

(*See* Pls.' Tr. Ex. 8 ¶ IV.B.(3)).  Similarly, with regard to detainees classified and held in general population, the policy manual states: Strip Search Request Form, even if no contraband is found.

4. **Inmate Strip Searches (for Inmates already classified in population):**

a. A strip search of general population inmates is only conducted when there is reasonable suspicion that the inmate may be in possession of an item of contraband.

(*See* Pls.' Tr. Ex. 8 ¶ IV.B.(4)).  On the other hand, with regard to detainees who have been classified from preclass, the manual provides that all such detainees (irrespective of sex) *will* be strip searched when moved out of preclass:

5. **Strip Searches of Inmates Once Classified to Population:**

Once an inmate has been classified from Pre-Classification status to population by the Classification section:

a. The Classification Officer will escort the inmate to Intake for the actual search, assisted by the on-duty Shift Officer, and change of uniform.  (See BCDC 5.14, #6, *Procedures for Strip Searches*)

b. Once searched, the inmate will not return to the Pre-Classification unit and will be moved to the proper housing unit for placement.  The strip search will be annotated on the inmate's classification sheet along with the names of the officers conducting the search.

(*See* Pls.' Tr. Ex. 8 ¶ IV.B.(5)).[15]

---

[15] This is the policy manual provision apparently codifying the Memorandum.

However, none of these provisions of the Detention Center policy manual authorizes or requires the strip searches at issue. In fact, nothing in the policy manual addresses the challenged strip searches, *i.e.,* where detainees are searched ***before going to preclass*** because of its proximity to general population. If all preclass women were strip searched, it was not because of anything stated in the Detention Center's manual.

Moreover, the February 27, 2015 intra-office memorandum from Deputy Director C.E. Allen ("Memorandum") (Plaintiffs' Exhibit 1) stated, among other things, that "all inmates being *moved from Pre-Class* to other areas of the facility will be strip searched as a matter of policy" (emphasis added):

Sub: Strip Search of all Inmates leaving Pre-Class

1. Effective this date all inmates being moved from Pre-Class to other areas of the facility will be strip searched as a matter of policy.

2. The Pre-Class officer assisted by other members of the shift will strip search all inmates that are being moved by Classifications to other areas of the facility, as part of the process of changing uniforms.

3. Inmates being assigned to Maximum Security or Super Max Security will be strip searched in the B-Wing as part of them changing uniforms.

4. Officers will ensure that all the linen, and personal property are also searched as part of this process.

5. Questions or clarification contact me ASAP.

(*See* Pl.'s Tr. Ex. 1). The Court's Findings of Fact and Conclusions of Law refer to this Memorandum as the "strip search policy." (*See* Docket Entry # 158, at 12).

The Memorandum *only* requires strip searches for detainees (emphasis added) "*moved from Pre-Class to other areas.*" In other words, it applies to detainees who *leave preclass*. The Memorandum does not authorize or permit searches when detainees *enter or remain in* preclass. It does not encompass what later became an informal practice. Further, the Memorandum does not reference gender or state that similarly-situated men and women should be treated differently.

Contrary to the Findings and Conclusions, the terms of the Memorandum did not require that the Detention Center strip search booked preclass women, because those detainees were not

being "*moved from Pre-Class* to other areas of the facility."  Plaintiffs were strip searched *before arriving at preclass,* because they would be housed in Unit B-1, which also housed general population women.  Detention Center Director Col. Grant testified that the Memorandum did not expressly apply to preclass women:

> Q.     Now, I noticed all these other exhibits have numbers, all these policies of 5.03, 5 -- they're all signed by you, but this one is not.  This one is not signed by you and it's not numbered as a policy.  And it's titled: Memo.  What's the difference between a memo and a policy?
>
> A.     This is like a memorandum in addition to the policy, and it kind of supersedes what we were doing before.
>
> Q.     Okay. So, it would describe a practice or an interpretation of the policy?
>
> A.     Yes.
>
> Q.     Okay.  And it says:  Effective this date, all inmates being moved from pre-class to other areas of the facility will be strip searched as a matter of policy.
>
> Now, if you read that literally, the women aren't moved from pre-class into other areas, they're in the general population area right from the beginning; isn't that right?
>
> A.     Correct.
>
> Q.     Okay.  So, if you really read this, you know, just for plain English, you wouldn't really see that it refers to females being strip searched, correct?
>
> A.     Yes.

(*See* Tr. Transc., at 135:13-136:8).

The unwritten practice at the Detention Center ultimately became that, before being sent to Unit B-1 from intake, preclass women were strip searched.  Plaintiffs presented no evidence that County Council or the County Administrator had any role in creating, authorizing, approving, or encouraging that practice.  Moreover, there is no evidence that County Council or the County Administrator had actual or constructive knowledge of the practice.  Despite hours of trial testimony and dozens of exhibits, Plaintiffs presented no evidence detailing the creation of an

informal practice, other than testimony that it existed. There is no evidence of when Col. Grant made the "decision" to strip search women going into preclass or how that decision was memorialized or conveyed to her subordinates. There is no testimony about the scope of the practice.

The Court's finding that the strip searching of all preclass women was the product of a the language of Plaintiffs' Exhibit 1 is contrary to the plain language of the Memorandum. As a result, the Court should alter or amend the Findings and Conclusions to remove this error and correct any legal conclusions it based upon that error.

**3.      Contrary to the Court's Findings, the South Carolina Department of Corrections Inspection Reports Did Not State That the County Was Improperly Housing Preclass Female Detainees with General Population.**

The Court's Findings of Fact and Conclusions of Law also state that "[f]rom 2005 to 2021, SCDOC reported that BCDC failed to comply with the SC Minimum Standards because it was improperly housing pre-class female detainees with general population." (*See* Docket Entry # 158, at 10 ¶ 36). The Findings and Conclusions further state that during that time period "SCDOC reported to Beaufort County that BCDC failed to comply with the SC Minimum Standards for housing pre-class females." (*See id.*, at 22-23). These findings and any legal conclusions that the Court based upon them are contrary to the plain language of the SCDOC reports.

The SCDOC reports state that "[t]he facility is housing both sentenced and pretrial female inmates in the same living unit." (*See* Pls.' Tr. Ex. 63; *see also* Pls.' Tr. Exs. 64-67). Those reports did not state that the housing of preclass women with general population women violated governing standards. Instead, the reports took issue with the housing of pretrial and sentenced females together. Pretrial is not synonymous with preclass. While preclass detainees are included in the definition of pretrial, that term also encompasses women who are in general population awaiting trial.

Col. Grant confirmed that SCDOC's complaint was not that preclass women were housed

in general population.    Rather, SCDOC contended that the Detention Center should house *sentenced* inmates (those found guilty of a crime and sentenced to a punishment) separate from detainees (general population, preclass, or otherwise) who had not yet been convicted:

Q.    . . . Isn't it true that even after a prisoner is classified, they can still be pretrial, right?

A.    Yes.

Q.    So, they're classified well before they go to trial?

A.    Yes. . . .

Q.    So, would you agree with me that when they say that both sentenced and pretrial female inmates shouldn't be in the same living unit, that's not the same as saying that pre-classification female prisoners shouldn't be housed with classified female prisoners?

A.    Correct.

Q.    Those are two different things, aren't they?

A.    Yes.

(*See* Tr. Transc., at 292:6-20).    The evidence does not support Plaintiffs' contention that the SCDOC reports expressed any views about how the Detention Center was specifically treating preclass detainees (particularly women), let alone how they were being strip searched.

In any event, there is no evidence that the SCDOC ever took any action against the County with regard to the housing of preclass women or the strip searching practices applicable to preclass women.  South Carolina statute authorizes SCDOC to inspect county detention centers and to take steps in the event a county fails to remedy deficiencies. *See* S.C. Code § 24-9-30(A)-(B).  There is no evidence that the SCDOC ever took any steps against the County with regard to any of the deficiencies noted in its inspections.  It particularly never took action with regard to the County's treatment of preclass women.  This further undermines the relevance of the SCDOC reports.

For these reasons, the relevant inspection reports do not support the Court's finding that the

SCDOC reported to the County Administrator that the Detention Center was improperly housing preclass female detainees with general population. The Court should correct its Findings and Conclusions to remove this factual finding and to amend its conclusions of law, which erroneously rely upon this finding.

**C.     If the Court Does Not Enter Judgment in Favor of the County, It Should Allow for an Immediate Appeal and Stay This Case Pending Appeal.**

If the Court denies the relief requested above and does not enter judgment for Defendant County, Defendant respectfully requests that the Court include in its Findings and Conclusions and/or order denying summary judgment the language required for immediate appeal. Under federal law, in order for an otherwise unappealable order to be immediately appealable, the Court must include certain language in the order:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

*See* 28 U.S.C. § 1292(b). For the reasons that follow, if it does not grant the relief requested above, the Court should amend the Findings and Conclusion or order denying the summary judgment requested herein to include the language required to permit Defendant County to pursue an immediate appeal.

First, there are (or will be) questions of law appropriate for immediate review in connection with the Findings and Conclusions and this Motion. In Section B.1, *supra*, Defendant County argues that the Court should either reconsider, alter, or amend the Findings and Conclusions to grant judgment to Defendants or grant summary judgment to the County. This is based on a pure legal issue: whether the entry of summary judgment for Col. Grant on qualified immunity forecloses Plaintiffs from succeeding on a municipal liability claim premised on the Court's conclusion that Col. Grant is a final County policymaker. As set forth above, there is substantial

compelling authority supporting that, as a matter of law, a municipal liability claim is foreclosed in this case. This does not involve any factual inquiry or determination; it is a legal question created by the Court's Findings and Conclusions. Therefore, if the Court is not inclined to enter judgment in the County's favor on that basis, it should (either in an amendment to the Findings and Conclusions or in the order denying the motion for summary judgment herein) include the language 28 U.S.C. § 1292(b) requires.

This question of law is undoubtedly controlling. "A question of law is generally considered to be controlling within the meaning of § 1292(b) if the action would have been terminated had the district court ruled the opposite way." *City of Charleston v. Hotels.Com, LP*, 586 F. Supp. 2d 538, 542 (D.S.C. 2008). If the Court agrees with the County, it will be dispositive of this case.

Finally, there may be a substantial ground for disagreement as to this legal question. Defendant anticipates that Plaintiffs' skilled counsel will contend that the law cited above should not apply and that the granting of summary judgment to Col. Grant does not doom their municipal claims against the County. Defendant County believes strongly that the law mandates dismissal of the claims against it. If the Court does not enter judgment in favor of the County, it will be because reasonable legal minds differ on this legal question. "A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution." *U.S. ex rel. Outlaw v. Compassionate Care Hospice Group, Inc.*, C/A No.: 3:18-0914-JFA, 2019 WL 10893998, at *1 (D.S.C. Nov. 8, 2019) (*citing In Re Trump*, 926 F.3d 360, 371 (4th Cir. 2019)).

Moreover, an immediate appeal would advance the resolution of this case. If the case proceeds to trial, it will be stressful for the parties. Such a trial would also be complex, costly, and difficult for the Court to conduct. If Plaintiffs are successful in their claims and their damages arguments, it could result in a large verdict that could be harmful to the County. In the event of such a verdict, the County will undoubtedly appeal. Such an appeal will be costly for all involved and far more complex than an appeal on this limited, precise issue. If the County is correct, this

simpler appeal will obviate the need for a difficult trial. An immediate appeal, limited to this issue, may materially advance the termination of this long and hard fought litigation.

For these reasons, the statutory bases for immediate appeal are all present. "When a district court determines that the statutory criteria are present, . . . it has a '*duty* . . . to allow an immediate appeal to be taken.'" *In re Trump*, 928 F.3d 360, 369 (4th Cir. 2019) (*quoting Ahrenholz v. Board of Trustees*, 219 F.3d 674, 677 (7th Cir. 2000) (emphasis added)). Therefore, the Court should amend its Findings and Conclusions to include (or include in an order denying summary judgment) language stating that the issue argued in Section B, *supra*, involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal on that ground may materially advance the termination of this case.

## CONCLUSION

The Court's Findings and Conclusions recognize potentially municipal liability that is incompatible with its prior qualified immunity ruling, unsupported by South Carolina law, and predicated on clearly erroneous factual findings. Accordingly, the Court should amend or vacate its prior order and enter judgment for Beaufort County. In the alternative, the Court should certify the controlling legal question for immediate appeal pursuant to 28 U.S.C. § 1292(b).

BARNWELL, WHALEY, PATTERSON, AND HELMS, LLC

By: s/ John W. Fletcher
M. Dawes Cooke, Jr., Esq.
John W. Fletcher, Esq.
P.O. Drawer H (29402)
211 King Street, Suite 300
Charleston, SC  29401
(843) 577-7700
*Counsel for Defendant Beaufort County*

Dated: April 28, 2026
Charleston, South Carolina